# IN THE UNITED STATES DISTRICT COURT FOR
# THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| **UNITED STATES** | : | |
| | : | |
| | : | |
| v. | : | **Case No. PJM-22-0209** |
| | : | |
| **NICHOLAS ROSKE** | : | |
| | : | |
| **Defendant** | : | |

## SUPPLEMENTAL MOTION TO SUPPRESS STATEMENTS

Nicholas Roske, through undersigned counsel, hereby supplements his Motion to Suppress Statements (ECF No. 17).

## INTRODUCTION

On June 8, 2022, Mr. Roske called 911 and said he was having suicidal and homicidal thoughts and that he needed psychiatric help. He remained on the line with a dispatcher, answering his questions and following his instructions, until multiple police officers arrived. Mr. Roske complied with the officers' commands and was arrested without incident.

On the scene of his arrest, and without advising Mr. Roske of his *Miranda* rights, a Montgomery County police officer interrogated Mr. Roske. These statements must be suppressed as they were taken in violation of Mr. Roske's Fifth Amendment rights.

Subsequent to his arrest, officers took Mr. Roske to an interrogation room at a police precinct, where he was questioned first by a Montgomery County detective and then, hours later, by federal agents. The Montgomery County detective advised Mr. Roske of his rights, but did not obtain a valid waiver of these rights. And while federal agents advised Mr. Roske of his rights and obtained his signature on a rights-waiver form, this waiver was not made voluntarily and intelligently. At the time, Mr. Roske was acutely suicidal, visibly exhausted, and had repeatedly

1

expressed his need for psychiatric care. Because these latter statements were not preceded by valid *Miranda* waivers, they too must be suppressed.

I.   **Factual Background**

   A. **Nicholas Roske called 911 and said he needed psychiatric help.**

At 1:39am on June 8, 2022, Montgomery County 911 Dispatch received a call from a Nicholas Roske stating he was having thoughts of harming himself or others.[1][2] Mr. Roske stated he had flown from California with an unloaded firearm that was locked in a case and that the case was inside a zip-tied shut suitcase. *Id.* at 2-3. He added that he had a backpack that did not contain any weapons. *Id.* at 3. When asked if he needed medical attention, Mr. Roske stated he needed "psychiatric help." *Id.* at 3.

The dispatcher instructed Mr. Roske on how to act when the officers arrived, including by placing the suitcase and backpack away from where he was standing and making sure he had nothing in his possession except his clothing and cell phone. *Id.* at 3-7. At one point Mr. Roske asked if he should move further away from his bags. *Id.* at 4. When the dispatcher said he should, Mr. Roske stated he had done so and moved "about 20 yards away from the suitcase [ ]." *Id.* at 5.

While Mr. Roske sat on the curb waiting for emergency responders to arrive, he continued to answer all the dispatcher's questions. *Id.* at 5-6. When the dispatcher asked "Okay. And why where you coming [to Justice Brett Kavanaugh's house]? Just to hurt yourself and him or what was going to be the plan?", Mr. Roske responded "Correct." *Id.* at 6. The dispatcher told Mr. Roske, "Now, I understand you said that you need psychiatric help and, again, they are going

---

[1] Motion to Suppress Warrantless Search and Seizure, Exhibit A at 2, and Exhibit B.
[2] Mr. Roske made a very brief initial call to 911, hung up before providing any information, and called right back. This call is not included as an exhibit.

to come and help you, okay." *Id.* at 8. Mr. Roske said that he had "been hospitalized multiple times" and that he had thought of harming himself before. *Id.* at 9,

### B. Montgomery County Police officers arrived and detained a compliant Mr. Roske.

As Mr. Roske stated he saw police coming, the dispatcher reminded him the importance of following the officers' commands. *Id.* at 11. Several Montgomery County police officers were dispatched to the area, including Officer L.C. An officer instructed Mr. Roske to put down his phone, stand up, and turn around.[3] Mr. Roske complied. As officers approached, they could see that Mr. Roske had followed the dispatcher's instructions and moved away from his bags.

The responding officers then ordered Mr. Roske to lay down on the ground with his arms and legs "far apart". *Id.* at 1:53. Mr. Roske complied with the officer's command. After being placed in handcuffs and moved into a seated position, Mr. Roske continued to be cooperative with officers' questions and directives. *Id.* at 1:54 -1:55. Officers asked him where his bag was; Mr. Roske replied it was "down the street on the left it should be pretty obvious." *Id.* at 1:54. An officer asked Mr. Roske, "How'd you get up here, Nicholas?" to which Mr. Roske responded, "I flew." *Id.*

### C. Officer L.C. interrogated Mr. Roske without advising him of his *Miranda* rights.

The officers then helped Mr. Roske to his feet and escorted him towards several police cars. *Id.* at 1:55-1:57. An officer searched Mr. Roske's pockets, then placed him in the front seat of a police vehicle, *id.* at 1:57-1:59. Without advising Mr. Roske of his *Miranda* rights, Officer L.C. proceeded to question him. Exhibit A, Officer L.C. Body Worn Camera Footage at 1:57-2:04; Exhibit B, Transcript Officer L.C. Body Worn Camera Footage at 6. Officer L.C. asked Mr. Roske for his name, address, and contact information, before asking "So, what's going on here?"

---

[3] Motion to Suppress Warrantless Search and Seizure, Exhibit C at 1:52-1:55.

*Id.* at 2:00. Mr. Roske explained that he had been mentally ill throughout his adulthood, and that he was "thinking about killing Brett Kavanaugh and then killing myself." Exhibit A, Officer L.C. BWC at 2:01; Exhibit B, Transcript Officer L.C. BWC at 8. Mr. Roske added that he texted his sister that he loved her, that she called him and told him not to do it, and that he then called 911. *Id.*

Officer L.C. asked Mr. Roske what was in his suitcase, and Mr. Roske gave a detailed answer. Exhibit A at 2:01; Exhibit B at 9. Officer L.C. asked Mr. Roske whether he had an explosive in the suitcase, and Mr. Roske said no. Officer L.C. asked Mr. Roske to go over, again in detail, everything he had in the suitcase, and Mr. Roske did. Exhibit A at 2:02:42-2:03:36; Exhibit B at 10-11. Several minutes into the interrogation, at 2:03 a.m., Officer L.C. advised Mr. Roske that he was being recorded by the body camera and the in-vehicle camera. Exhibit A at 2:03:45; Exhibit B at 11-12.

Officer L.C. left Mr. Roske in the car for approximately one minute as he walked around the car, turned off his body worn camera, spoke briefly to another officer, then entered the driver's seat of the police vehicle. At that point, Officer L.C. turned on his camera again. Exhibit C, Officer L.C. BWC 2; Exhibit D, Transcript Officer L.C. BWC 2. Officer L.C. asked Mr. Roske for his sister's contact information and details about the conversation they had before Mr. Roske called 911, and Mr. Roske answered. Exhibit C at 2:06:35-02:07:35; Exhibit D at 2-3. Officer L.C. then got out of the vehicle and called and spoke to Mr. Roske's sister. Officer L.C. got back in the car and continued questioning Mr. Roske about his mental health history. Exhibit C at 2:12; Exhibit D at 5.

**D. Mr. Roske was interrogated by local and federal law enforcement.**

Mr. Roske was transported to the Montgomery County Police Department Second District precinct in Bethesda to be interviewed. He was first interviewed by Montgomery County

4

Police Detective M.D. between approximately 4:00 a.m. and 6:30 a.m. Exhibit E, Recorded Interview Footage 1; Exhibit G, Transcript Recorded Interview at 2-36. At the beginning of the interview, Detective M.D. asked Mr. Roske if he had any physical conditions, and Mr. Roske replied that he had a condition that was triggered by not taking his medication and not getting enough sleep. Exhibit F at 4:25:54; Exhibit G at 2. Mr. Roske explained that his medication was in his backpack and that he should take his medication. Detective M.D. said that he would "have our medical people come" to give the medication. Exhibit G at 3-4.

Then, Detective M.D. read Mr. Roske his rights and asked, "Do you understand what I've just said?" Exhibit E at 4:27; Exhibit G at 4-5.[4] After Mr. Roske replied "Yes," and Detective M.D. confirmed that Mr. Roske could read and write English, the detective said, "I need you to initial those, just stating that you've been advised. And then I need you to sign here saying that you understand. So where are you from in California." Exhibit G at 5. The detective then resumed questioning. Partway through the interview, EMTs entered the room to assist with administering Mr. Roske's prescription medications, which he had not taken since the prior morning. Exhibit E at 4:49 – 4:57; Exhibit G at 18-24. Towards the end of the interview, Mr. Roske asked, "am I going to the hospital or am I going to prison?" Exhibit G at 27. Detective M.D. responded,

> At this moment, I'm not sure. I'm not sure. You're under arrest and I'm not sure what you're going to be charged with exactly. But, you know, given that you have all your issues and your medical condition and everything else, you know, definitely we're going to make sure that you get to the appropriate to be taken care of. And that it's going to – whatever charges that are placed by you will have to run its course, okay. But at the moment, you know, we just want to make sure that your health and safety is foremost.

*Id.* at 27.

---

[4] The defense does not have a copy of this form.

Between approximately 9:50 a.m. and 11:35 a.m., Mr. Roske was interviewed by FBI Special Agents I.M. and M.H. Exhibit F, Recorded Interview Footage 2; Exhibit G at 36-68. Agent I.M. told Mr. Roske,

> I'm going to go through some stuff really quickly. It's very similar to what you covered with Mark earlier, and then we just have some questions. We'll try and, you know, you've been through a lot. You've probably been up for a while now. I understand that, so I just want to go through this really quickly and then we can hopefully get out of your hair.

Exhibit F at 9:53; Exhibit G at 39. Agent I.M. then advised Mr. Roske of his Miranda rights and had him sign a form. Exhibit F at 9:53; Exhibit H, FBI Advice of Rights Form. While Agent I.M. was reading the rights, Mr. Roske's head was on the table.



When Agent I.M. asked Mr. Roske to sign the document, he lifted his head and quickly signed before putting his head back down on the table.

6





During both interviews, Mr. Roske provided detailed answers to the agents' questions. He also expounded on his mental health history, particularly his past and present suicidality.

## II.     Argument

Mr. Roske made multiple statements to law enforcement after his arrest on June 8, 2022, first to officers at the scene of the arrest, and later to a detective and federal agents in an

7

interrogation room. Each statement was obtained in violation of Mr. Roske's rights under the Fifth Amendment to the United States Constitution.

The Court should suppress the statements Mr. Roske made to officers at the scene of his arrest. Mr. Roske was in custody at the time, and his statements were made in response to interrogation. Because Mr. Roske was not provided *Miranda* warnings before questioning, these statements are inadmissible at trial.

The Court should also suppress the statements Mr. Roske made to a detective and federal agents during his post-arrest custodial interrogations. While agents provided Mr. Roske *Miranda* warnings prior to each round of questioning, they did not obtain valid waivers of these rights, rendering the statements inadmissible.

### A. The Court should suppress the statements made on-scene because they resulted from a *Miranda* violation.

Officers interrogated Mr. Roske while he was in custody on the scene of his arrest without advising him of his *Miranda* rights. As a result, these statements are inadmissible.

Statements made during a custodial interrogation are admissible only if the government establishes that law enforcement officers both (1) adequately informed the defendant of his *Miranda* rights[5] and (2) obtained a knowing and voluntary waiver of those rights. *Miranda v. Arizona*, 384 U.S. 436, 467 (1966). An individual is "in custody" for purposes of *Miranda* if, considering the totality of circumstances, "a reasonable person [would] have felt he or she was not at liberty to terminate the interrogation and leave." *United States v. Hashime*, 734 F.3d 278, 283 (4th Cir. 2013) (internal quotations and citation omitted; alteration in original). Relevant

---

[5] A valid *Miranda* warning includes a warning that the defendant has the "right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed.'" *Stansbury v. California*, 511 U.S. 318, 322 (1994) (quoting *Miranda*, 384 U.S. at 444).

factors to this analysis include, but are not limited to, "the time, place and purpose of the encounter, the words used by the officer, the officer's tone of voice and general demeanor, the presence of multiple officers, the potential display of a weapon by an officer, and whether there was any physical contact between the officer and the defendant." *Id.* (internal quotation marks and citations omitted). "Interrogation" refers to "express questioning" as well as "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v. Inniss,* 446 U.S. 291, 301 (1980).

Here, it is indisputable that Mr. Roske was in custody at the time Officer L.C. interrogated him. He had been approached by numerous officers at gunpoint, handcuffed, and physically placed in a police vehicle. And while Officer L.C. began with what are arguably routine booking questions—asking Mr. Roske for his name, date of birth, and address—he quickly transitioned into express questioning, asking "So what's going on here?" and "Okay. And what's that purpose you're trying to do today?" Exhibit B at 8.

Because officers did not advise Mr. Roske of his *Miranda* rights prior to interrogating him on scene, these statements are inadmissible.

**B. The Court should suppress the statements made at the police station because Mr. Roske's *Miranda* waivers were not valid.**

The Court should suppress the statements Mr. Roske made to detective M.D. and federal agents at the police station because law enforcement did not obtain a valid waiver of *Miranda* rights.

A statement made during a custodial interrogation is "inadmissible at trial unless the prosecution can establish that the accused in fact knowingly and voluntarily waived *[Miranda]* rights when making the statements." *Berghuis v. Thompkins,* 560 U.S. 370, 382 (2010) (internal quotations and citation omitted; alteration in original). To be valid, the "waiver must be

voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception, and made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Id.* (internal quotations and citation omitted).

After Mr. Roske was subjected to an un-*Mirandized* interrogation by Officer L.C. at the scene of the arrest, he was interrogated by Detective M.D. between approximately 4:00 a.m. and 6:30 a.m. Mr. Roske was asked to repeat what he had already told Officer L.C. And while Detective M.D. advised Mr. Roske of his *Miranda* rights, he did not obtain a valid waiver of those rights.

Approximately three hours later, between 9:50 a.m. and 11:35 a.m., Mr. Roske was interviewed by FBI Special Agents I.M. and M.H. The agents advised Mr. Roske of rights from the FBI's advice of rights form. They did not ask him, verbally, if he waived his rights or was willing to speak to them. Rather, they instructed him to sign the form, which contains a consent statement.

**CONSENT**

I have read this statement of my rights and I understand what my rights are. At this time, I am willing to answer questions without a lawyer present.

Signed _[signature]_

Excerpt from Exhibit H

When Mr. Roske signed this form, he did not knowingly and voluntarily waive his rights. It is clear from the video that Mr. Roske scarcely glanced at the document before signing where indicated. He was acutely suicidal, visibly exhausted, and had for hours been expressing his need for psychiatric care, which he had not received, despite the officers' assurances that help would

10

be provided. He had already given multiple detailed incriminating statements to other officers, some of which did not provide him with *Miranda* warnings. He did not exhibit, through words or demeanor, that he comprehended his rights or that he was voluntarily relinquishing them.

Because no valid *Miranda* waiver was obtained, these statements too must be suppressed.

**CONCLUSION**

For these reasons, Mr. Roske moves to suppress the statements he made subsequent to his arrest.

Respectfully submitted,
James Wyda
Federal Public Defender
 for the District of Maryland

\_\_\_/s/_____
Andrew R. Szekely (#16407)
Ellie C. Marranzini (#817525)
Assistant Federal Public Defender
100 South Charles Street
Tower II, 9th Floor
Baltimore, Maryland 21201
Phone: (410) 962-3962
Fax: (410) 962-0872
Email: andrew_szekely@fd.org
Email: ellie_marranzini@fd.org

# Exhibits

Exhibit A – Officer L.C. Body Worn Camera Footage 0147

Exhibit B – Transcript, Officer L.C. Body Worn Camera Footage 0147

Exhibit C – Officer L.C. Body Worn Camera Footage 0206

Exhibit D – Transcript, Officer L.C. Body Worn Camera Footage 0206

Exhibit E – Recorded Interview Footage 1

Exhibit F – Recorded Interview Footage 2

Exhibit G – Transcript, Recorded Interviews

Exhibit H – FBI Advice of Rights Form