**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | |
| | * | |
| v. | * | **CRIMINAL NO. DLB-22-209** |
| | * | |
| **NICHOLAS JOHN ROSKE,** | * | |
| | * | |
| **Defendant** | * | |
| | * | |

\*\*\*\*\*\*\*

**GOVERNMENT'S OMNIBUS RESPONSE IN OPPOSITION TO DEFENDANT'S
MOTIONS TO SUPPRESS STATEMENTS AND EVIDENCE**

**TABLE OF CONTENTS**

I.    **INTRODUCTION** ................................................................................................ 3

II.   **FACTUAL BACKGROUND** .......................................................................... 4

III. **MOTION TO SUPPRESS STATEMENTS** ................................................. 27

    A. Legal Background ............................................................................................ 27

        1.   Exceptions to *Miranda* ........................................................................ 27

        2.   Waiver of *Miranda* ............................................................................ 29

    B. Roske's Initial Statements in the Neighborhood Fall Under the Officer/Public Safety and Booking Exceptions to *Miranda* .............................................................. 31

    C. Roske's Statements in the Neighborhood Were Also to Questions Not Designed to Elicit Incriminatory Admissions ......................................................................... 37

    D. Roske Gave a Knowing, Intelligent, and Voluntary *Miranda* Waiver ...................... 39

IV. **MOTION TO SUPPRESS EVIDENCE** ........................................................ 47

    A. Pressing, Exigent Circumstances Rendered Any Search Objectively Reasonable ..... 48

    B. The Plain View Exception Applied, and the Baggage's Contents Were a Foregone Conclusion ...................................................................................................... 52

    C. There Was No Reasonable Expectation of Privacy Where Roske Volunteered the Contents of the Baggage and Abandoned Them ..................................................... 55

    D. An Inventory Search Would Have Been Performed and the Evidence Inevitably Discovered ....................................................................................................... 58

V.    **CONCLUSION** .............................................................................................. 60

## EXHIBIT TABLE OF CONTENTS

**Exhibit 1 –** Computer Aided Dispatch Transcript

**Exhibit 2** – Maryland Petition for Emergency Evaluation

**Exhibit 3** – Photographs

**Exhibit 4** – Officer L.C. Cruiser Camera **(Filed Under Seal)** (provided on CD)

**Exhibit 5** – Officer L.C. Body-Worn Camera starting at 2:31 a.m. (provided on CD)

**Exhibit 6** – Detainee Processing and Detention Log

**Exhibit 7** – Officer L.C. Body-Worn Camera starting at 4:11 a.m. (provided on CD)

**Exhibit 8** – MCPD Advice of Rights Form

**Exhibit 9** – Initial Appearance Transcript

**Exhibit 10** – MCDOR Policy and Procedure Manual, Operation of the Central Processing Unit

**Exhibit 11** – FBI Collection Log

# I.  INTRODUCTION

The United States, through undersigned counsel, respectfully submits this omnibus response in opposition to the defendant's two motions to suppress; a motion to suppress statements, ECF Nos. 17 (original) and 64 (supplemental); and a motion to suppress evidence, ECF No. 67.

In the middle of the night on June 8, 2022, Montgomery County Police Department ("MCPD") officers received an emergency dispatch for service, to respond to a 9-1-1 caller reporting suicidal and homicidal thoughts, and who reported having a gun and other weapons.  The urgent nature of the call was heightened even further when the 9-1-1 caller disclosed that his intended target was a judge, specifically a Supreme Court Justice, and that the 9-1-1 caller was standing in front of the Justice's house.

This unfortunately was not the only time in recent weeks that law enforcement needed to respond to the Justice's house, in a residential neighborhood.  In the weeks leading up to this night, this same Supreme Court Justice's house and others had been the focal point for protests, due to the unprecedented leak of a Supreme Court draft opinion in a highly followed case.  On June 8, 2022, MCPD officers responded rapidly to the urgent dispatch, and once in the neighborhood, immediately worked to secure both officer and public safety.  This included detaining an individual that matched the description of the 9-1-1 caller, and, based on the caller's disclosures to 9-1-1 that he had a gun and other weapons, locating and rendering safe all weapons brought into the community.

In the neighborhood, MCPD worked quickly to locate and confirm the identity of the 9-1-1 caller, determined to be the defendant, Nicholas Roske.  His statements at the scene, in the neighborhood, fall squarely under the officer and public safety, and booking exceptions.  In addition, law enforcement's questions were not designed to elicit incriminatory admissions, where the information sought was identity related, and for use in a potential emergency evaluation

petition. After being taken to the local MCPD station, Roske knowingly, intelligently, and voluntarily waived *Miranda* — twice, even though once was sufficient — and spoke with law enforcement.

At the neighborhood, the exigencies of the situation rendered any warrantless search of baggage left on an open and public street objectively reasonable under the Fourth Amendment. The plain view exception also applied, and the contents of the baggage were a foregone conclusion due to Roske's own disclosure of them to 9-1-1. Further, Roske voluntarily left the baggage on a public street and disclosed its contents to 9-1-1, and thus retained no reasonable expectation of privacy in their contents. Last, the contents of the baggage would have been inevitably discovered through an inventory search, whether conducted by Montgomery County or the FBI.

## II. <u>FACTUAL BACKGROUND</u>

In the middle of the night, on June 8, 2022, at approximately 1:42 a.m., Montgomery County Police Department ("MCPD") officers received an urgent, priority call for service. Dispatch reported that a 9-1-1 caller was having both suicidal and homicidal thoughts, and had traveled from California to act on them. **Exhibit 1** (Computer Aided Dispatch Transcript) at 2.[1] The caller reported having a gun and additional weapons. *Id*. The caller stated that he had the gun and weapons, including pepper spray, a knife, and various other tools, in a suitcase. *Id*. at 3. The caller denied using any alcohol or drugs. *Id*. at 2.

A few minutes later, dispatch alerted officers that the caller stated that he had come from California to kill a Supreme Court Justice. *Id*. at 3. Dispatch transmitted that the caller advised that he was standing in front of the suitcase, in which the gun was located. *Id*. Dispatch also

---

[1] Page citations are inclusive of the cover page, and supersede any preexisting pagination numbering.

transmitted that the caller, gun, and suitcase were in front of the house of the Supreme Court Justice that the caller came from California to kill. *Id*.

Within several minutes, the first MCPD officers arrived on the scene, a residential neighborhood with homes lining both sides of the street. It was approximately 1:52 a.m. *Id*. at 3. The officers — three on-duty officers in uniform and one officer working on an off-duty contract — quickly assembled and, after readying their equipment and without waiting for others, immediately begin their approach. The officers started on foot towards an individual, wearing dark clothing, standing down the street. **ECF No. 67-5 (Officer G.D. body-worn camera)** at 2:05-3:30.[2] Because the 9-1-1 call was for an individual with a firearm and suicidal and homicidal thoughts, the officers had their weapons drawn.

As the officers neared the individual, Officer G.D. radioed dispatch to ask for the caller's name. Dispatch advised: "Nicholas Roske." *Id*. at 3:57-4:05. Officer G.D. called out, "Nicholas!," and issued commands to the individual in the street, including to lay down on the ground face down with his hands apart. "Nicholas" responded accordingly. *Id*. at 04:27-05:15. The individual was taken into custody without incident at approximately 1:54 a.m. *Id.* at 05:21-05:30. At this point, officers believed — but subject to further confirmation — that the individual in custody is the same person who called 9-1-1 to report that he had a gun, other weapons, and that he flew from California to kill a Supreme Court Justice.

After "Nicholas" is handcuffed, Officer J.R. asked "Nicholas" where his bag was. *Id*. at 5:29-5:33. Officer J.R. is a MCPD officer who was working, during his off-duty hours, on a separately authorized part-time job under a contract between MCPD and the town of Chevy Chase,

---

[2]  Exhibits already provided as defense exhibits are referenced using the docket number. Timestamps cited are to the approximate point of time of the video (rather than time of night).

Maryland. Accordingly, he was nearby when he heard the dispatch call for service and responded. In response to and evidencing his understanding of Officer J.R.'s question, "Nicholas" stated, "Down the street, on the left. It should be pretty obvious." *Id*. at 5:33-5:40. Officers J.R. and G.D. proceeded immediately down the street, while Officers L.C. and J.W. stayed with "Nicholas." *Id.* at 5:40-5:55.

Within a few steps down the street, Officer G.D. spotted the suitcase, left on the street next to the curb, in full public view. *Id*. at 5:44. As the officers walked closer to the suitcase, Officer G.D. cautioned out loud, "Let's look at it for a second and make sure it's not a freaking--" before trailing off his thought. *Id*. at 5:44-6:00. The officers used their flashlights to examine the exterior of the suitcase and a backpack, which were left next to each other on the curb. *Id*. at 6:00-6:27. After not seeing anything obviously protruding from the bags, but without confirmation that the bags were in fact safe, Officer G.D. remarked about having other officers come to their location to secure the items, and Officer J.R. offered to stay with the items. *Id.* at 6:27-6:35.

Meanwhile, as Officers G.D. and J.R. walked up the street to locate the suitcase, Officers L.C. and J.W. stayed with "Nicholas." **ECF No. 64-1 (Officer L.C. body-worn camera)** at 6:30-6:38. The officers stood him up and started walking with him back down the street, toward where the officers had parked and left their patrol cars. *Id*. at 6:38-8:19. During this time, the officers asked him identity-related questions, such as for his identification ("You have I.D. on you?"), last name ("What's your last name?"), how he got here ("How'd you get up here, Nicholas?"), when he left and arrived ("When did you leave?" and "And you got in today?"), and where he lived ("So you live in California, right?). *Id*. "Nicholas" responded that he didn't know "where [his wallet] went," that his last name is Roske, and that he "flew" to Maryland. *Id*. In response to being asked when he left to fly to Maryland, Roske had full awareness of the date and

time, stating, "Earlier today," before correcting himself: "Or yesterday, since it's past midnight." *Id*. Roske also confirmed that he lived in California. *Id*.

Officers put Roske in the front passenger seat of Officer L.C.'s car, after his person is searched. *Id*. at 11:11-11:24. Officer L.C., who is standing near the open front passenger door, asked Roske identity-related questions: first name, middle name, last name, date of birth, home address, and contact number. *Id*. at 11:24-12:59. Officer L.C. then provided the note sheet he wrote the information down on, and asked Officer J.W. to "run him" — Roske's identifiers — "for me." *Id*. at 13:05-13:14. This process took a few minutes, and the dispatcher came back on the air a few minutes later to confirm Roske's identity and to advise that he's "negative" for, for example, any open arrest warrants: "he's got a middle name of John, J-O-H-N. Address on [intentionally redacted] in Simi Valley, California. Got a valid license and nothing through . . . he's negative." *Id*. at 17:09-17:25.

During the few minutes while Officer J.W. and dispatch worked to confirm Roske's identity, Officer L.C. asked Roske questions to address the officer and public safety threat, to determine what weapons or dangerous items are in the community, and if anything in the suitcase could harm anyone. **ECF No. 64-1 (Officer L.C. body-worn camera) at 13:00-17:25**. Office L.C.'s questions also aligned with the information needed should a Petition for Emergency Evaluation need to be made under Maryland Code, Health General Article § 10-620 *et seq*. The evaluation form requires information about the evaluee; their mental health history and prescriptions; and information about why the petitioner believes an evaluation is appropriate, including their current behaviors, access to firearms or weapons, and whether and why the evaluee

presents a danger to their own life or others. **Exhibit 2** (version dated revised 12/09/2020);[3] *see also* Maryland Health General Article § 10-622(c) (detailing information needed for a petition). Specifically, the form requires the following information:

- the biographical information of the evaluee (Question #2);

- any parent, relative, or other individual interested in the evaluee and their contact information (Question #3);

- whether any petition has previously been filed (Question #4);

- whether the evaluee has been hospitalized in the past and the facilities of hospitalization (Question #5);

- whether the evaluee is currently receiving psychiatric treatment, and from who and where (Question #6);

- the evaluee's prescribed medications (Question #7);

- whether the evaluee is taking the prescribed medications (Question #8);

- a narrative description of the behavior that the "evaluee is demonstrating . . . that leads me to conclude that they currently have a mental disorder" (Question #9);

- a narrative explanation of why the "evaluee presents a danger to the life or safety of the evaluee or others" (Question #10); and

- a narrative of what "firearms/weapons" the evaluee "has access to" (Question #11).

Officer L.C. accordingly asked "Nicholas" "what's going on here?;" and in response to "Nicholas" describing "wanting to have a sense of purpose," asked about the purpose that he was "trying to do today;" why "Nicholas" called 9-1-1; what was in the suitcase, including any explosives; any medical diagnoses; whether "Nicholas" was taking his medication; and any other weapons or dangerous items that "Nicholas" had. **ECF No. 64-1 (Officer L.C. body-worn camera) at 13:00-17:25**. During this time, "Nicholas" recited what he believed to be the Supreme

---

[3] Available online through the Maryland Courts website, https://www.mdcourts.gov/district/emergencyevaluations (last accessed February 16, 2025).

Court Justice's specific address. *Id*. "Nicholas" also told Officer L.C. that he had texted his sister that he loved her, and that she called him and "told [him] not to do it," after which "Nicholas" called 9-1-1. *Id*. Officer L.C. also informed "Nicholas" that he was being recorded, and "Nicholas" responded, "By the body cam?" When Officer L.C. confirmed, "Nicholas" stated, "Yup." Officer L.C. also stated that his cruiser camera was also recording. *Id*. at 16:10-16:32. It is at this point that Officer L.C.'s body-worn camera captures dispatch coming back on the air to confirm Roske's identity and to advise that he's "negative" for, for example, any open arrest warrants: "he's got a middle name of John, J-O-H-N. Address on [intentionally redacted] in Simi Valley, California. Got a valid license and nothing through . . . he's negative." *Id*. at 17:09-17:25.

Officer L.C. then closed the front passenger door, and walked towards the back of his car, where Officer J.W. and a few other uniformed officers were standing. *Id*. at 17:25-17:30 (timestamp of 2:04:55). After a brief dialogue with one of the uniformed officers, Officer L.C. entered and sat in the front driver seat of his car, next to Roske in the front passenger seat. **ECF No. 64-3 (Officer L.C. body-worn camera)** at 0:00-0:15 (timestamp of 2:06:19). Officer L.C. asked Roske for his sister's name, phone number, date of birth, and then stepped out of the car. *Id*. at 0:17-1:55 (timestamp of 2:07:58). After calculating her approximate age, which confirms that she is an adult, Officer L.C. called Roske's sister. *Id*. at 1:55-6:14. Officer L.C. inquired with Roske's sister the same topics that he did with Roske; for example, Roske's state of mind and plans ("I'm just wondering what he told you" "He didn't say he was going to kill himself? He didn't say that? He didn't say he was going to kill somebody else? No? . . . You know why he's here?"); Roske's medical diagnoses and treatment ("Do you know what he's diagnosed with?" "Do you know if he's been seeing therapy or a psychologist?"); whether Roske has been taking his medication ("Do you know if he's been taking his medications?"); and whether this has

9

happened before ("Has he ever thought about this before?" . . . "Has this ever happened before in California?"). *Id*. After learning this information, including about Roske's mental health provider, Officer L.C. returned inside the patrol car, and followed up with Roske about seeing any therapist or psychologist, any prior suicide attempt, and when Roske was seeing his therapist or psychologist. *Id*. at 06:28-08:37 (timestamp of 2:12:32 to 2:14:42).

After "Nicholas" was taken into custody, around the same time that Officers J.W. and L.C. walked Roske back to the patrol cars, Officer G.D. had also walked back to the cars. Body-worn camera shows that Officers G.D. and L.C. are putting away the equipment that they used to approach "Nicholas" when an officer radioed Officer G.D. to determine how to approach the suitcase and backpack left on the street. **ECF No. 67-5 (Officer G.D.'s body-worn camera)** at 08:20-08:36. Officer G.D. radioed back to "very carefully search it." *Id*.

On May 2, 2022 — just over a month before these overnight events of June 8, 2022 — Politico had published a copy of the draft majority opinion in a pending Supreme Court case, *Dobbs v. Jackson Women's Health Org.*, No. 19-1392.[4] A statement from the Supreme Court called "the leak of a draft opinion" as "one of the worst breaches of trust in its history" and a "grave assault on the judicial process." *Id*. In response to the leak, which publicly and prematurely disclosed the Supreme Court's draft majority opinion in a high-profile, politically charged case, protests were organized and held at selective Supreme Court Justices' homes.[5] This included the

---

[4] Office of the Marshal, Supreme Court of the United States, "Marshal's Report of Findings & Recommendations" (Jan. 19, 2023), available at https://www.documentcloud.org/documents/23579080-dobbs_public_report_january_19_2023/.

[5] Rebecca Shabad and Gary Grumbach, "Abortion rights activists protest outside conservative Supreme Court justices' homes," (May 9, 2022), available at https://www.nbcnews.com/politics/supreme-court/abortion-rights-activists-demonstrate-conservative-supreme-court-justi-rcna27901.

Maryland home of the Supreme Court Justice that Roske stated he flew from California to kill. *Id*.[6]  The events of June 8, 2022 occurred against this backdrop.

Officer G.D., after determining that a prompt, on-scene search was necessary, then drove in his patrol car up the street, in the direction of where "Nicholas" was detained and where Officer J.R. and two additional on-duty uniformed officers were with the suitcase and backpack.  *Id*. at 10:30.  The officers searched both items, using a knife to cut a zip tie around the suitcase zippers, and using a key located in the backpack to open a case in the suitcase.  *Id*. at 10:30-13:19.  Inside the suitcase were a Glock 17 pistol with two magazines and ammunition, a chest rig (harness used to carry tactical gear), a knife, lock picks, a hammer, screwdriver, nail punch, crow bar, duct tape, hiking boots with padding on the outside of the soles, and other items.  **Exhibit 3 (**photographs taken on scene) (three of four pages shown in the screenshots below).



---

[6]  Indeed, Roske acknowledged to 9-1-1 that he knew about the protests.  ECF No. 67-2 at 8.





Officer G.D. asked, "Did he [Roske] say something about a rifle too?," and Officer J.R. responded, "Knife and pepper spray." *Id*. at 12:24-12:31. The officers worked to confirm that the weapons that Roske told dispatch about were all accounted for. The officers also worked to confirm that the suitcase and backpack did not contain any other threats, such as explosives. Officer G.D.'s body-worn camera captures that it is at this point that dispatch has confirmed Roske's identity and to advise that he's "negative" for, for example, any open arrest warrants: "he's got a middle name of John, J-O-H-N. Address on [intentionally redacted] in Simi Valley, California. Got a valid license and nothing through . . . he's negative." *Id*. at 16:14-16:28.

Officer G.D. also collected from the ground an airline luggage tag of the type that would have been affixed to the outside of the suitcase for checked luggage. *Id*. at 17:56-18:15, 18:55-19:00. Officer G.D. put the suitcase and backpack inside his patrol car, and drove back down the street, to the location where he had originally parked upon initial arrival at the scene, and where there were now other officers' cars. *Id*. at 19:28-20:28. Once back with the other cars and officers, Officer G.D. exited his vehicle reported to other officers that what Roske told 9-1-1 appeared to be consistent with Officer G.D.'s observations: "Well, he didn't lie about anything." *Id*. at 20:29-20:48.

Officer L.C. drove Roske to the district station. **Exhibit 4** (Officer L.C. interior patrol car camera) at 32:13-40:46 (timestamp 2:30 a.m. to 2:39 a.m.).[7] During the entire approximately nine minute trip, Roske is quiet. *Id*. Roske is not yelling, is not moving around, and is not verbally or physically agitated. *Id*. The screenshot below shows Roske approximately mid-transport. *Id*. at 35:34 (timestamp of 2:34 a.m. (6:34 Zulu)).

---

[7] As the substantive conversations that occurred while Roske was in the patrol car are also captured on Officer L.C.'s body-worn camera, *see* ECF Nos. 64-1 (body-worn camera) and 64-2 (transcript) and ECF Nos. 64-3 (body-worn camera) and 64-4 (transcript), a separate transcript for this cruiser camera footage has not been made, but can be done upon request.



This demeanor is consistent with Roske's behavior during the entirety of the time when he was in Officer L.C.'s car at the scene — he is quiet, calm, and not verbally or physically agitated. *See id*. at 16:17-32:13 [starting from when Officer L.C. steps out of the front driver seat after discussion of Roske's therapist or psychologist at approximately 2:14 a.m. (6:14 Zulu), to when Officer L.C. comes back into the car to transport Roske to the station at approximately 2:30 a.m. (6:30 Zulu)]; *see also* screenshot below of Roske in the car earlier in time, but still while at the scene, at approximately 2:27 a.m. (6:27 Zulu).



During the time when Roske is in the car at the scene, other than around 2:21 a.m. to 2:25 a.m., when Roske is asked to step out of the car for a few minutes for — unknown to him at the time — a "show-up" with the Deputy United States Marshals protecting the Supreme Court Justice's house, *id*. at 23:23-27:13,[8] officers do not harass or bother Roske, nor prevent him from resting.

After arriving at the station, Roske is compliant with officers' instructions and sat calmly in a holding cell. **Exhibit 5** (Officer L.C. body-worn camera) at 9:14-15:00; *see also* screenshot below of Roske sitting calming in holding cell. When Officer L.C. asked him if he had a "second layer" of clothing on, or had a belt on, Roske understood the questions and answered accordingly. *Id*. at 12:43-14:25.

---

[8]  Roske made no statements during this time.



Officer L.C. completed the Detainee Processing and Detention Log form, and the timestamp on his body-worn camera is 2:46 a.m. *Id*. at 15:01-16:00. Officers kept watch over Roske. **Exhibit 6** (Detainee Processing and Detention Log).

Approximately 90 minutes later, at approximately 4:10 a.m., Officer L.C. approached the holding cell where Roske was, and walked him to the interview room section of the station. **Exhibit 7** (Officer L.C. body-worn camera starting at 4:10 a.m.). When Officer L.C. approached the holding cell, Roske appeared to be resting. *Id*. at 0:07 (screenshot below).



Officer L.C. escorted Roske to an interview room. **ECF No. 64-5 (Interview Footage 1)** at 2:26 (timestamp of 4:12 a.m.). At approximately 4:25 a.m., MCPD Detective M.D. came into the room. Detective M.D.'s first questions to Roske were to ask how he is doing ("How are you today? Could have been better?) and to confirm Roske's physical state ("Otherwise, everything okay? You're not sick or anything?). *Id*. at 14:45-14:59. To the question, "You're not sick or anything?," Roske responded, "No." *Id*. Detective M.D. introduced himself, and asked about any other physical conditions ("Other than being upset, do you have any other physical conditions?") to which Roske stated that he has one physical condition that could be triggered if he does not take his medication or get enough sleep, or if he drinks alcohol, which he has not done in a long time. *Id*. at 14:59-15:55.[9] Detective M.D. noted out loud that, according to Roske, he is sober, and asked

---

[9] While in Officer L.C.'s patrol car at the scene, Roske had also told Officer L.C. that Roske had this physical condition but that it's "not psychiatric," and that Roske had been taking his medication. **ECF No. 64-1** at 14:42-14:55.

Roske about the medication that he is taking for the condition and if he had it with him.  *Id*. at 15:55-16:20.  Roske stated that the medication should be in his backpack, and further stated that he took his morning dose, but needed to take his evening dose, which should be taken "about 12 hours" from his prior dose, and "should probably take my . . . definitely my [physical condition] medication some time."  *Id*. at 16:20-16:55.  Detective M.D. stated that he would ask for medical personnel to come, *id.* at 16:55-17:18, and within a few minutes, did ask MCPD personnel to have EMS come to administer Roske's medication to him.  *Id*. at 21:44-22:48 (timestamp 4:33 a.m.).

In addition to inquiring into Roske's physical condition, Detective M.D. asked Roske about his educational level.  Roske stated that he has a Bachelor's degree in Philosophy.  *Id*. at 17:18-17:31.  Detective M.D. proceeded to advise Roske of his rights, including his *Miranda* rights:

```
11            DET. D█████: Oh, all right.  What I'm going to
12   do before we can really get into talking about anything of
13   substance is I need to inform you of your rights, okay.
14   You have a right now and at any time to remain silent.
15   Anything you say may be used against you.  You have the
16   right to a lawyer before and during any questioning.  If
17   you cannot afford a lawyer, one will be appointed for you.
18   This big paragraph number 5, I'm going to read to you.  I
19   don't even know yet exactly what is going on, but I'm
20   going to read the entire thing to you.
21            You have the right to be taken before a District
22   -- promptly before a District Court Commissioner who is a
23   judicial officer not connected with the police. A
24   Commissioner will inform you of each offense you were
25   charged with and the penalties for each offense, provide
```

```
1    you with a written copy of the charges against you and
2    advise you of your right to counsel, make a pretrial
3    custody determination and advise you whether you have a
4    right to a preliminary hearing before a judge at a later
5    time.
6                Do you understand what I've just said?
7            MR. ROSKE:  Yes.
8            DET. D████:  Okay.  I need you to sign.
9    Initial this.  Do you read and write English?
10           MR. ROSKE:  Correct.
11           DET. D████:  I need you to initial those, just
12   stating that you've been advised.  And then I need you to
13   sign here saying that you understand.  So where are you
14   from in California?
```

*Id*. at 17:30-19:14; *see also* ECF No. 64-7 at 4-5 (excerpted above).

During that colloquy, Detective M.D. also asked Roske, "Do you understand what I've just said?" and Roske unequivocally responded, "Yes." **ECF No. 64-5 (Interview Footage 1)** at 17:30-19:14. Detective M.D. asked Roske if he can read and write English, which Roske confirmed. *Id*. Detective M.D. asked Roske to initial next to each of the advisements read, and to sign the form. *Id*.; see also **Exhibit 8** (MCPD Advice of Rights Form) (excerpt below with redaction applied).[10]

---

[10]  The defense noted in its motion that they did not have a copy of this form. ECF No. 64 at 5 n.4. Upon reviewing the motion, counsel for the Government directed the defense to the form produced (in unredacted format).



1. You have the right now and at any time to remain silent.

2. Anything you say may be used against you.

3. You have the right to a lawyer before and during any questioning.

4. If you cannot afford a lawyer, one will be appointed for you.

5. *(NOTE: #5 will only be used for an arrestee who will be charged as an adult.)* You have the right to be taken promptly before a District Court Commissioner who is a judicial officer not connected with the police. A Commissioner will inform you of each offense you are charged with and the penalties for each offense; provide you with a written copy of the charges against you; advise you of your right to counsel; make a pre-trial custody determination; and advise you whether you have a right to a preliminary hearing before a judge at a later time.

6. Do you understand what I have just said?     Answer: Yes

Officer/ID #                                                              Signature of Person Advised

Detective M.D. then, after a few initial questions, including when Roske traveled to Maryland (response: "It was around 1:40 was take off"), *id*. at 19:14-19:57, immediately asked Roske: "My chief concern is, you know, right off the bat, I understand the basics of why you're here.  Is there anybody else with you that came with you?" and "Is there anybody else that you've been talking to that may come and help you out or that you had planned to do anything with?"  *Id*. at 19:57-20:30.  When Roske denied both, Detective M.D. asked Roske again to confirm that there are no others:  "So you're solely here upon your own.  It's a decision you just – you decided to do?"  *Id*.  Roske claimed, "Correct."  *Id*.

Detective M.D. then started to ask Roske about the substantive events, but amended his thought to ask Roske again about his physical condition, and if Roske can tell when he's about to have an episode.  *Id*. at 20:50-21:50.  As Roske is answering that, he generally gets a feeling about an hour before an episode, Detective M.D. went to the door to ask EMS to come administer Roske's medication to him.  *Id*. at 21:50-22:48.  Detective M.D. also told the person who came to the door that, "And Mr. Nicholas here has already said that there's nobody else, he's the only one that's, you know.  So we don't need a ---."  *Id*.

Detective M.D. then questioned Roske about what Roske had planned on doing; and his planning for the event ("I researched methods multiple times and that kind of stuff. And when I heard the leaked draft, it upset me and makes me thinking a little bit my (indiscernible) perspective at the time, to do something positive before I die."),[11] including how he arrived (arrived at "11:45. Something like that"), when and how he found the Justice's home address, when and where he obtained the gun, and his intention in buying a gun ("It was with the intention of using it. To kill [the Justice] and then myself."). *Id*. at 23:04-27:06.

Detective M.D. then discussed with Roske about what happened at the scene after arriving by taxi ("I noticed immediately that there were people sitting outside and this was a very like empty neighborhood, so I was like, okay, they're keeping a lookout. So then I went around the house on the other side"). Roske also discussed a text to his sister and her call to him ("so she called me up and I told her what I was doing") and his decision to call 9-1-1 after speaking with his sister. *Id*. at 27:06-28:34.

Roske further explained that the zip tie around his suitcase was done by the airline ("I had gone through the airport, you know. You know, legally had declared [the gun], so they put a zip tie around the outside of the suitcase."). *Id*. at 28:34-29:19. Roske and Detective M.D. continued to converse, including discussing the events of that morning and Roske's planning. *Id*. at 29:19-39:05. Roske also told Detective M.D. that his medication was in a "gray backpack." *Id*. During this conversation, EMTs arrived to check on Roske, within approximately 16 minutes of

---

[11] This quote is taken from ECF No. 64-7 (defense's draft transcript). The Government hears a slightly different version of this statement: "I researched methods multiple times and that kind of stuff. And when I heard the leaked draft, it upset me and my – I felt like I could – my perspective at the time – do something positive before I die."

Detective M.D. asking for them to be called to administer Roske's medication. *Id.* at 39:05 (timestamp 4:49 a.m.).

The EMTs began by asking Roske, "Are you having any current issues right now? Do you feel sick at all?," to which Roske unequivocally replied, "No." Roske denied having an episode today, and said that his last episode was around nine months ago. The EMT confirmed with Roske that he has been taking his medication ("Yes") and again asked Roske, "But right now you're feeling fine. You don't have any mental issues currently or any pain anywhere?" Roske again answered, "No." *Id.* at 39:05-40:22.

The EMTs checked Roske's vital signs and asked Roske about his medications. Roske provided the specific names of his medications and the conditions they treat. The EMTs further asked if Roske was having "[a]ny trouble breathing" or was having any "chest pain, [anything] like that," all to which Roske replied, "No." In response to a question from the EMT about when Roske should have taken his medication, Roske computed that he is "supposed to take it approximately every twelve hours and I took my first dose 10:00 a.m. California time. . . . So probably 1:00 a.m. . . . Here time." The EMTs measured Roske's blood pressure and inquired into whether Roske had any blood sugar issues, to which Roske also replied, "No." The EMTs assessed that "all the vital signs look stable." *Id.* at 40:22-45:30.

The EMTs and Officer L.C., who had accompanied them into the room, initially discussed that the EMTs wouldn't be able to administer the medication in Roske's backpack, because they were not pharmacists and "don't know whether the pills look like they're supposed to." The EMTs then worked to find a solution so that Roske can take his medication. The EMTs brought in the medication box from Roske's backpack, and asked Roske to confirm the shape and description of his medication. Roske described one of them as "yellow, oblong, pretty big," and confirmed that

the other pills are the ones he takes.  Roske then took his medication.  *Id*. at 45:30-51:08 (timestamp at 5:01 a.m.).

Detective M.D. and Roske continued to discuss the events of that morning, including the tools Roske brought with him; and events leading up to that morning, including his motivation for his acts.  Detective M.D. reminded Roske that, "if you start feeling ill or, you know the trigger signs if you were to have some sort of episode, let us know, okay?"  During the conversation, Roske stated that he worked as a substitute teacher, primarily for middle and high school.  At another point, Roske also stated that he needed to use the restroom, and Officer L.C. came in and escorted Roske to the restroom, *id.* at 1:10:40-1:16:16.  Detective M.D. exits the room at approximately 6:00 a.m., and Roske is escorted back to the holding cell area.  *Id*. at 1:50:14.

Later that morning, at approximately 9:48 a.m., Roske is brought back to the interview room, and the officer asked Roske, "Are you feeling all right?," to which Roske replied, "Just cold."  The officer responded, "Just cold.  That's it.  Nothing else going on medically?," to which Roske replied, "No.  No."  **ECF No. 64-6 (Interview Footage 2)** at 3:01-4:19.  Detective M.D. came into the room, and asked Roske, "your meds working okay?," to which Roske responded, "Yup."  *Id*. at 5:16-5:19.

FBI Special Agents I.M. and M.H. entered the room and as the officer is giving Roske a blanket, Special Agent I.M. asked Roske if there's "anything else you need right now?" to which Roske shook his head 'no.'  The agents then let Roske know that if he needs to use the bathroom, or needs water, "whatever it is," to let them know.  *Id*. at 6:36-7:20.  Special Agent I.M. then provided the same *Miranda* advisements to Roske, and ended by stating, "are you able to read this, if you want to – if you're able to read that paragraph for me and sign."  *Id*.  Roske, whose head

was down on the table, picked his head up, looked at the form and signed it.  *Id*. at 7:20-8:36; *see also* **ECF No. 64-8 (FBI Advice of Rights)** (screenshot below).

---

## YOUR RIGHTS

Before we ask you any questions, you must understand your rights.

You have the right to remain silent.

Anything you say can be used against you in court.

You have the right to talk to a lawyer for advice before we ask you any questions.

You have the right to have a lawyer with you during the questioning.

If you cannot afford a lawyer, one will be appointed for you before any questioning if you wish.

If you decide to answer questions now without a lawyer present, you have the right to stop answering at any time.

---

## CONSENT

I have read this statement of my rights and I understand what my rights are.  At this time, I am willing to answer questions without a lawyer present.

Signed _____

---

Special Agent I.M. explained that the main purpose was "to just better understand and make sure that, you know, nobody else is at risk or in danger here" and immediately asked, "And so that's the first thing I kind of wanted to talk about.  Do you know if anybody else was planning on doing anything today or going forward that you may have heard of, even if it was completely unconnected to you?"  *Id*. at 8:36-9:36.  Roske stated, "No."  The agents asked Roske about his knowledge of discussing the Supreme Court draft leak ("Can you remember where you heard about this or where you saw people discussing that event?"), and of Roske's social media accounts (*e.g.*, Reddit, Gmail, Discord), including any other individuals that Roske may have discussed his or similar plans with ("And did you ever discuss with these folks, you know, anything related to

why you came here or what they were, you know, what their thoughts on the topic were?", "Did they ever talk about taking action or doing anything about stuff they were upset about?"). Roske answered these questions, including providing his Gmail email accounts, stated that he had deleted his Discord account. During this portion of the conversation, including when Roske was speaking, his head was on the table. *Id*. at 9:36-19:17.

To seek to confirm Roske's statements, Special Agent I.M. asked Roske about his computer, including where it was (response: "in my room"). The agent disclosed law enforcement's interest in the computer was:

> "mak[ing] sure that, . . . if you came across somebody who was . . . gotten to a bad place and thought about doing some bad stuff, that we want to try and talk to them before anything bad happens, as well. So that's kind of one of the main reasons, you know, I'm asking a lot of questions and kind of focused on that."

Special Agent I.M. asked Roske for consent to search his computer: "[would it] be okay if, you know, if we were to make a phone call and talk to somebody out in California? Would it be okay if they went and took a look at that computer for us?" *Id*. at 19:17-20:33. In response, Roske stayed silent for approximately 30 seconds and then replied, "Why are you asking?" *Id*. at 20:33-21:00. Special Agent I.M. repeated that, "We just want to make sure that, again, nobody else is kind of planning anything that's dangerous. . . . the last thing we want to do is, you know, not be able to stop somebody from doing something that they might regret later." *Id*. at 21:00-22:02.[12] In response, Roske stayed silent for approximately 30 seconds. *Id*. at 22:02-22:33.

At that point, Special Agent I.M. decided to "change gears and we'll come back to that because it sounds like maybe you're still kind of thinking about it," and proceeded to ask Roske

---

[12]   The Government hears the portion of the last sentence as "something that they might regret later," as opposed to ECF No. 64-7 at 48-49 (defense's draft transcript) ("something that they cannot regret here").

other questions, starting with his friends and those Roske may have discussed the news or events in general with. Roske — still with his head down, and in contrast to his silence when asked about granting access to his laptop — responded immediately. Roske provided names, including spellings, and explained the history of his friendship with each, even providing further explanation of why he found one friend to be somewhat naïve. The agents again repeated that their focus was on "if anybody else is . . . a danger to themself or others," and asked Roske questions about others' knowledge of his plans to travel to Maryland, those Roske may have spoken with or asked questions to about his plans, and where those conversations took place. *Id*. at 22:33-39.15.

At that point, Special Agent I.M. brought back up the laptop, asking, "So is that something that you'd be willing to let us look at if we could get a hold of that computer?" *Id*. at 40:00-40:32. Roske stayed silent for approximately 35 seconds. *Id*. at 40:32-41:07. Special Agent M.H. reiterated that the focus was "to vet out the possibility of any other threats or dangers to anybody else." *Id*. at 41:07-41:40. Roske stayed silent for approximately 25 seconds. *Id*. at 41:40-42:05. When Roske ultimately spoke, he answered Special Agent I.M.'s question as to what type of laptop it is and recalled that it was an "Acer, I think." *Id*. at 42:05-44:03. Roske also disclosed that he had recently done a "data wipe" of the laptop. *Id*. at 44:23-44:41. After some discussion of why Roske chose to delete his laptop data, whether he had deleted any other data, and some wrap-up questions, the agents concluded their interview. *Id*. at 44:41-51:51. Agent M.H. later came in to tell Roske that they were headed to the courthouse for his initial appearance. *Id*. at 1:44:14 (timestamp of 11:29:59).

Roske had an initial appearance before a Magistrate Judge in this district starting around 3:27 p.m. the same day, and was represented by counsel. *See* **Exhibit 9** (Initial Appearance transcript). Roske was sworn in and stated that he is a college graduate with a bachelor's degree,

and that he reads, writes, and understands English language. *Id*. at 4-5. In response to the question, "Are you currently under the influence of any drugs, alcohol, or medication that would in any way interfere with your ability to understand these proceedings?," Roske responded, "No." *Id*. at 5. Roske confirmed that he has been taking medications prescribed by a doctor, and had taken them that day. *Id*. at 6. Roske also, after conferring with and having the benefit of counsel, stated that he has a "clear enough understanding" of the proceeding. *Id*. at 6-7. Roske stated that he understood the criminal charge against him and the maximum possible penalties. *Id*. at 7. Roske also confirmed that he understood his Fifth Amendment right to remain silent. *Id*. at 8.

### III. MOTION TO SUPPRESS STATEMENTS

The defendant's motion to suppress statements should be denied. As detailed in this Part, Roske's statements at the scene, in the neighborhood, fall under several exceptions, namely the officer and public safety, and booking exceptions. In addition, law enforcement's questions were not designed to elicit incriminatory admissions, where the information sought was identity related, and for use in a potential emergency evaluation petition. At the station, Roske knowingly, intelligently, and voluntarily waived *Miranda* — twice, even though once was sufficient — and spoke with MCPD and FBI officers.

#### A. Legal Background

During a stop by police, "officer[s] may ask the detainee a moderate number of questions to determine his identity and to try and obtain information confirming or dispelling the officer's suspicions." *Berkemer v. McCarty*, 468 U.S. 420, 439 (1984). However, even after an individual is in custody for *Miranda* purposes, there are exceptions to the *Miranda* requirement.

#### 1. Exceptions to *Miranda*

One exception is the "routine booking exception" for personal information to establish information necessary for booking or pretrial services; for example, identity, date of birth, age,

and place of residence, and any other questions not "designed to elicit incriminatory admissions." *Pennsylvania v. Muniz*, 496 U.S. 582, 601-02 (1990). This flows from the Supreme Court's description of "interrogation" as "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police know are reasonably likely to elicit an incriminating response from the suspect." *Id*. at 600-01; *see also United States v. El Shafee Elsheikh*, 103 F.4th 1006, 1013 (4th Cir. 2024) (quoting *Muniz*). In the *Elsheikh* district court proceedings, a court in the Eastern District of Virginia found that a biometric enrollment process "did not involve questions 'designed to elicit incriminatory admissions' to be used at trial," because they were "questions designed for administrative purposes," and thus the responses fell within the booking exception. 578 F. Supp. 2d 752, 779-80 (E.D. Va. 2022). Courts have also found that questions for "basic identification purposes," such as how an individual arrived at an apartment, are also not interrogation questions. *United States v. Brown*, 101 F.3d 1272, 1274 (8th Cir. 1996).

Additionally, there is a "public safety exception" to *Miranda* as recognized by the Supreme Court in *New York v. Quarles*, 467 U.S. 649, 655-56 (1984), for "situation[s] in which police officers ask questions reasonably prompted by a concern for the public safety." In *Quarles*, police on patrol at approximately 12:30 a.m. were told by a young woman that she had just been raped and that the perpetrator had just entered a nearby supermarket with a gun. *Id*. at 651-52. The officers quickly went to the supermarket and spotted an individual that matched the description the woman provided. *Id*. at 652. After handcuffing the individual, frisking him and finding an empty shoulder holster, the officer asked the defendant where the gun was. *Id*. The defendant told officers that "the gun is over there" while nodding to some cartons, and the officer thereafter found a loaded revolver in one of the cartons. *Id*.

The Supreme Court held that there is a "public safety" exception to *Miranda*, because

> [the police had] every reason to believe the suspect had just removed from his empty holster and discarded [a gun] in the supermarket. So long as the gun was concealed somewhere in the supermarket, with its actual whereabouts unknown, it obviously posed more than one danger to the public safety: an accomplice might make use of it, a customer or employee might later come upon it.

*Id*. at 657. The Supreme Court explicitly

> decline[d] to place officers such as [the officer who asked the question] in the untenable position of having to consider, often in a matter of seconds, whether it best serves society for them to ask the necessary questions without the *Miranda* warnings and render whatever probative evidence they uncover inadmissible, or for them to give the warnings in order to preserve the admissibility of evidence they might uncover but possibly damage or destroy their ability to obtain that evidence and neutralize the volatile situation confronting them.

*Id*. at 658-59. In other words, the Supreme Court explicitly declined to "penaliz[e] officers for asking the very questions which are the most crucial to their efforts *to protect themselves and the public*." *Id*. at 659 n.7 (emphasis added); *see also United States v. Lloyd*, 581 F. App'x 203, 204 (4th Cir. 2014) ("If the custodial statement is made in response to police inquiries made to preserve their own safety or that of the public, however, the statement is admissible.") (citing *Quarles*). In addition, the exception applies regardless of the "subjective motivation . . . of individual officers in such a situation." *Quarles*, 467 U.S. at 656.

### 2. Waiver of *Miranda*

Where there is custodial interrogation, and no *Miranda* exception applies, a person can "knowingly, intelligently, and voluntarily" waive their *Miranda* rights. *United States v. Holmes*, 670 F.3d 586, 591 (4th Cir. 2012). A *Miranda* waiver is valid when the "totality of the circumstances surrounding the interrogation reveal both an uncoerced choice and the requisite

level of comprehension." *Moran v. Burbine*, 475 U.S. 412, 421 (1986) (internal quotation marks omitted).

The Government has the burden to show, by a preponderance of the evidence, that the statements were voluntary. *Lego v. Twomey*, 404 U.S. 477, 489 (1972). Whether a waiver was voluntary looks to whether the statements were "extracted by any sort of threats or violence," "obtained by any direct or implied promises," or the "exertion of any improper influence." *Holmes*, 670 F.3d at 591. But even if there are "threats, violence, implied promises, improper influence, or other coercive police activity," statements are "not necessarily rendered involuntary." *Id*. The "proper inquiry is whether the defendant's will has been overborne or his capacity for self-determination critically impaired." *Id*. Relevant considerations to the inquiry can include the "characteristics of the defendant, the setting of the interview, and the details of the interrogation." *Id*. at 592. Further, the totality of the circumstances must be considered. *Id*. Thus, the Fourth Circuit has held that, even when an officer has drawn a gun or the individual is handcuffed, neither "establish[es] involuntariness in and of [itself]." *United States v. Elie*, 111 F.3d 1135, 1144 (4th Cir. 1997) (quoting *United States v. Seni*, 662 F.2d 227, 281-82 (4th Cir. 1981)).

A waiver is knowing and intelligent when it is made with "full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Moran*, 475 U.S. at 421. In other words, the individual's "decision to speak was made with full awareness and comprehension of all the information *Miranda* requires the police to convey." *Id*. at 424. This requires examining "the totality of the circumstances surrounding the interrogation, including the suspect's intelligence and education, age and familiarity with the criminal justice system, and the proximity of the waiver to the giving of *Miranda* warnings." *United States v. Dire*, 680 F.3d 446, 474 (4th Cir. 2012) (quoting *Correll v. Thompson*, 63 F.3d 1279, 1288 (4th Cir. 1995)).

Where there is a valid *Miranda* waiver, the statements are admissible unless they are involuntary under the Fifth Amendment's Due Process Clause. This analysis is the same as the *Miranda* waiver's voluntariness inquiry. *United States v. Cristobal*, 293 F.3d 134, 140 (4th Cir. 2002). Thus, the question is whether under the totality of the circumstances, including the "characteristics of the defendant, the setting of the interview, and the details of the interrogation," an individual's "will has been overborne or his capacity for self-determination critically impaired because of coercive police conduct," with coercive police conduct being a "necessary predicate." *United States v. Nielsen*, 640 F. App'x 224, 228-29 (4th Cir. 2016).

### B. Roske's Initial Statements in the Neighborhood Fall Under the Officer/Public Safety and Booking Exceptions to *Miranda*

Roske's initial statements at the scene fall within the officer/public safety and booking exceptions to *Miranda*. In the early morning hours of June 8, 2022, law enforcement responded to an urgent, priority dispatch reporting that a caller had called 9-1-1 to report thoughts of homicide and suicide, and that he had traveled from California to act on them. The caller stated that he had weapons, including a gun, and his intended target to kill was a Supreme Court Justice. Further, the caller was in a residential community, in the middle of the night, when it was dark outside and residents would be asleep. In other words, given the time of night, the community was particularly vulnerable, and the threat was significant and potentially deadly.

At the time that "Nicholas" is handcuffed, his identity as the 9-1-1 caller has yet to be confirmed, and officers were working quickly to respond to the public safety threat. As soon as the priority dispatch went out, several officers responded to the scene immediately, arriving within minutes. This included Officer J.R., who was working on a separately authorized part-time job nearby, but responded given the serious and urgent nature of the dispatch call. Officers, including Officers J.R., G.D., and J.C., arrived at the scene fairly simultaneously and, without waiting for

others to arrive, quickly readied their equipment and approached the individual who appeared to be the 9-1-1 caller. After taking "Nicholas" into custody, the officers continued to address the public safety threat, including by trying to locate and rendering safe the weapons reported to be in the area. Officer J.R.'s question to "Nicholas" of where his bag was part of the officers' questions under the public safety exception to *Miranda*.

The circumstances here are very similar to the facts in *Quarles*. In *Quarles*, the officers identified an individual matching the description given by the victim, and the victim reported the individual having a gun. 467 U.S. at 651-52. After handcuffing the individual, a frisk revealed that the individual did not have a gun on his person, but had an empty shoulder holster, corroborating that he had disposed of the gun somewhere. *See id*. The officer then asked the individual where the gun was, and the individual responded "over there" while nodding in the direction of some cartons. *Id*.

Here, the officers responding to the scene knew the general area of the 9-1-1 caller, and located an individual who appeared to match the description of the 9-1-1 caller, including responding to the name given to dispatch, "Nicholas." The 9-1-1 caller had reported having a suitcase with weapons inside, and that suitcase was not in the immediate vicinity of "Nicholas" when he was taken into custody. Just like in *Quarles*, Officer J.R. had "every reason to believe" that there was a gun (and in this case, other weapons) at large in the community, and his question was "reasonably prompted by a concern for the public safety." *See id*. at 656-57. Also like in *Quarles*, without knowing the weapons' "actual whereabouts," these weapons being at large posed multiple risks, both in terms of a potential accomplice making use of them, a community member coming upon them, and the safety of officers themselves. *See id*. at 657-59.

This conclusion is reinforced by Officer J.R.'s and G.D.'s actions upon locating the baggage, which was placed in the open, curbside, on the neighborhood street. Officer G.D. verbally cautioned himself and Officer J.R., "Let's look at it for a second and make sure it's not a freaking--" after which both officers examined the exterior of the bags for any wires or other protruding material from the bags. This supports the determination that Officer J.R. asked "Nicholas" about the bag's whereabouts in furtherance of officer and public safety.

At the patrol car, during the few minutes while Officer J.W. and dispatch worked to confirm Roske's identity, Officer L.C. likewise asked Roske questions to address the public and officer safety concerns that confronted all the earliest responding officers. At the time Officer L.C. asked these questions, dispatch had not yet returned to confirm Roske's identity, and all officers knew was the biographical information that "Nicholas" provided them, and the third-hand information that dispatch provided about the 9-1-1 caller. This information included that the 9-1-1 caller had flown from California to kill a Supreme Court Justice, and that the caller had brought various weapons, including a gun, which were in a suitcase. In addition, when officers, including Officer L.C., took "Nicholas" into custody on the street, there was no suitcase immediately apparent at the same location.

Thus, officers needed to work quickly to find the location of the suitcase; determine what, if any, weapons were in the suitcase; determine what weapons were supposed to be in the suitcase or in the area; and ultimately, to account for all the weapons and render them safe, for the protection of the officers and the community. These statements are covered by *Quarles*'s "need for answers to questions in a situation posing a threat to the public safety," which "outweigh[ ] the need for the prophylactic rule protecting the Fifth Amendment's privilege against self-incrimination." 467 U.S. at 657. Specifically, in this urgent and heightened, yet nascent and uncertain, situation, the

officers needed to determine what weapons were in the community (an open neighborhood area), where they were, to locate them, and to confirm that they were all accounted for and rendered safe. Officer L.C.'s questioning arose from an objectively reasonable need to secure officer and community safety, and lasted only a few minutes. The officer and public safety imperative also is shown by the fact that this occurred extremely early at the scene — even before dispatch had returned a positive match confirming Roske's identity.

Further, the officers at this point only knew what dispatch had reported about what the 9-1-1 caller, the individual posing the threat in this instance, claimed. The source of the information is relevant to veracity. Unlike in *Quarles* where the report came from a third party witness, it is possible that the 9-1-1 caller could have provided partial, incomplete, or even intentionally misleading information, including the number and nature of the weapons in the community and the existence or presence of any accomplices. Thus, the officers were warranted in assessing the situation for themselves once on the ground (*i.e.*, to locate and account for any weapons in the community), and not exclusively rely on or assuming as truthful the information the 9-1-1 caller provided. The officers were, under *Quarles*, entitled to ask questions and assess the situation in working to secure their own safety and the safety of the residential community.

The officer's choice of words to inquire into officer and public safety concerns is not dispositive in the inquiry. *See United States v. Newton*, 369 F.3d 659, 678 (2d Cir. 2004) ("Courts recognize that public safety questions are framed spontaneously in dangerous situations. Precision crafting cannot be expected in such circumstances."); *see also United States v. Estrada*, 430 F.3d 606, 612 (2d Cir. 2005) (explaining that a "question need not be posed as narrowly as possible"). In *Estrada*, the court explained that a question phrased "broad enough to elicit other information" does not automatically prevent the public safety exception where safety is at issue. *Id*.

In *United States v. Williams*, 181 F.3d 945, 953-54 (8th Cir. 1999), the court found that a response by a handcuffed suspect in an apartment to the question "is there anything we need to be aware of?," was admissible under *Quarles*, even though it was a broader question that "did not specifically refer to weapons or safety concerns," because public safety concern was an issue. The court explained that even though the question was "broad enough to elicit other information," it did not prevent finding the exception because "conditioning admissibility of evidence under the public safety exception on an officer's ability to ask questions in a specific form would run counter to *Quarles*." *Id*. at 953 n.13.

Likewise, in *United States v. Ferguson*, 702 F.3d 89, 95-96 (2d Cir. 2012), the court upheld the district court's determination that an officer's questioning of an individual about a gun was justified under the *Quarles* exception. In *Ferguson*, officers responded to a 9-1-1 call reporting that an individual named "Lamot" had fired two shots outdoors. *Id*. at 90. Upon arriving in the neighborhood, officers approached the defendant, confirmed his first name of "Lamont," arrested him, and took him to the police station. *Id*. At the police station, an officer questioned the defendant for approximately 30-45 minutes, after which the defendant agreed to show officers where the gun could be recovered (in his sister's apartment). *Id*. at 91-92. The court found that even if the questions had been "broad enough to elicit other information," *Quarles* still applied because the "context in which the officers acted made clear that the questions primarily involved safety." *Id*. at 94 (internal quotation marks and alterations in original omitted). The court also found that the defendant's arrest occurred near the altercation, and was only approximately an hour after the weapon in question was fired, making their "basis for believing that Ferguson had left a weapon in a dangerous place [ ] stronger than of officers who simply do not know where a suspect may have left a weapon." *Id*. at 95 n.1. Last, the court found that questioning lasting

30-45 minutes, that occurred approximately 1 to 1½ hours after the defendant's arrest and approximately 2 to 2½ hours after the firing of the gun in public, were "brief amounts of time" that "did not diminish the officers' objectively reasonable need to protect the public" from the public safety threat. *Id*. at 96.

The circumstances in this case are similar, but more persuasive, than the scenarios above. Here, officers knew from dispatch that a 9-1-1 caller reported homicidal and suicidal thoughts, had a gun and various other weapons, had a suitcase, and was located in a neighborhood. Officers responded quickly to the location, and did not observe a suitcase in the immediate vicinity of an individual they believed to be the 9-1-1 caller. Within minutes of their first interaction with "Nicholas," Officer L.C. asked questions to inquire into the location, type, and number of weapons present in the area. This questioning lasted only a few minutes, and occurred even before dispatch confirmed Roske's identity. Thus, Officer L.C.'s questions to Roske, prompted by a public and officer safety concern, meets the *Quarles* exception. *See Quarles*, 467 U.S. at 656 (describing the exception for "questions reasonably prompted by a concern for the public safety"); *cf. United States v. Mobley*, 40 F.3d 688, 692 (4th Cir. 1994) (finding *Quarles* exception inapplicable where agent questioned defendant after arrest and protective sweep of the residence). Unlike in *Mobley*, however, this location was an open neighborhood with public roads and intersections, not wholly within a select residence. As in *Quarles*, the questions were not "designed solely to elicit testimonial evidence from a suspect," such as "ownership and place of purchase of the gun." *See Quarles*, 467 U.S. at 659. The questions were put to Roske merely minutes into a "kaleidoscopic situation" and against the backdrop of a serious threat to officer and community safety, the scope of which needed to be understood and addressed swiftly. *See id.* at 656.

Other questions officers asked to "Nicholas" as they walked him to the patrol cars are identity-related questions, to confirm his identity, including for his license, his name, and state of residence. These fall within the booking exception to *Miranda*, as these questions are not "designed to elicit incriminatory admissions." *See Pennsylvania v. Muniz*, 496 U.S. at 601-02; *see also United States v. Guiterrez*, 92 F.3d 468, 471 (7th Cir. 1996) ("Prior to or after arresting a suspect, law enforcement may ask preliminary questions as to identity"), *United States v. Hitselberger*, 991 F. Supp. 2d 130, 138-39 (D.D.C. 2014) (questions "pre-printed on a standard form" that included "educational background, employment, identifying characteristics" have the "same quality as the questions asked during routine booking."). Similarly, Officer L.C.'s questions to Roske once Roske was seated in the front passenger seat of Officer L.C.'s patrol car were administrative: first name, middle name, last name, date of birth, home address, and contact number. These likewise are questions that fall within the booking exception to *Miranda*, because they are not designed to elicit incriminating admissions.

### C. Roske's Statements in the Neighborhood Were Also to Questions Not Designed to Elicit Incriminatory Admissions

As described above in Part III.B., *supra*, Officer J.R.'s and L.C.'s questions were within the *Quarles* public and officers safety exception. In addition to that exception, Officer L.C.'s questions to Roske at the scene were also not designed to elicit incriminatory admissions. *See Pennsylvania v. Muniz*, 496 U.S. at 600-601 (defining "interrogation" as "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police know are reasonably likely to elicit an incriminating response from the suspect.") (quoting *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980)). At that point in time, merely minutes into an emergent and evolving situation, officers were working to confirm "Nicholas's" identity and information, as dispatch had not yet come back with the transmission stating "he's got a middle name of John,

J-O-H-N.  Address on [intentionally redacted] in Simi Valley, California.  Got a valid license and nothing through . . . he's negative."  At this time, all officers knew was the biographical information that "Nicholas" provided them, and the third-hand information that dispatch provided about the 9-1-1 caller.

Based on that limited information, Officer L.C. asked "Nicholas" questions that aligned with the information needed should a Petition for Emergency Evaluation need to be made.  The process requires the petitioner to provide the court with, among other information, information about the evaluee's mental health history and medications (Questions #5, 6, 7, 8), the evaluee's current mental state (Question #9), why the petitioner believes the evaluee "presents a danger to the life or safety of the evaluee or others" (Question #10), and whether the evaluee has access to any "firearms/weapons" (Question #11).  **Exhibit 2**.  Officer L.C.'s questions mirrored the information required, including about medical diagnoses and medication, state of mind and danger to his own life and of others, and weapons that "Nicholas" had.  When "Nicholas" also said that he had been in communication with his sister — information relevant to Question #3 of the petition form — Officer L.C. called to speak with her.  It is around this point that dispatch returned to confirm Roske's identity, underscoring the nascent yet fast-evolving nature of events at the scene.

During Officer L.C.'s call with Roske's sister, Officer L.C. similarly asked for information that is needed for the form, such as trying to confirm Roske's state of mind, medical diagnoses, treatment, medication, as well as whether this had ever happened before, which is relevant to Question #5 of the petition.  With the benefit of some new information that Roske's sister provided, Officer L.C. thereafter re-entered the patrol car to follow up with Roske about that new information, including Roske's therapy, as relevant to Question #6 of the petition.

In *United States v. Porterfield*, Case No. 20-CR-42A, 2022 WL 1651395, at *6 (W.D.N.Y. Mar. 31, 2022), a United States Magistrate Judge, whose recommendations and reasoning were adopted by the District Judge, 2022 WL 1645262 (May 24, 2022), determined that an agent's question posed post-arrest to a defendant about how the defendant was feeling in regard to his mental health was "not asked for the purpose of obtaining incriminating evidence from the defendant," but rather to determine whether the agents should proceed with taking him to the courthouse for processing by the U.S. Marshal Service, or to a medical center for mental evaluation. The questions asked here by Officer L.C. were for a similar purpose — to obtain information for the petition form, as needed under Maryland law; *see* Maryland Health General Article § 10-622(c) — for use should an emergency psychiatric evaluation petition be made.

### D. <u>Roske Gave a Knowing, Intelligent, and Voluntary *Miranda* Waiver</u>

At the station, Roske knowingly, intelligently, and voluntarily waived *Miranda*, as evidenced both on video (with audio) and in writing. *See* **ECF No. 64-5 (Interview Footage 1)** at 14:45 – 19:14 and **Exhibit 8** (MCPD Advice of Rights Form). At the outset, Detective M.D. asked after Roske's physical and mental condition. Roske stated that he wasn't sick, and that he wasn't under the influence of alcohol. Roske's demeanor was calm, lucid, and he responded with clarity and detail to these initial status questions. Roske recited the few circumstances in which one *physical* condition could be triggered (if he does not take his medication, does not get enough sleep, or drinks alcohol). *See also* **ECF No. 64-1** at 14:42-14:55 (Roske telling Officer L.C. that this is a physical condition, "not psychiatric"). Instead, showing awareness and conscientiousness of where he was and what time it was, Roske stated that he had taken his morning dose of medication, and that, because his evening dose of medication should be taken "about 12 hours" from his morning dose, should take his medication again "some time". *See* **ECF No. 64-5** at 14:45-16:55. At no point does Roske raises any concern that he is about to experience an episode, and

as detailed in Part II. (Factual Background), *supra*, Detective M.D., other MCPD officers, and EMTs ensure that Roske is provided and takes his medication.

Detective M.D. advised Roske of his *Miranda* rights, including his right to remain silent, and that anything he says may be used against him; his right to a lawyer, including an appointed lawyer; and the right to be presented promptly before a judicial officer for any charges. Detective M.D. asked Roske, "Do you understand what I've just said?" and Roske unequivocally responded, "Yes." Roske further confirmed that he reads and writes English, and proceeded to sign the Advice of Rights Form. *See id*. at 17:30-19:14; *see also* **Exhibit 8**. Roske initialed next to each of the rights advisements that Detective M.D. had read to him, and further signed the bottom of the form. *See id*. At no point did Detective M.D. rush, hurry, harass, or intimidate Roske into initialing and signing the form. Roske had also stated that he has a Bachelor's degree in Philosophy, *id*. at 17:18-17:31, which was noted on the Advice of Rights Form ("Education level: B.A."). This underscores his ability to read, write, and understand the *Miranda* warnings given to him, his awareness of his abilities when questioned, and his informed decision to answer questions.

The events leading up to this moment also show that Roske's waiver was knowing, intelligent, and voluntary, and that he was able to understand, process, and respond appropriately to questions and directions. At the scene, Roske understood and complied with directions by Officer G.D., such as to lay down on the ground face down and hands apart. Roske then comprehended and responded to Officer J.R.'s question about the suitcase. In response to Officer J.C.'s questions to confirm his identity, Roske showed full awareness of the date and time, initially stating that he had left California "[e]arlier today. Or yesterday, since it's past midnight." Roske also provided details of his contact information and spelling of his home address and zip

code.  In response to Officer L.C.'s other questions, Roske provided his sister's phone number by memory, her birthdate, and then his therapist's name and timeframe of treatment.  All of this evidences Roske's ability to understand, comprehend, and articulate responses, including specific recall and awareness of details, dates, and times.

Further, Roske's demeanor while at the scene was calm and quiet.  While in Officer L.C.'s car, and during transport to the station, Roske is not verbally or physically agitated, and looked to be resting at times.  At the station, Roske similarly is compliant with officers' instructions and responded accordingly to questions about a second layer of clothing and belt.  For approximately 90 minutes, from the time Roske arrived at the station to when Detective M.D. spoke with him, Roske is in a holding cell without incident.  Thus, Roske's behavior and demeanor with Detective M.D. is consistent with his behavior and demeanor throughout the evening, all of which showed that he maintained full awareness of his surroundings and had the capacity and ability to understand and respond, including about his *Miranda* rights.

As described above, the "totality of the circumstances . . . reveal both an uncoerced choice and the requisite level of comprehension."  *See Moran v. Burbine*, 475 U.S. 412, 421 (1986).  Roske's choice to speak was uncoerced.  Detective M.D. made no threats or promises, direct or indirect, to coerce Roske to speak.  There was no show of force, for example, by drawing a weapon.  While Roske was in a police station and in handcuffs, these circumstances did not override his "will . . . or [render] his capacity for self-determination critically impaired."  *See United States v. Holmes*, 670 F.3d 586, 591 (4th Cir. 2012) (finding this to be the "proper inquiry"); *see also United States v. Elie*, 111 F.3d 1135, 1144 (4th Cir. 1997) (holding that neither a gun drawn nor handcuffs on an individual establishes involuntariness on its own).  In addition, only Detective M.D. was speaking with Roske, as opposed to a situation where an individual is vastly outnumbered by law

enforcement. In interacting with Roske, Detective M.D. never raised his voice, threatened, yelled, or otherwise became aggressive or combative. In short, there were no actions that rise to the level of coercive police conduct. *See United States v. Nielsen*, 640 F. App'x 224, 229 (4th Cir. 2016) (finding that "the sometimes aggressive questioning of the agents" and an interview length of approximately three hours did not "rise to the level of coercive police conduct. Nielsen can point to no conduct by the agents that would constitute the types of actions generally considered to be coercive under our case law, such as threats or violence, lengthy marathon interrogations, or extended isolation.").

Roske's age (an adult, age 26), and intelligence and education (Bachelor's degree in Philosophy), also supports the determination that the waiver was knowing and intelligent. *See United States v. Dire*, 680 F.3d 446, 474 (4th Cir. 2012) (citing the "suspect's intelligence and education" and "age" as among the "totality of the circumstances" inquiry). Roske also showed some familiarity with the law enforcement system when Officer L.C., at the scene, informed then-"Nicholas" that he was being recorded, and Roske, on his own, understood this to be by body-worn camera ("By the body cam?" "Yup."). *See* ECF No. 64-1 at 16:10-16:32; *see also Dire*, 680 F.3d at 474 (citing "familiarity of the criminal justice system"). In addition, Roske confirmed at the outset that he was not under the influence of alcohol, which was supported by his behavior and demeanor. When Roske stated that he should take his medication "some time," law enforcement and EMTs worked diligently to provide it to him, and Roske successfully took his medication. Throughout the night, starting at the scene and at the MCPD police station post-*Miranda*, Roske demonstrated precise recall and clarity of dates and times, including when he traveled to Maryland ("It was around 1:40 was take off"); when he arrived ("11:45. Something like that"); and calculating the time difference between west coast and east coast time ("supposed to take it

approximately every twelve hours and I took my first dose 10:00 a.m. California time. . . . So probably 1:00 a.m. . . . Here time."). Given the circumstances observed that night — Roske's overall coherent demeanor, clarity, awareness, understanding, and responsiveness — Roske's will was not "overborne [n]or his capacity for self-determination critically impaired." *See Holmes*, 670 F.3d at 591.

This conclusion is not changed by Roske's mental health diagnoses and the fact that he was on medication. "A suspect's mental condition, whether due to mental illness or medication, is not, standing alone, sufficient to render that suspect's statements involuntary." *Nielsen*, 640 F. App'x at 229. This is because the "voluntariness of a waiver depends on 'the absence of police overreaching, not on 'free choice' in any broader sense of the word." *United States v. Walker*, 607 F. App'x 247, 255 (4th Cir. 2015). Therefore, in cases such as *Nielsen* and *United States v. Cristobal*, 293 F.3d 134, 141 (4th Cir. 2002), the Fourth Circuit has found that medical diagnoses, taking medication, having anxiety during interaction with agents, and being on pain killers and narcotics such as morphine, is not enough to render a waiver involuntary, so long as there was no coercive police activity. In *Cristobal*, the Fourth Circuit determined that where the defendant was interviewed in a hospital intensive care unit post-emergency surgery, the police did not "exploit[ ] Cristobal's weakened condition with coercive tactics," that Cristobal "never requested not to be interviewed due to pain," "[n]o officer harmed or threatened to harm Cristobal," and that agents did "not pressure Cristobal in any way to waive his rights." 293 F.3d at 138-39, 141, 141 n.9.

Similarly here, Detective M.D. did not use any coercive tactics, threats of harm, or pressure to coerce Roske to speak. To the contrary, Roske consistently stated that he was not feeling sick, both to Detective M.D. ("You're not sick or anything?" "No") and EMTs ("Are you having any current issues right now? Do you feel sick at all?" "No" "You don't have any mental issues

currently or any pain anywhere?"  "No").  When Roske told Detective M.D. that he had not yet taken his evening dose of medication for his physical condition, Detective M.D., law enforcement, and EMTs worked diligently to obtain and provide Roske's medication to him to take.  Law enforcement also consistently asked Roske if he needed anything and addressed what he asked for, such as using the bathroom and finding him a blanket.  As in *Cristobal*, this is "not a case where law enforcement has attempted to wring[ ] a confession [or *Miranda* waiver] out of an accused against his will."  *Id*. (alterations in original) (internal quotation marks omitted).

Further, because Roske's waiver to Detective M.D. was knowing, intelligent, and voluntary, no re-advisement was necessary when FBI Special Agents later questioned Roske. Multiple courts of appeals, including the Fourth Circuit, have found that the "mere passage of time, however, does not compromise a *Miranda* warning," including if multiple hours elapse between the warning and the interrogation.  *United States v. Frankson*, 83 F.3d 79, 83 (4th Cir. 1996).  In *Frankson*, there was a two and a half hour period between Frankson's *Miranda* advisements and when he began speaking with law enforcement.  In one case cited by the Fourth Circuit in *Frankson* in support of its holding, *United States ex rel. Henne v. Fike*, 563 F.2d 809, 814 (7th Cir. 1997), the Seventh Circuit found that a nine hour passage of time did not require "fresh warnings" to be administered.  In this case, there was approximately four hours between Detective M.D.'s interview and the interview conducted by the FBI.  The four hour period is more akin to, and is squarely within, the time periods noted by Fourth Circuit in *Frankson* that do not require a repeat of *Miranda* advisements.

The fact that Roske validly waived *Miranda* without delay in response to Detective M.D.'s questions further underlines that repeated warnings were not required.  In other words, Roske waived his *Miranda* rights and continued to do so in response to FBI questioning occurring a few

hours later. *See United States v. Thompson*, Case No. 09-CR-64, 2012 WL 2375541, at *8-9 (S.D. W.Va. June 22, 2012) ("The present case is distinguishable from *Frankson* only in that Defendant immediately waived his *Miranda* rights and then continued to waive those rights two hours later."). These interviews were about the same set of events, occurred in the same location, and other than the passage of time, there was no other change in circumstance or intervening event that rendered Roske unable to continue waiving his *Miranda* rights. *See id.* at 9; *see also United States v. Pruden*, 398 F.3d 241, 247 (3d Cir. 2005) (finding that, after a defendant waived and spoke with law enforcement, "[b]eyond the passage of time," which the court estimated to be 20 hours, there was "no other relevant event that could have lessened the effectiveness of Pruden's *Miranda* waiver," specifically, "no allegations of mistreatment, intimidating, or deprivation of food or sleep during the intervening detention.").

Nevertheless, the FBI did provide valid *Miranda* advisements, and Roske continued to waive his *Miranda* rights. At this time, Roske was asked if there was anything else "going on medically," and Roske responded, "No. No." Detective M.D. then asked Roske if his "meds [were] working okay," to which Roske responded, "Yup." FBI Special Agent I.M.'s first question to Roske is there was "anything else you need right now," to which Roske shook his head 'no.' In response to Special Agent I.M. verbally providing *Miranda* advisements — the same advisements given to Roske a few hours before — and asking Roske to "read this . . . read that paragraph for me and sign" the FBI Advice of Rights, Roske also responded affirmatively, by picking his head up from the table, looking at the form — again containing the same advisements as given to Roske a few hours before — signing it, and proceeding to answer questions.

Roske's response to the FBI showed that he continued to knowingly, intelligently, and voluntarily waive his *Miranda* rights. This analysis is largely the same as it was as for his waiver

to Detective M.D., because there were no material changes in the intervening time to the totality of the circumstances, including his intelligence and education, age, lack of threats or promises, and overall lack of police coercion. Roske also continued to confirm that he did not need anything else. If anything, the fact that Roske had already been provided *Miranda* warnings once and was now receiving them again weighs in favor of a continued finding that the waiver was knowing and intelligent, as he had then been given the admonishments twice, akin to an individual with familiarity with the criminal justice system because of repeated contacts.

Roske then proceeded to answer the Special Agents' questions. Thus, even if Roske's affirmative response and signature on the FBI Advice of Rights form were not a valid waiver — which, for the reasons above, it was — his willingness to answer questions after not one, but two, sets of *Miranda* advisements were given is an implied waiver. *See United States v. Cardwell*, 433 F.3d 378, 389-400 (4th Cir. 2005) ("Waiver need not be express, but may be implied from the defendant's actions and words.") In *Cardwell*, the Fourth Circuit found that an individual, after having been fully informed and indicating his understanding of his *Miranda* rights, his "willingness to answer Agent High's question is as clear an indicia of his implied waiver of his right to remain silent as we can imagine." *Id*. at 389-90 (citing *United States v. Frankson*, 83 F.3d 79, 82 (4th Cir. 1996)). After signing the FBI Advice of Rights form — which occurred after acknowledging and signing the MCPD Advice of Rights form — and putting his head back down on the table, Roske responded immediately to Special Agent I.M.'s questions. He did so to multiple questions, and provided information about his Gmail email accounts.

Roske's knowing and voluntary waiver is exemplified most prominently when the agents asked for consent to search his laptop. In response to every question prior to this, Roske responded quickly and without hesitation. In contrast, when Special Agent I.M. asked if it would "be okay if

they went and took a look at that computer for us," Roske stayed silent for approximately 30 seconds before replying, "Why are you asking?" Special Agent I.M. explained that it was to try and confirm that "nobody else is kind of planning anything that's dangerous," after which Roske stayed silent for approximately 30 seconds. At that point, Special Agent I.M. stated that they would "change gears" and turned to ask other questions, to which Roske again began to respond immediately and unhesitatingly. This exchange shows that Roske was comprehending and affirmatively deciding to speak with law enforcement, and was knowingly and intelligently doing so. For the reasons explained above, Roske's waiver was valid, and continued to be valid through the FBI's questioning. Although there was no legal requirement to repeat the advisements, the FBI did so, and Roske continued to knowingly, intelligently, and voluntarily waive his *Miranda* rights and speak with law enforcement.

## IV. <u>MOTION TO SUPPRESS EVIDENCE</u>

The defendant's motion to suppress evidence should be denied for four independent reasons. Each reason is sufficient on its own, but can also be considered in combination with the others, to deny the motion. As explained in this Part, each of these bases are established by a preponderance of the evidence, the relevant standard. *See United States v. Matlock*, 415 U.S. 164, 177 n.14 (1974); *United States v. Helms*, 703 F.2d 759, 763-64 (4th Cir. 1983).

First, the exigencies of the situation rendered any warrantless search objectively reasonable under the Fourth Amendment. Second, the plain view exception to the Fourth Amendment permitted seizure, and the contents of the baggage were a foregone conclusion. Third, because Roske had voluntarily and knowingly left the baggage on the street and walked away, he had no reasonable expectation of privacy in their contents. Fourth, the contents of the baggage would

have been inevitably discovered through an inventory search, whether conducted at Montgomery County's Central Processing Unit or by the FBI at the Greenbelt courthouse.

A. **Pressing, Exigent Circumstances Rendered Any Search Objectively Reasonable**

The Supreme Court has "long recognized an exigent-circumstances exception to the warrant requirement in the Fourth Amendment context." *Quarles*, 467 U.S. at 653 n.3. This is due to the "'exigencies of the situation' mak[ing] the needs of law enforcement so compelling that the warrantless search is objectively reasonable under the Fourth Amendment." *Id.* (quoting *Mincey v. Arizona*, 437 U.S. 385, 394 (1978)). This may include "the need to pursue a fleeing suspect, protect individuals who are threatened with imminent harm, or prevent the imminent destruction of evidence," *Carpenter v. United States*, 585 U.S. 296, 319-20 (2018). In addition to these circumstances, however, "the Supreme Court and this Circuit have held that more general 'emergencies,' if enveloped by a sufficient level of urgency, may also constitute an exigency." *United States v. Yengel*, 711 F.3d 392, 397 (4th Cir. 2013).

Specifically, the "possibility of a threat to the safety of law enforcement officers" and others may constitute an exigent circumstance. *See United States v. Legg*, 18 F.3d 240, 244 (4th Cir. 1994) (characterizing the threat to the safety of law enforcement officers as a "hallmark of Fourth Amendment jurisprudence"); *Warden v. Hayden*, 387 U.S. 294, 298-99 (1967) ("The Fourth Amendment does not require police officers to delay in the course of an investigation if to do so would gravely endanger *their lives or the lives of others*.") (emphasis added). Officers may act under exigent circumstances if they have a "reasonable suspicion" that the "circumstances exist at the time of the search or seizure in question." *United States v. Grogins*, 163 F.3d 795, 797 (4th Cir. 1998); *see also Terry v. Ohio*, 392 U.S. 1, 21 (1968) (defining reasonable suspicion as "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant th[e] intrusion.").

Officers' actions are analyzed through "objective reasonableness—that the facts available to the officer at the moment of the seizure or the search [would] warrant a man of reasonable caution in the belief that the action taken was appropriate." *Id*. at 21-22 (internal quotation marks omitted). Courts also analyze the actions of law enforcement "with due deference for the difference in perspective between an officer who must make snap judgments in minutes or seconds, and a judge who has the 20/20 vision of hindsight." *Mora v. City of Gaithersburg*, 519 F.3d 216, 225 (4th Cir. 2008) (internal quotation marks omitted); *see also U.S. v. Montoya de Hernandez*, 473 U.S. 531, 542 (1985) ("courts should not indulge in 'unreasonable second-guessing'" of the officers' assessment of the circumstances faced).

The Fourth Circuit has, in prior cases, detailed some non-exhaustive factors that are relevant for courts to consider in exigent circumstance searches and seizures: "(1) the degree of urgency involved and the amount of time necessary to obtain a warrant; (2) the officers' reasonable belief that the contraband is about to be removed or destroyed; (3) the possibility of danger to police guarding the site; (4) information indicating that the possessors of the contraband are aware that the police are on their trail; and (5) the ready destructibility of the contraband." *United States v. Turner*, 650 F.2d 526, 528 (4th Cir. 1981). The Fourth Circuit has also recognized, however, that the "emergency circumstances will vary from case to case and the inherent necessities of the situation at the time must be scrutinized." *Id*. (quoting *United States v. Rubin*, 474 F.2d 262, 268 (3d Cir. 1973)).

In this case, officers faced objectively exigent circumstances: recovering the weapons that they had reasonable suspicion to believe were in the community, and that posed a threat to themselves and the community, as well as determining what and where any other weapons were present and a danger to themselves and the community. Officers responding to the scene were

made aware, through dispatch, of an individual with multiple weapons, including a gun, and who had a stated purpose of killing a Supreme Court Justice. This threat is potentially deadly serious whenever made; however, it was particularly serious at this time given the recent, significant, and negative media attention on certain Supreme Court Justices, and the numerous protests that had occurred in the weeks leading up to this day, at this very Justice's residence.

Upon arrival at the scene, officers located who they believed to be the 9-1-1 caller, "Nicholas," but the luggage he claimed the weapons were in was not beside him. Thus, Officer J.R. asked "Nicholas" where his bag was, which for the reasons explained in Part III.B., *supra*, was warranted under the *Quarles* officer and public safety exception to *Miranda*.[13] This provided specific and articulable facts which, taken with rational inferences, indicate that there were weapons at large in a residential community, at one (or possibly more) unknown locations, and potentially in the possession of unknown person(s).

Upon seeing the luggage in plain view a little bit further down the street, Officer G.D.'s first response was to verbalize his concerns over officer and public safety — not once, but twice. First, Officer G.D. cautioned on approach to "look at it for a second and make sure it's not a freaking--" and observed the bags externally for any protruding wires. After not seeing anything obviously protruding from the bags, but without confirmation that the bags were in fact safe, Officer G.D. remarked about having other officers come to the location to secure the items. Second, when deciding that the bags needed to be examined on scene, Officer G.D. instructed officers to be "very careful[ ]" in doing so. All of these events — which occurred within mere minutes of taking "Nicholas" into custody — evidenced the officers' objectively reasonable

---

[13] In addition, Roske's unwarned but voluntary statement does not require suppression of evidence. *See United States v. Patane*, 542 U.S. 630, 639-41 (2004) ("the Self-Incrimination Clause contains its own exclusionary rule.").

suspicion that officer and community safety was at risk, and that the risk was urgent and required immediate action.

Officers needed to act immediately to account for the weapons — all of the weapons — that the 9-1-1 caller stated he had brought into the community, and to secure them in law enforcement custody, rather than in the possession of any potential but unknown accomplices in the area. Officers were also justified in determining whether other weapons (beyond those described by Roske) might be in the immediate vicinity, including of the Justice's home or neighborhood area. This was also true during the search of the luggage. As the officers identified the items in the suitcase, Officer G.D. asked, "Did he say something about a rifle too?," evidencing the need to uncover and account for all the weapons that the 9-1-1 caller claimed to have. The officers ultimately confirmed that the weapons the caller reported to dispatch were all accounted for, and that the luggage did not contain any other threats, such as explosives. It is only at this point that dispatch returned to the air to confirm Roske's identity, further underscoring that the officers acted immediately and based on the exigency of the situation.

The emergency circumstances of this case coincide with, but are not completely accounted for, by the non-exhaustive factors outlined in *Turner*. Thus, while *Turner* supports a finding of exigent circumstances, the factors in *Turner* are not exclusive nor necessarily determinative in this case. At least two factors enumerated in *Turner*, the "degree of urgency involved and the amount of time necessary to obtain a warrant," and "the possibility of danger to police guarding the site," are implicated here. As discussed above, the degree of urgency was at its utmost, given the unknown whereabouts of several declared weapons and the immediate need to locate and secure them for officer and public safety, including against potential unknown accomplices. There was also a real possibility of danger to police and the community, given the possibility of explosives

being in the luggage, and due to the nascent stage of the events. In addition to these factors, the emergency circumstances of this case involved a direct threat to life and safety, particularly against the backdrop of the leak of the draft *Dobbs* opinion and recent protests at the targeted Supreme Court Justice's home. These additional facts make this case unique and, along with the other circumstances presented, warrant the exception.

**B.** **The Plain View Exception Applied, and the Baggage's Contents Were a Foregone Conclusion**

The officers' actions regarding the baggage does not contravene the Fourth Amendment under the "plain view exception" to the Fourth Amendment. *See, e.g.*, *United States v. Williams*, 41 F.3d 192 (4th Cir. 1994); *United States v. Runner*, 43 F.4th 417, 421 (4th Cir. 2022) ("The Fourth Amendment's protection against unreasonable searches is not implicated when the plain view doctrine applies."). Under this exception, officers may seize items when officers are (1) "lawfully present" at the place where officers can plainly view the item; (2) the officers have a "lawful right of access to the object itself;" and (3) it is "immediately apparent that the item seized is incriminating on its face." *Williams*, 41 F.3d at 196.

The Supreme Court has explained that the phrase "immediately apparent" was "an unhappy choice of words" and should not be taken to require "an unduly high degree of certainty as to the incriminatory character of [the] evidence." *Texas v. Brown*, 460 U.S. 730, 741 (1983) (plurality opinion). Instead, a seizure conducted under the plain view doctrine is "presumptively reasonable" as long as "there is probable cause to associate the property with criminal activity." *Id*. at 741-42; *see also United States v. Davis*, 690 F.3d 226, 237 (4th Cir. 2012) (an item "need only be evidence of a crime" for it to have an "incriminating nature"). Probable cause, a standard well known to courts, is a "flexible, common-sense standard" that "merely requires that the facts available to the officer would warrant a man of reasonable caution in the belief . . . that certain items may be . . .

useful as evidence of a crime; it does not demand any showing that such a belief be correct or more likely true than false." *Brown*, 460 U.S. at 742; *see also Runner*, 43 F.4th at 421 (quoting *Brown*).

With respect to containers legally seized, including under plain view, a "subsequent search of the bag (whether to identify or examine its contents), was warranted if it was a foregone conclusion" what that the bag contained. *Davis*, 690 F.3d at 232 n.11, 234; *see also Williams*, 41 F.3d 192, 198 ("When a container has been legally seized, and its contents are a foregone conclusion, we hold that a subsequent search of the container is lawful under the plain view container doctrine.").[14]  Under this analysis, the "circumstances under which an officer finds the container" may be considered, and "add to the apparent nature of its contents." *Williams*, 41 F.3d at 197.  In *Williams*, the Fourth Circuit determined that cellophane wrapped packages found in the defendant's suitcase were properly the subject of a plain view "search," because the packages "spoke volumes as to [their] contents." *Id*.  Further, the Fourth Circuit found that the "contents of the suitcase also spoke volumes," and aided the analysis, because the suitcase contained "no items which a person typically carries in his or her suitcase when traveling, such as clothes, shoes, or toiletry items." *Id*. at 198.  The court also took into account the testimony and experience of law enforcement. *Id*.  The court determined that, where a container's contents was a foregone conclusion, there was no reasonable expectation of privacy. *Id*. ("Accordingly, Williams' expectation of privacy in those packages was unreasonable, and a search warrant was unnecessary.").  Burglary tools and gun cases are two types of containers, specifically, that the Supreme Court has described that "cannot support any reasonable expectation of privacy because

---

[14]  Although cases such as *Williams* uses the "search" verbiage, *Davis* clarifies that, because "it was a foregone conclusion that the bag contained evidence of a crime," namely, certain clothing, there was no search for Fourth Amendment purposes, because "no privacy interests were implicated."  690 F.3d at 232 n.11.  Thus, to the extent the "looking in the bag or cataloguing its contents" is described as a "search," it is "more of labeling than of substance." *Id*.

their contents can be inferred from their outward appearance." *Arkansas v. Sanders*, 442 U.S. 753, 765 n.13 (1979) (overruled on other grounds, *California v. Acevedo*, 500 U.S. 565 (1991)); *see also United States v. Hall*, 495 F. App'x 319, 324-25 (4th Cir. 2012) (applying plain view exception to "search" of rifle bag).

The conditions for the plain view exception are undoubtedly met here. First, the officers were lawfully present at the street where the baggage was located, as it was a public street in a neighborhood within their jurisdiction. Second, the officers also had a lawful right of access to the baggage, as it was sitting openly on the street, next to the curb. Third, there was probable cause to associate the baggage with evidence of a crime, satisfying the third prong of the exception. This is because the 9-1-1 caller stated, as relayed to officers by dispatch, that:

- he had both a suitcase and a backpack;

- he had weapons;

- there were weapons in the suitcase, including a gun, knife, and other tools;

- he was having thoughts of hurting another and himself; and

- he had come from California to kill the Supreme Court Justice.

*See* **Exhibit 1** at 2-3 ("Caller says he is having suicidal and homicidal thoughts came from California to act on them"; "Caller has wpns [weapons]"; "Blk suitcase that has the gun in it///Backpack"; "Pepper spray/knife/firearm and various tools in suitcase"; "Caller came to kill Supreme Court Justice"). While the 9-1-1 caller claimed that there were weapons in the suitcase, dispatch also relayed to officers more broadly that "Caller has wpns [weapons]." Additionally, this occurred merely weeks after the leak of draft opinion in a high-profile Supreme Court case, after which there were numerous protests in front of the targeted Supreme Court Justice's house. Thus, under the totality of the circumstances (including that the officers were alerted to both items,

and both items were left together, next to each other, on the street), officers had facts available to "warrant a man of reasonable caution in the belief" that both the suitcase and backpack contained evidence of a crime; in other words, the officers had probable cause as to both items. *See Brown*, 460 U.S. at 742.

What the baggage contained was a "foregone" conclusion for the same reasons. The 9-1-1 caller claimed that there were weapons, including a gun, pepper spray, knife, and various tools, and the backpack and suitcase were found together on the street, near the location where "Nicholas" was located and detained. These "circumstances under which an officer finds the container," in this case, supports the "apparent nature of its contents." *See Williams*, 41 F.3d at 197-98. Further, as *Sanders* and *Hall* provide, for the burglary tools and gun case, their "contents can be inferred from their outward appearance," making their contents a foregone conclusion. *See Sanders*, 442 U.S. at 765 n.13; *Hall*, 495 F. App'x at 324-25.

## C. <u>There Was No Reasonable Expectation of Privacy Where Roske Volunteered the Contents of the Baggage and Abandoned Them</u>

A person who voluntarily abandons property does not have any reasonable expectation of privacy in the property. *See Abel v. United States*, 362 U.S. 217, 241 (1960). The "proper test for abandonment is not whether all formal property rights have been relinquished, but whether the complaining party retains a reasonable expectation of privacy in the [items] alleged to be abandoned." *United States v. Haynie*, 637 F.2d 277, 237 (4th Cir. 1980); *see also United States v. Ferebee*, 957 F.3d 406, 412-13 (4th Cir. 2020) ("one who abandons property would have no subjective expectation that the property would remain private, nor would society recognize any such expectation as reasonable.").

The analysis is an objective one, to determine the defendant's intent of abandonment from "words spoken, acts done, and other objective facts." *United States v. Mayberry*, 125 F.4th 132,

145 (4th Cir. 2025). This may include the individual's "physical actions" or "disclaimer of ownership over the property." *Id*. Thus, in *United States v. Stevenson*, 396 F.3d 538, 546 (4th Cir. 2005), the Fourth Circuit determined that, "as a matter of law, any expectation of privacy that Stevenson held in the apartment at the time of the search was unreasonable," where the defendant, Stevenson, had evidenced no intent of living in the apartment in the future.

Here, Roske had abandoned an expectation of privacy in the baggage by informing the 9-1-1 operator of its contents. Roske informed 9-1-1 that he had a gun, that there was a gun in the suitcase, and that there were other weapons in the suitcase, namely pepper spray, a knife, and other various tools. **ECF No. 67-1** (9-1-1 call audio) at 1:25 – 2:04 ("I brought a firearm with me, but it's unloaded and locked in a case" and "It's in a suitcase"), 4:51 – 5:17 ("There are other weapons in the suitcase" "There is pepper spray. There is a knife. There are various tools. No other firearms. No explosives, nothing like that."). He also disclosed that there was a jacket and "random" items in a backpack. *Id*. at 2:31 – 2:46. These facts were relayed by dispatch to the responding offers. **Exhibit 1** at 2-3 ("Blk suitcase that has the gun in it//backpack", "Caller says he has a firearm with him that is unloaded and locked in a case", "Caller on foot standing IFO [in front of] HSE [house]//Suitcase IFO Addy//Caller moving 20yds away from suitcase where gun is loc", "Pepper spray//knife//firearm and various tools in suitcase").

Further, in addition to disclosing the contents of the baggage, Roske, without prompting and on his own, voluntarily left the baggage. After he informed 9-1-1 that he has a suitcase and a backpack, and after some back-and-forth on other questions, Roske informed 9-1-1 in response to the question, "Are you on foot? Are you in a car?" that, "I'm on foot and I'm just standing in front of the house on the sidewalk. I'm on the other side of the street *from where I left the suitcase*. I can move it further away from myself, if that's advisable." **ECF No. 67-1** at 3:52-4:25 (emphasis

added).  This shows that Roske had voluntarily left the baggage on the street, in the open, consistent with where law enforcement later found the items.  It is only in response to Roske's unprompted physical abandonment that 9-1-1 stated to "Move far away from the weapon."  *Id*.  Roske's voluntary and unprompted leaving of the baggage and walking across the street is action of abandonment.  *See Ferebee*, 957 F.3d at 414 ("For example, a defendant could abandon a backpack by choosing to leave it as he disembarks from a cross-town bus.  The abandonment is complete when the defendant deliberately walks away without the bag, even if there was no witness to the act."); *see also United States v. Dickens*, 695 F.2d 765, 778, *abrogated on other grounds as recognized in In re Grand Jury Empaneling of Special Grand Jury*, 171 F.3d 826, 828 (3d Cir. 1999) ("courts of appeals have rejected such claims of expected privacy where defendants have placed the seized evidence in public places.").

In addition, Roske had told 9-1-1, which in turn informed the responding officers, that he had suicidal thoughts, **Exhibit 1** at 2 ("Caller says he is having suicidal and homicidal thoughts came from California to act on them").  This indicates no intention of having these items in the future.  This, coupled with the physical, voluntary separation and disclosure of the contents, objectively evidences Roske's intent of abandonment.  Roske's statements and actions show that he did not retain a reasonable expectation of privacy in the baggage.

In *Mayberry*, the Fourth Circuit affirmed a district court's determination that an individual who had left a backpack in a hotel's common stairwell and walked 15-20 feet away from the bag had abandoned it.  125 F.4th at 145-46.  Facts relevant to the court's analysis were that the individual voluntarily left the backpack and walked away from it, the backpack was left in a location where anyone could have had access to it, the backpack was "not hidden from observation in any way," the individual "made no attempt to protect the bag or its contents from inspection by

others," and took no "action indicating an intent to retrieve the backpack later from that location." *Id*. at 146. Similarly, here, Roske left the baggage and walked away from it – across the street – voluntarily and unprompted by law enforcement or 9-1-1; Roske left the baggage on the side of the street, in the open, where any member of the public had access to it; Roske disclosed the contents of the baggage to the 9-1-1 operator and made no other attempt to protect the baggage from inspection by others;[15] and Roske took no actions indicating that he intended to retrieve the baggage later from the location, indeed, to the contrary, he spoke to 9-1-1 about the contents of the baggage. These facts "resolve the legal issue that . . . abandonment of the backpack in a place open to the public relinquished his reasonable expectation of privacy in the bag." *Id*. at 146.

### D. An Inventory Search Would Have Been Performed and the Evidence Inevitably Discovered

Under the "inevitable discovery" doctrine, evidence determined to be improperly obtained may nevertheless be admitted if "the information ultimately or inevitably would have been discovered by lawful means." *Nix v. Williams*, 467 U.S. 431, 444 (1984). Lawful means include inventory searches, or other searches that fall into an exception to the warrant requirement. *United States v. Seay*, 944 F.3d 220, 222 (4th Cir. 2019).

Inventory searches "serve to protect an owner's property while it is in the custody of the police, to insure against claims of lost, stolen, or vandalized property, and to guard the police from danger." *Colorado v. Bertine*, 479 U.S. 367, 372 (1987). Thus, the Government must show, by a preponderance of the evidence, that an inventory search would have been conducted "according to standardized criteria, such as a uniform police department policy[,] and performed in good faith." *Id*. (internal quotation mark omitted) (alteration in original). The Government can meet its

---

[15] The suitcase had a zip tie around its zippers; however, that was placed by airport personnel due to a firearm being in the checked luggage. *See* ECF No. 67-1 at 1:53-2:04 (Roske explaining to 9-1-1 that "the suitcase is zip-tied shut from – I just came from the airport.").

burden to establish standardized criteria only through "testimony regarding standard practices;" it is permissible, although not necessary, to refer to "written rules and regulations." *Id*.

In this case, even assuming, *arguendo*, that the circumstances — the declared attempted assassination of a judge and bringing of weapons to the neighborhood — were not exigent; that the items could not be seized and "searched" under plain view doctrine; and that Roske retained a reasonable expectation of privacy in the baggage despite revealing its contents to 9-1-1 and voluntarily leaving it on a public street; the contents of the baggage would have been inevitably discovered through an inventory search. This is the case whether Roske would have been brought by the FBI to the Greenbelt courthouse in the first instance, or whether he would have gone to Montgomery County's Central Processing Unit had he proceeded in MCPD custody.

Had Roske proceeded in MCPD custody, he would have been brought to the Montgomery County Department of Correction and Rehabilitation's ("MCDOR") Central Processing Unit ("CPU"). Upon arrival at CPU, an arrestee is frisk searched by a CPU officer, with a law enforcement officer present in the search area. **Exhibit 10** (MCDOR Policy and Procedure Manual, Operation of the Central Processing Unit) at 7 (Section IV.C), 12 (Section VI.A.). Any contraband or weapons found during the search are turned over to law enforcement. *Id*. at 12 (Section IV.A.). For other property, the "CPU Officer shall search all property" and document the property inventory. *Id*. (Section IV.B.). Again, "[n]o weapons, tools, scissors, or other sharp objects will be accepted into the CPU at any time." *Id*. These items, as well as any "excess property," are "returned to the transporting officer for disposition according to the transporting agency/officers department directives." *Id*. Thus, had Roske stayed in MCPD custody, and had he not abandoned the baggage, this property would have been fully searched during the intake process at CPU. This would have included opening the bags, and any compartments within. And

as described above, once the suitcase was open, the presence of a gun case would have been obvious and there would be no reasonable expectation of privacy as to its contents. *Arkansas v. Sanders*, 442 U.S. 753, 765 n.13 (1979).

If Roske had been immediately taken into FBI custody, and as will be established by testimony, the baggage would also have been inventoried by the FBI, because the United States Marshal Service operating the Greenbelt courthouse lockup would not have accepted the baggage. This FBI inventory search similarly would have included opening the bags and any compartments within, and discovering the gun case. The fact that the FBI would have inventoried the baggage is supported by the fact that, when the items were transferred from MCPD to the FBI (*i.e.*, when FBI took possession of the items, as they would have done when the Marshals would not accept the items at the courthouse lockup), they were inventoried on a collection log. **Exhibit 11** (FBI collection log). As testimony and exhibits will establish, the contents of the baggage would have been inevitably discovered through an inventory search, and further, there was no reasonable expectation of privacy in certain items, such as the burglary tools and gun case.

## V. <u>CONCLUSION</u>

For the reasons stated above, the defendant's motion to suppress statements and motion to suppress evidence should be denied.

Respectfully submitted,

Philip A. Selden
Acting United States Attorney

By: /s/_____
Thomas M. Sullivan
Coreen Mao

Assistant United States Attorneys
United States Attorney's Office
District of Maryland
Greenbelt, Maryland