**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | |
| | * | |
| **v.** | * | **CRIMINAL NO. DLB-22-209** |
| | * | |
| **NICHOLAS JOHN ROSKE,** | * | |
| | * | |
| **Defendant** | * | |
| | * | |
| | ****** | |

## GOVERNMENT'S MEMORANDUM IN AID OF SENTENCING

## TABLE OF CONTENTS

I.    INTRODUCTION ................................................................................................. 2

II.   SUMMARY OF FACTS ...................................................................................... 5

III.  GUIDELINES CALCULATION ....................................................................... 17

IV.   TERRORISM ENHANCEMENT ..................................................................... 18

V.    SENTENCING FACTORS UNDER 18 U.S.C. § 3553(a) ................................ 19

    A.  Nature and Circumstances of the Offense ................................................. 20

    B.  History and Characteristics of the Defendant ........................................... 23

    C.  Need for the Sentence to Fulfill the Purposes of Sentencing ..................... 25

        1.  To Reflect the Seriousness of the Offense, to Promote Respect for the Law, and to Provide Just Punishment for the Offense, 18 U.S.C. § 3553 (a)(2)(A) ........ 25

        2.  To Afford Adequate Deterrence to Criminal Conduct, 18 U.S.C. § 3553(a)(2)(B) ................................................................................ 27

        3.  To Protect the Public from Further Crimes of the Defendant, 18 U.S.C. § 3553(a)(2)(C) ................................................................................ 30

        4.  To Provide the Defendant with Needed Educational Training, Medical Care, or Other Correctional Treatment in the Most Effective Manner, 18 U.S.C. § 3553(a)(2)(D) ................................................................................ 31

    D.  Supervised Release Conditions ................................................................. 31

VI.   CONCLUSION ................................................................................................. 32

# I.  **INTRODUCTION**

"**[W]hat do you think would happen if [last name of Associate Justice] died?**" – May 18, 2022

"**Also the right have a 5-4 majority so if one conservative justice dies then it becomes a 5-4 for the left**" – May 18, 2022

Google search:  "**countries least likely to extradite to the us**" – May 19, 2022

"**[Y]eah but i could get at least one, which would change the votes for decades to come. *[A]nd I am shooting for 3***" – May 27, 2022 (emphasis added)

"***[P]eople have killed judges before***" – May 27, 2022 (emphasis added)

Google search:  "**how much force do you need to stab someone's neck**" and "**most effective way to silently kill someone**" – May 29, 2022

Google search:  "**insanity defense**" – June 3, 2022

Google search:  "**does twisting or dragging a knife cause more damage**" and "**how to break a lock**" – June 4, 2022

"It is emphatically the province and duty of the judicial department to say what the law is." *Marbury v. Madison*, 1 Cranch 137, 177 (1803).  Nicholas Roske, disagreeing with that bedrock principle of our system of government, attempted to overrule that principle of judicial independence through judicial assassination.

In the spring of 2022, the defendant meticulously researched, planned, and attempted to assassinate at least one — but had a stated target of three — sitting judges of the United States Supreme Court.  The defendant's explicit objective was to single-handedly alter the Constitutional order for ideological ends.  Those plans mercifully were disrupted upon the defendant's arrival at the first Associate Justice's residence due to the presence of a protective security detail, and the defendant was arrested at that location.  The defendant's own words show that the defendant was "***shooting for 3***" assassinations (emphasis added).  A map saved in the defendant's Google account

contained location pins marking what the defendant believed to be the residential addresses of four sitting Supreme Court Justices.

In the month leading up to June 8, 2022, the defendant conducted internet searches for the homes of these four Justices, including images. In the two weeks before June 8, 2022, the defendant purchased a Glock 17 pistol, ammunition, a rail mounted tactical light with laser sight, tactical gloves, non-slip grip socks, cable ties, pepper spray, lock pick set, a screwdriver, and a wrecking bar. Two days before June 8, 2022, the defendant searched "windows how to wipe down a drive" and submitted a request to delete permanently the defendant's Discord account, where the defendant had made statements such as "***people have killed judges before***."

On June 6, 2022, the defendant attempted to fly from Los Angeles to Washington Dulles airport, but arrived at the airport too late to check a bag — a bag containing a knife, gun, ammunition, lock pick set, and other equipment.[1] The defendant, remaining steadfast in carrying out the planned mission to kill, rescheduled the flight for the next day. On June 8, 2022, the defendant arrived at Washington Dulles airport and took a taxi to the personal residence of a sitting Associate Justice of the Supreme Court in Montgomery County, Maryland, arriving at about 1:06 a.m. The defendant had packed and brought a suitcase containing the purchased Glock 17 pistol, two loaded magazines and additional ammunition, a chest rig (harness used to carry tactical gear), a knife, lock picks, a hammer, screwdriver, nail punch, crowbar, duct tape, hiking boots with padding affixed to the bottom of the soles, and pepper spray.

Two Deputy United States Marshals, who were guarding the Associate Justice's residence from separate vehicles stationed outside the residence, saw the taxi arrive and stop in the street

---

[1] The defendant told the MCPD detective: "I had a flight yesterday, but I was too – I arrived too late at the airport to check my bag, so I rescheduled for Tuesday." ECF No. 64-7 at 8:16-18.

directly in front of the residence, and watched the defendant get out of the taxi and retrieve a suitcase from the trunk.  One of the Deputy United States Marshals postured to be able to get out of her car, cracking open her car door and illuminating the interior of her vehicle.  Upon seeing law enforcement presence, the defendant decided to walk past the front of the house and directly past the Deputy United States Marshal.  In the defendant's own words:  "***I noticed immediately that there were people sitting outside*** and this was a very like empty neighborhood, so ***I was like, okay, they're keeping a lookout***."  ECF No. 64-7 at 10:16-20 (emphasis added).  It was only after this point — after observing a visible law enforcement presence protecting the residence — that the defendant walked past the Associate Justice's home, received a phone call from the defendant's sister and, after speaking for approximately 20 minutes, called 9-1-1.

The defendant's criminal conduct — the Attempted Assassination of a Justice of the United States, in violation of 18 U.S.C. § 351(c) — required extensive premeditation.  The defendant researched; planned; procured the tools for the planned killings; traveled across the entirety of the country with those tools, including a gun; and attempted to delete online evidence of motive and intent.  The defendant's objective — to target and kill judges to seek to alter a court's ruling — is an abhorrent form of terrorism and strikes at the core of the United States Constitution and our prescribed system of government.  The defendant's Sentencing Guidelines range accurately reflects the severity of the crime in its recommended range of imprisonment of 30 years to life.  For the same reason and as explained further in this memorandum, the Government submits that a Guideline sentence – of **no fewer than 30 years to life imprisonment, followed by lifetime supervised release**, is the necessary and just sentence in this case given all the aggravating and other factors to be considered under 18 U.S.C. § 3553(a).

Restitution is not being sought in this case.  The Government concurs in the Mandatory and Standard Conditions of Supervision, along with the Additional Conditions of Supervision proposed by the U.S. Probation Office, with one proposed modification.  The Government proposes that Additional Condition of Supervision #2 be revised to state (revisions in italics): "You must not knowingly communicate, or otherwise interact, with the victim, *the victim's immediate family, and all other individual Justices of the Supreme Court and their immediate families*, either directly or through someone else, without first obtaining the permission of the probation officer. *This condition does not apply for filing pleadings with any appeal taken from any judgment entered in this matter*."  The Government also asks that the Court accept any Victim Impact Statement prior to sentencing.

## II.  <u>SUMMARY OF FACTS</u>

The events of June 8, 2022, starting at approximately 1:42 a.m. when Montgomery County Police Department ("MCPD") officers received an urgent, priority call for service, are well-detailed in the Government's Omnibus Response in Opposition to Defendant's Motion to Suppress Statements and Evidence, ECF No. 74, and accompanying Exhibits, ECF Nos. 74-1 through 74-11. For brevity, the Government repeats in this memorandum only certain facts from that recitation, and submits that the Court may use the Exhibits submitted from both parties during pre-trial motions briefing to make findings of fact by a preponderance of the evidence, *see United States v. Vinson*, 886 F.2d 740, 741-42 (4th Cir. 1989).

While the events that transpired in the middle of the night of June 8, 2022, and at the MCPD district station that morning, have been detailed and submitted for the Court, those events — which covered approximately only 9 hours of time — represent only a small and incomplete portion of the defendant's extensive conduct in this case.  The more complete picture starts approximately at least **three months** earlier, in March 2022, and shows that the defendant meticulously

contemplated, researched, plotted, and carried out a terrorist plot to target and assassinate multiple Supreme Court justices.

On March 18, 2022, the defendant, on Discord, told another Discord user: "[M]y mental health is too poor for me to fear death. But prison sounds worse. To be monitored to the point where you can't even kill yourself. **So if I did kill someone I would definitely try to get away with it**." **Exhibit A (Agent Affidavit), Attachment 1 (hereinafter "Timeline")** at 1[2] (emphasis added). In April 2022, Roske's Google accounts repeatedly searched for shooting videos, including school shooting videos, and for mass shootings or mass shooters. *Id*. Roske also searched firearms-related terms 18 times, including "buy guns online," "gun store," and "where to find serial numbers on guns." *Id*. Roske also posted on Reddit, "Which person's death would have the biggest impact on the world?" *Id*.

On May 2, 2022, a leaked draft majority opinion in a highly anticipated pending Supreme Court case about *Roe v. Wade* was published online. Within two days, Roske searched "roe v wade" online. *Id*. at 2. Over the next two weeks, Roske searched terms relating to combat and body armor approximately 28 times. *Id*. Within a month, Roske searched firearms-related terms over 90 times. *Id*. Searches included:

- "quietest semi auto rifle"
- "gun calibers"
- "best silencers for glock 17"
- "can you bring a gun in your luggage"
- "how long does it take for cops to respond to shots fired"
- "22 laser sight"
- "most important attachments for pistols"
- "how far are 9mm accurate"
- "homemade silencers"

---

[2] In this memorandum, pincites to the Attachments are to the internal pagination (not the ECF stamped page number).

*Id.* Roske also researched the potential to shoot as a sniper from a longer range. Searches included:

- "do snipers aim for the head or the chest"
- "best caliber for 200 yards"
- "scope magnification for 200 yards"
- "does the secret service protect supreme court justices"
- "do you have to account for wind at 200 yds"

*Id.* at 4. In the month leading up to June 8, 2022, Roske conducted online research into breaking into a residence, burglary tools, and ways to avoid detection. Searches included:

- "easiest way to open a locked door"
- "how to break glass quietly"
- "how to remain undetectable"
- "most reliable way to pick locks"
- "best way to break into a house"
- "how to make shoes quieter"
- "how to make handcuffs with zip ties"

*Id.* at 3.

In addition to extensive research on guns and shooting, body armor, breaking and entering, and methods to be silent and avoid detection, Roske conducted repeated research on the Supreme Court and targeted certain justices.[3] In the month leading up to June 8, 2022, Roske searched "supreme court" and general searches about its cases approximately 12 times. *Id.* at 3. Roske researched the Associate Justice extensively, searching approximately 27 times, including by name and the Associate Justice's home address. *Id.* Roske researched Justice 2 extensively, approximately 16 times, including Justice 2's home address. *Id.* at 5. Roske researched Justice 3

---

[3] As used in this Memorandum and accompanying Exhibits, the justice whose home Roske directed the taxi to and arrived at in the morning of June 8, 2022 is referenced as the "Associate Justice." Other justices that Roske conducted research into are referenced as "Justice 2," "Justice 3," "Justice 4," and collectively, the "other Justices."

A key that provides non-anonymized information is in the Government's proposed sealed filing **Exhibit D**.

extensively, approximately 10 times, including Justice 3's home address.  *Id*. at 6.  On May 28, 2022, Roske searched "justice home."  *Id*.  On June 1, 2022, Roske searched Justice 4 extensively, approximately 9 times, including Justice 4's home address.  *Id*. at 7.  On that same day, June 1, 2022, Roske searched, "***mark locations on google maps***."  *Id*. (emphasis added).  Roske also searched, "***has a supreme court justice ever been assassinated***." (emphasis added).  Roske's Google accounts also contained a saved map with a "modified date" of June 4, 2022, plotting the locations of the four justices' homes that Roske had researched on a map.  *Id*. at 8.

Roske's online statements unequivocally reveal the terroristic purpose of the planned assassinations.  Throughout May, Roske's posted and stated to other users on Discord:

- "Would [Associate Justices' last name] being removed from the SC help women long term?"  *Id*. at 3.

- "I was thinking of the Roe decision.  I feel like those 9 people make a much bigger impact than most people."  *Id*. at 4.

- "***what do you think would happen if [last name of Associate Justice] died***?"  *Id*. at 5 (emphasis added).

- "***Also the right have a 5-4 majority so if one conservative justice dies then it becomes a 5-4 for the left***."  *Id*. (emphases added).

- "[I]f a conservative judge were replaced by a liberal judge, thus changing which party has the majority, what would change?"  *Id*.

- "The thought of Roe v Wade and gay marriage both being repealed has me furious."  *Id*. at 6.

On May 27, 2022, Roske messaged a different user on Discord, stating an intent to remove multiple Supreme Court justices through murder:

- In response to the question "what u tryna do," Roske stated, "***remove some people from the supreme court***,"

- "[Y]eah but ***i could at least get one, which would change the votes for decades to come.  [A]nd I am shooting for 3***."

- "***people have killed judges before***"

8

*Id.* (emphases added).

This intent for multiple killings can be seen as far back as January 2022, when Roske searched online for websites for mass shootings in the United States in 2021 and 2022. Timeline at 1. Roske also visited websites for "How are mass murderers treated in prison?" and "***Games where you play as a serial killer and try to get away with murder***." *Id.* (emphasis added). In March 2022, Roske searched for serial killers Donald Henry Gaskins and Peter Sutcliffe. *Id.*[4]

Roske's searches for killing included for videos of mass shootings, such as school shootings ("school shooting videos" and "best place to find video of school shooting"). *Id.* Roske also searched for video from specific mass shooting events, such as in Sutherland Springs, Texas ("Sutherland springs video" and "kelley shooting video")[5] and New Zealand ("new zealand shooting video").[6]

In addition to researching serial killers, mass shootings, and specific individual target judges, breaking and entering a house undetected, and firearms, Roske intensely researched stabbing, strangulation, and killing someone quietly. Repeatedly between May 10, 2022 and June 5, 2022, Roske searched for, among other terms:

- "most effective place to stab someone"

---

[4] Gaskins confessed to killing 15 people. Sarah Ellis, *40 years ago, infamous SC killer 'Pee Wee' Gaskins slayed last victim – a fellow prisoner*, The State (Sept. 24, 2022), *available at* https://www.aol.com/40-years-ago-infamous-sc-100000131.html. Sutcliffe killed 13 women. *Yorkshire Ripper Peter Sutcliffe dies*, BBC (Nov. 13, 2020), *available at* https://www.bbc.com/news/uk-england-54874713.

[5] In 2017, an individual with the last name Kelley shot and killed at least 26 people at a church in Sutherland Springs, Texas. Neena Satija, Jolie McCullough, and Abby Livingston, *At least 26 dead after worst mass shooting in Texas history at San Antonio-area church*, The Texas Tribune (Nov. 5, 2017), *available at* https://www.texastribune.org/2017/11/05/reports-multiple-people-dead-following-central-texas-police-shooting/.

[6] In 2019, a now-convicted defendant shot and killed 51 people at a mosque in New Zealand. Nick Perry, *Man who killed 51 in New Zealand mosque attacks files appeal*, the AP (Nov. 7, 2022).

- "how to quietly knock someone out"
- "how far into the neck is the trachea"
- "how far into the neck is the throat"
- "what is the best length of knife for stabbing"
- "how much force do you need to stab someone's neck"
- "carotid artery"
- "most effective way to silently kill someone"
- "garrote"
- "does twisting or dragging a knife cause more damage"
- "neck injury with highest mortality rate"

*Id*. at 3.  On June 4, 2022, Roske visited and viewed over 30 websites showing head and neck anatomy and graphics depicting knives in the body, especially in the neck.  Some of these websites had graphic photographs of neck wounds and some showed a knife lodged in a person's neck.  *Id*. at 8.

Roske also researched serial killers and murderers who were careful not to leave evidence, posting on Reddit:

- "Which Serial Killer was the most careful?" "By most careful I mean planned things out, very conscious of leaving evidence, purposefully trying to avoid having a pattern, etc."
- "Writing a killer who is obsessed with not leaving evidence.  What methods could they use?"
- "I am trying to write a killer who is very methodical, calm, patient, etc.  Not theatrical but practical.  I was curious what lengths someone like that would go to in order to avoid leaving evidence."

*Id*. at 4.

Simultaneous to Roske's online research of specific targets, ways to kill someone, and ways to do so without leaving evidence, Roske purchased tools to carry out the plan.  This included:

- May 23, 2022 – a Glock 17 at a gun store in California ("Gun Store 1")
- May 25, 2022 – a rail mounted tactical light with laser sight, tactical gloves
- May 27, 2022 – lock pick set
- May 31, 2022 – non-slip grip socks, duct tape, cable ties
- June 1, 2022 – pepper spray

- June 2, 2022 – Roske took possession of the Glock 17 and purchased 9mm ammunition
- June 5, 2022 – pry bar, screwdriver, 34 piece lock pick set

*Id*. at 6-8.

Roske's research also looked into how to evade prosecution by fleeing to a foreign country that did not have an extradition agreement with, or would be less likely to extradite to, the United States, searching for:

- "countries that don't extradite to the us"
- "does iceland extradite to the us"
- "does Sweden extradite to the us"
- "how to get a passport in California"
- "countries least likely to extradite to the us"

*Id*. at 5.

By early June 2022, Roske had conducted extensive research and obtained the items needed to carry out the planned assassinations. On June 3, 2022, Roske visited a shooting range ("Gun Store 2") to practice pistol shooting. *Id*. at 7. That same day, Roske conducted multiple online searches showing full awareness of what may occur after the crime, including:

- "insanity defense"
- "by reason of insanity louis theroux"
- "what happens if you are suicidal in prison"
- "if you are hospitalized after a crime what happens"

*Id*.[7] On the next day, on June 4, 2022, the same day that Roske visited over 30 websites showing head and neck anatomy and graphics depicting knives in the neck, Roske booked a flight from Los Angeles airport to Washington Dulles airport for June 6, 2022. *Id*. at 8. The date June 4, 2022 also showed as the "modified date" on a saved map to Roske's Google accounts that plotted the

---

[7]    Roske had also previously searched, on May 28, 2022, "how to stay sane in solitary confinement." *Id*. at 6.

locations of the four justices' homes that Roske had researched.  *Id*.  On June 4 and 5, 2022, Roske researched how to travel by air with weapons, and returned to Gun Store 2 on June 5, 2022 to purchase a lockbox.  *Id*.

On June 6, 2022, Roske searched for "***windows how to wipe down a drive***," as well as received an email from Discord confirming receipt of a request to delete the Discord account that Roske had been using to post and message the statements quoted above.  *Id*.  Roske drove to LAX to board the flight booked to Dulles airport, *id.*, but, in the defendant's own words to the MCPD Detective, "I arrived too late at the airport to check my bag, so I rescheduled for Tuesday."  ECF No. 64-7 at 8:16-18.  An email to Roske confirmed a flight change.  Timeline at 9.

After taking the re-booked flight, on June 8, 2022, at approximately 12:37 a.m., Roske took a taxi to the targeted Associate Justice's home.  *Id*.  At approximately 12:53 a.m., Roske texted "I love you" to Roske's sister.  *Id.*  At approximately 1:06 a.m., Roske arrived and was dropped off on the street in front of the Associate Justice's home.  *Id*.  Two Deputy United States Marshals, each sitting in their own patrol vehicle facing each other in front of the Associate Justice's home, observed the taxi arrive and park in the middle of the street.  **Exhibit B (Declaration of Deputy U.S. Marshal A.C.) ¶¶** 3-5.  The Deputies observed a passenger exit the taxi and retrieve a suitcase from the trunk.  *Id*.  One of the Deputies, Deputy Marshal A.C., cracked open her car door to be ready to exit her vehicle if needed, which also illuminated the interior of her vehicle.  *Id*. ¶ 5.  Upon observing the Deputies, Roske, with the suitcase, walked on the sidewalk directly past Deputy Marshal A.C. and continued until becoming out of Deputy Marshal A.C.'s sight.  *Id*. ¶ 6.  In the defendant's own words:  "***I noticed immediately that there were people sitting outside* and this was a very like empty neighborhood, so *I was like, okay, they're keeping a lookout*.**"  ECF No. 64-7 at 10:16-20 (emphases added).

Approximately 10 minutes later, at 1:17 a.m., Roske's sister called Roske, and they spoke for approximately 20 minutes.  Timeline at 9.  At approximately 1:39 a.m., Roske spoke with 9-1-1.  *Id*.[8]  At approximately 1:42 a.m., MCPD officers are alerted to an urgent call for service to respond to the area near the Associate Justice's home.  *Id*.

Once at the scene, the MCPD officers quickly located and detained the individual that matched the description given by dispatch, later confirmed to be Roske.  ECF No. 74 (Government's Opp'n) at 5.  The officers also worked quickly to locate the bag where the caller (later confirmed to be Roske) stated there were weapons, including a gun, knife, pepper spray, and various other tools.  *Id*. at 4-6.  The officers determined that a prompt, on-scene search of the suitcase was necessary for officer and public safety.  *Id*. at 6, 11.  Inside the suitcase, officers located a chest rig with a knife, a Glock 17 pistol with two magazines and additional ammunition — later determined to be 37 rounds in total, ECF No. 74-11 at 2 — lock picks, hammer, screwdriver, nail punch, crow bar, duct tape, hiking boots with padding affixed to the bottom of the soles, and other items.  ECF No. 74 at 11-12.  Other items included a flashlight and laser, zipties, pepper spray, and a thermal imaging monocular.  ECF No. 74-11 at 2-3.  *See also* ECF No. 74-3 (photographs taken on scene) (three of four pages shown in the screenshots below).

---

[8]  Roske made a call to 9-1-1 at approximately 1:38 a.m., and 9-1-1 called back at 1:39 a.m.







At the scene, a "show up" is conducted and Deputy Marshal A.C. positively identified Roske as the individual she observed exiting the taxi in front of the Associate Justice's home. *Id*. At the scene, and at all times after arrest, Roske's demeanor is calm, responsive, and not verbally or physically agitated. Indeed, Roske appeared to be resting on multiple occasions: while at the scene in an officer's car, while being transported to the district station, and while in a holding cell at the station. ECF No. 74 at 13-16. When an officer approached the holding cell to bring Roske to an interview room, Roske appeared to be resting. *Id*. at 16-17.

At the station, upon learning that Roske has a physical condition for which Roske takes medication about every 12 hours, the MCPD Detective and officers diligently asked for medical personnel to come to attend to Roske. *Id*. at 17-18. The EMTs examined Roske and assessed that all of Roske's "vital signs look stable." *Id.* at 17-18, 21-22. The EMT also asked if Roske had

been taking his medication, which Roske confirmed ("Yes"). *Id*. at 22.[9]  The MCPD and EMTs also worked promptly to locate and provide Roske's medication (for the physical condition) to Roske to take. *Id.* at 17-18, 21-23.

In the meantime, the MCPD Detective had provided Roske *Miranda* warnings, which Roske unequivocally understood and waived. *Id*. at 18-20; *see also* ECF No. 74-8 (MCPD Advice of Rights Form initialed and signed by Roske).  Roske told the Detective that Roske had done research on the Associate Justice, and had purchased the gun "with the intention of using it.  To kill [the Associate Justice] and then myself.").  ECF No. 74 at 21.  Roske stated that the leaked Supreme Court draft "made me upset" and motivated Roske's plan to kill the Associate Justice. *Id*.; *see also* ECF No. 64-7 at 41:2-6.  Roske also stated that "Another motivating factor was I heard that the current court was thinking about loosening gun restrictions[.]" *Id*. at 31:20-22.

Roske told the Detective that after being dropped off by the taxi, Roske "noticed immediately that there were people sitting outside and this was a very like empty neighborhood, so I was like, okay, they're keeping a lookout.  So then I went around the house on the other side[.]" *Id*.  Soon after, Roske's sister called and after that conversation, Roske called 9-1-1.  Roske also told the Detective that the burglary tools were purchased online, and that Roske conducted research for about a month for what Roske described as "a project, I guess" using the computer.  ECF No. 64-7 at 27-28.  In response to the Detective asking what Roske planned to do with the duct tape, Roske stated, "Covering windows when I break them," and about plans for the zip ties, Roske stated, "In case I wanted to restrain someone." *Id*. at 34-35.  The interview concluded shortly after.

---

[9]  At the defendant's initial appearance at approximately 3:27 p.m. on the same day, June 8, 2022, Roske confirmed that Roske has been taking medications prescribed by a doctor, and had taken them that day. *Id*. at 26-27.

Later that morning, Roske was interviewed by the FBI. The FBI Special Agents, too, provided *Miranda* advisements to Roske, who again unequivocally understood and signed an Advice of Rights form. ECF No. 74 at 23-24; *see also* ECF No. 64-8 (FBI Advice of Rights signed by Roske). Throughout the interview, Roske is conversational and responsive to questions. A prominent exception was Roske's reluctance about a consent search for Roske's computer in California, with Roske ultimately revealing that Roske had done a "data wipe" of the laptop. In response to a Special Agent asking Roske for consent to search Roske's computer in California, Roske stayed silent for approximately 30 seconds and then replied, "Why are you asking?" ECF No. 74 at 25. The Special Agent repeated that, "We just want to make sure that, again, nobody else is kind of planning anything that's dangerous. . . . the last thing we want to do is, you know, not be able to stop somebody from doing something that they might regret later." *Id*. In response, Roske stayed silent for approximately 30 seconds. *Id*. The Special Agent decided to "change gears and [to] come back to that," and engaged in conversation with Roske on other topics for approximately 17 minutes. *Id*. at 25-26. After a free-flow of conversation on other topics for approximately 17 minutes, the Special Agent brought back up the laptop, asking, "So is that something that you'd be willing to let us look at if we could get a hold of that computer?" *Id*. at 26. Roske stayed silent for approximately 35 seconds. The Special Agent reiterated that the focus was to "vet out the possibility of any other threats or dangers to anybody else," and Roske stayed silent for approximately 25 seconds. *Id*. A few minutes later, Roske finally disclosed that Roske had recently done a "data wipe" of the laptop. *Id*. The interview concluded shortly after.

### III. <u>GUIDELINES CALCULATION</u>

The Government concurs with the Sentencing Guidelines calculated in the Presentence Investigation Report, ECF No. 88 (hereinafter "PSR"). The defendant has not submitted any

objections to the PSR Guidelines calculation.  *See* PSR at 18.  As determined in the PSR, the Guidelines are:

- Base offense level, under U.S.S.G. § 2A2.1(a):  33

- Terrorism enhancement, under § 3A1.4(a):  +12

- Adjusted offense level:  45

- Acceptance of responsibility, under § 3E1.1(a) and (b):  -3

- **Final adjusted offense level:  42**

PSR ¶¶ 29-38; *see also* Government's letter submitted in advance of the defendant's plea, ECF No. 81 (calculating the same).  Roske does not have a prior criminal history, which indicates a criminal history category of I.  PSR ¶ 41.  Under § 3A1.4(b), however, the criminal history category becomes a VI as the offense involved a federal crime of terrorism.  PSR ¶ 42.  Under either criminal history, however, the Guidelines range is the same:

- Offense level 42, criminal history category I = 360 months – life

- **Offense level 42, criminal history category VI = 360 months – life**

Thus, the defendant's Sentencing Guidelines range is 360 months (30 years) to life imprisonment.

## IV. TERRORISM ENHANCEMENT

The terrorism enhancement under Sentencing Guideline § 3A1.4(a) is appropriate in this case and, as noted above, is not objected to by the defense.  *See* PSR at 18.  The enhancement applies if the "offense is a felony that involved, or was intended to promote, a federal crime of terrorism."  U.S.S.G. § 3A1.4(a).  A "federal crime of terrorism," in turn, is defined by 18 U.S.C. § 2332b(g)(5).  U.S.S.G. § 3A1.4(a) cmt App. Note 1.

The defendant's conduct meets both prerequisites (though one is sufficient) under 18 U.S.C. § 2332b(g)(5) for this crime to be a "federal crime of terrorism."  Under 18 U.S.C.

§ 2332b(g)(5)(A), a "federal crime of terrorism" is one that "is calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct." The defendant's conduct wholly meets this definition. The defendant sought to influence or affect the workings of the Supreme Court, both in the outcome of a then-pending decision and, in the defendant's own words, in the judiciary's decisions for "decades to come." The offense also meets the definition under 18 U.S.C. § 2332b(g)(5)(B)(i), which defines a "federal crime of terrorism" as particular statutes. One of the enumerated statutes is 18 U.S.C. § 351(c), the offense to which the defendant pled guilty. Thus, the defendant's conduct and offense is undoubtedly a "federal crime of terrorism."

## V. SENTENCING FACTORS UNDER 18 U.S.C. § 3553(a)

The severity and potential devastating impact of the defendant's criminal conduct is immeasurable and staggering. By targeting and planning to kill "at least one," but "shooting for 3" justices of the Supreme Court, the defendant sought single-handedly and irrevocably to alter an entire branch of the United States government through violence. The defendant researched and planned the assassination plot over an extended time period, purchased a firearm, ammunition, and other tools needed to carry out the plot, and destroyed a laptop and attempted to delete an online account to conceal evidence. Roske presented a very real threat to life to an individual and their family members — a threat that showed up at their home in the middle of the night. No judicial or court official, or their family, should have to live under the fear and mental toll that they could, on any day, at any time of day or night, be gunned down based on a judicial decision.

There is an overwhelming need for the sentence in this case to "reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense," to "afford adequate deterrence to criminal conduct," both specific and general, and "to protect the public from further crimes of the defendant." 18 U.S.C. § 3553(a)(2). Taking these purposes of

sentencing into account, and considering all other factors to be considered in imposing a sentence, the necessary and just sentence is one that no fewer than 30 years' imprisonment.

## A.  Nature and Circumstances of the Offense

The nature and circumstances of the offense are bone-chilling.  At base, the defendant attempted to commit pre-planned, cold-blooded murder.  The defendant targeted "at least one," but was "shooting for 3" individuals — members of the judiciary — to kill.  The defendant targeted those individuals based on a judicial outcome, and sought out those individuals at their personal homes, where they and their families live.  The defendant sought to change through violence the workings of an entire, co-equal, branch of government.  Assassination and attacks on an independent federal judiciary, including their attempts where mercifully the resultant harm may be more mental than physical, is reprehensible and should be roundly condemned in our society.

The facts show that starting months before June 8, 2022 — indeed, even over a month prior to the draft Supreme Court opinion leak — the defendant conducted online research into mass shootings and serial killers.  *See* Timeline at 1 (searches in January 2022 for, among other things, "Games where you play as a serial killer and try to get away with murder;" in March 2022 for serial killers Donald Henry Gaskins and Peter Sutcliffe; and in April 2022 for guns, including "buy guns online.").  After the leaked draft Supreme Court opinion was published online in early May 2022, Roske's attention focused on assassinations, body armor, and specific guns and attachments. *See* Timeline at 2 (searches for "assassinations," "does kevlar block 5.56 ammo," "what do marines carry in combat," "quietest semi auto rifle," "best silencers for glock 17," "22 laser sight," "how far are 9mm accurate," among others).

Throughout May 2022, Roske continued to research and plan for an assassination, including on a sniper-style killing, *see* Timeline at 4 ("do snipers aim for the head or the chest,"

"best caliber for 200 yards," "do you have to account for wind at 200 yds"); and breaking and entering, *see* Timeline at 3 ("how to break glass quietly," "how to remain undetectable," "most reliable way to pick locks," "best way to break into a house). Roske also surveilled the intended targets, *see* Timeline at 3, 5, 6, 7 (searching repeatedly for the Supreme Court, justices' information and addresses), and plotted their addresses on a map, Timeline at 8.

Disturbingly, in addition to firearms-related searches, Roske also closely researched various manner and means of homicide, including stabbing, strangulation, and killing a human being in a quiet manner. *See* Timeline at 3 ("how much force do you need to stab someone's neck," "most effective way to silently kill someone," "does twisting or dragging a knife cause more damage," "neck injury with highest mortality rate"). The same day that Roske booked a flight to D.C. (originally for June 6, 2022), Roske visited numerous websites showing extremely graphic images of knives in the neck and neck lacerations. Timeline at 8; *see also* **Attachment 10D (Graphic Warning. Unredacted version filed under seal)**. And indeed, Roske brought a knife to Montgomery County. Timeline at 9; *see also* **Attachment 2**.

Roske's conduct went far beyond internet searches. Roske purchased numerous tools needed for the plan, including a pistol, ammunition, lock picks, tactical gloves, non-grip socks, duct tape, and a gun lockbox to use to transport the pistol on a flight. *See* Timeline at 6-8. Roske practiced shooting with the pistol just a few days prior to traveling across the entire country to Maryland. *See* Timeline at 7. Roske brought the purchased gun, tools, and other materials to Montgomery County. Timeline at 9; *see also* **Attachment 2**. Roske told a MCPD Detective that the duct tape was to be used for "Covering windows when I break them," and that the zip ties would be used "In case I wanted to restrain someone." ECF No. 64-7 at 34-35.

In the days immediately preceding June 8, 2022, on June 2-3, Roske took possession of the pistol, purchased 9mm ammunition (the same caliber recovered in Montgomery County), and practiced shooting the pistol.  Timeline at 7.  On June 4, Roske searched how to "mark locations on google maps," and indeed had a Google Map saved with locations marked for where Roske believed the Associate Justice and three other Justices of the Supreme Court lived.  Timeline at 7-8.  When Roske arrived at the airport too late for the originally scheduled flight, Roske rescheduled and returned to the airport for the re-booked flight the next day.  Timeline at 8-9; ECF No. 64-7 at 8:16-18.

Also in the days immediately preceding June 8, 2022, Roske also sought to delete evidence. On June 6, Roske searched "windows how to wipe down a drive," and later told FBI agents — after thoughtful reticence — that Roske had done a "data wipe" of Roske's laptop.  Timeline at 8, ECF No. 74 at 26.  Roske also received an email from Discord confirming the request to delete permanently Roske's Discord account.  Timeline at 8.  Messages by Roske in Roske's Discord account included:

- March 18, 2022:  "So if I did kill someone I would definitely try to get away with it."

- May 18, 2022:  "what do you think would happen if [last name of Associate Justice] died?"

- May 18, 2022:  "Also the right have a 5-4 majority so if one conservative justice dies then it becomes a 5-4 for the left"

- May 27, 2022:  "im gonna stop roe v wade from being overturned"

- May 27, 2022:  in response to the question "what u tryna do," Roske stated, "remove *some people* from the supreme court" (emphasis added)

- May 27, 2022:  "yeah but i could get at least one, which would change the votes for decades to come. and *I am shooting for 3*" (emphasis added)

- May 27, 2022:  "*people have killed judges before*" (emphasis added)

Roske exhibited full awareness of the significance and consequences of Roske's assassination plan, and preemptively researched potential escapes and defenses. On May 18-19, 2022, Roske searched for "countries that don't extradite to the us," "does iceland extradite to the us," and "does sweden extradite to the us." Timeline at 5. On June 3, 2022, Roske searched for the "insanity defense," "what happens if you are suicidal in prison," and "if you are hospitalized after a crime what happens." Timeline at 7.

This months-long course of research, planning, and conduct shows that Roske's actions were purposeful, premeditated, methodical, and clearly aimed at committing at least one to three assassinations, with the aim of violently usurping the legitimate and Constitutional function of the Supreme Court. Further, as the defendant's own conduct and statements show, the defendant was repeatedly undeterred from carrying out the attack. When the defendant purchased the gun, the defendant had to return the following week to take possession of it. When the defendant wasn't able to make the original flight as booked, the defendant re-booked for the following day. The defendant made it to the front of the Associate Justice's home, in the middle of the night. Even then, the defendant's attack was disrupted only by the presence of law enforcement guarding the residence. Judicial officials should not have to employ around-the-clock armed protection to be safely free to conduct their work.

## B. History and Characteristics of the Defendant

The history and characteristics of the defendant reinforce the defendant's ability to undertake the research and planned actions described above. In terms of intelligence, the defendant has a Bachelor of Arts degree in Philosophy, PSR ¶ 65, and the defendant was clearly attuned to current events and major social issues. *See also* ECF No. 64-7 at 50:4-7 (interview transcript) (stating that the defendant would discuss "whatever is happening in the news and just life in

general" with the defendant's friend). During the time of these events, the defendant was also employed as a substitute teacher for the local public school district. PSR ¶ 67, *see also* ECF No. 64-7 at 30 (discussing substitute teaching position). The defendant's intelligence, which enabled the defendant to obtain a Philosophy degree and a teaching job, undoubtedly enabled the defendant to undertake the activities that are part of this crime, including conducting research on how to kill, procuring tools and supplies, and deleting evidence.

The defendant described growing up with a "normal" childhood in a family who provided for all basic needs, and being very close with the defendant's sister. PSR ¶ 51-52. The defendant also described that since the age of 19, the defendant has had a series of serious mental health episodes and diagnoses. PSR ¶¶ 59-61. These prior episodes have included, at age 19, having thoughts to kill the defendant's sister — an individual the defendant is very close with — by stabbing her in the throat with a knife because the defendant was bored and thought it would bring some interest to the defendant's life. PSR ¶ 59. After that incident, the defendant received outpatient mental health treatment, medication, and psychotherapy. PSR ¶ 60.

Another prior incident has also included, in 2021, endorsing a homicidal ideation towards people who have wronged the defendant. PSR ¶ 61. The defendant was on medication for mental health issues at the time of that incident. *Id*. Similarly, here, as outlined above and in the Government's Omnibus Response, ECF No. 74 and accompanying exhibits, the defendant was taking all prescribed medication at the time of this incident. Thus, while the defendant does have a mental health history, it was not untreated and does not excuse, nor did it cause, the defendant's behavior in this case.

24

**C.  Need for the Sentence to Fulfill the Purposes of Sentencing**

      1.  <u>To Reflect the Seriousness of the Offense, to Promote Respect for the Law, and to Provide Just Punishment for the Offense, 18 U.S.C. § 3553 (a)(2)(A)</u>

At outlined above, the defendant's conduct is extremely serious and dangerous.  The defendant's conduct went far beyond online research, or even making threats online, by phone, or by mail.  The defendant researched killing by different methods, including by sniper shot, by pistol, and by stabbing someone in the neck.  The defendant took actions based on that research to purchase weapons and tools needed to break into a home and kill someone by stabbing them or shooting them.  The defendant chose specific targets and collected their addresses.  The defendant packed the weapons and tools and brought them from California to Virginia — including re-booking a flight when the first flight wasn't successful — then taking a taxi from Virginia to Maryland, directly to the front of the defendant's target's home.

The defendant sought to be surreptitious.  The defendant arrived in the middle of the night, when there would be fewer people around and most people would be asleep and thus, more vulnerable.  The defendant affixed cloth material to the bottom of shoes in order to quiet the defendant's footsteps, had lock picking materials, and brought duct tape for the purpose of "Covering windows when I break them."  The defendant also attempted to cover the defendant's tracks and actions, by doing a "data wipe" of a laptop, and seeking to delete the defendant's Discord account that contained incriminating messages such as "people have killed judges before."

Promoting respect for the law is also paramount in this case.  While the defendant does not have a criminal history, the defendant's messages and statements are evident that the defendant viewed the unlawful killing of others as a valid way to express disagreement, and as a way to bring significance to the defendant's life.  The defendant's message to another on Discord that "***I only have violent thoughts towards people I feel are bad***.  I could never just hurt a random person or

*someone I thought didn't deserve it*," Timeline at 1 (emphases added), shows that the defendant believed in being the sole arbiter of who is "good" or "bad," and of who "deserve[s]" to be harmed or killed, and who doesn't. The defendant has also previously expressed homicidal ideation towards people who have wronged the defendant. PSR ¶ 61. In all these scenarios, the defendant has the sole and unreviewable discretion to decide who is targeted with violence, including fatal killing. The sentence here must forcefully convey to the defendant and others that taking matters into one's own hands as the judge, jury, and executioner is wholly condemned and will be punished.

It should be noted that the defendant's actions have led to other threats. As recently as earlier this year, the Associate Justice received a letter invoking Roske's name and referencing a gunshot to the Associate Justice's head, expressing that the Associate Justice should "Die." **Exhibit C (unredacted version filed under seal)**. This shows that not only is the defendant a threat to the Associate Justice and other members of the Court, but that defendant's actions will continue to have consequences for the Court and its members for years to come. The continuation of threats also requires significant government resources to investigate, disrupt, and prosecute other threats.

Promoting respect for the law also means, in this case, promoting respect for the Constitutional order and the independence of the judicial branch. It is paramount that the sentence imposed in this case powerfully send the message that violence and threats of violence are not acceptable methods of expressing disagreement with a judicial ruling. The sentence must send the message that the costs imposed for attempting to override our constitutional system of government through attempted murder vastly outweigh any perceived benefit.

2.  <u>To Afford Adequate Deterrence to Criminal Conduct, 18 U.S.C. § 3553(a)(2)(B)</u>

Similar to promoting respect for the law, it is also paramount that the sentence imposed deter other criminal conduct — namely, committing violence (including murder) out of disagreement — both by the defendant and by others.  It is not a secret that threats of violence to members of the judiciary (and to public officials overall) have been on the rise, and with increasing deadly outcomes as well.  A 2024 publication by the American Judges Association included an article titled, "Perceptions and Experiences with Judicial Security Threats: A Survey of U.S. State Court Judges" that surveyed state judges.  Judges who responded to the survey overwhelmingly agreed with the statement that they "worry about my safety because of my position as a judge" (82.7% agreement) and that they "worry about the safety of my family because of my position as a judge" (74.1% agreement).  A majority of judges (56.1%) reported being threatened while being a judge.[10]

At the federal level, the United States Courts has reported a dramatic rise in threats and inappropriate communications to federal judges and other court personnel, citing U.S. Marshal Service statistics (from 926 incidents in 2015 to 4,511 incidents in 2021).[11]  In 2024, the United States Courts' Judiciary's Vulnerability Management Program, which was formed specifically to respond to the increasing threats to federal judges, worked with federal, state, and local government agencies on "more than 1,090 potential or actual incidents that either disrupted

---

[10]  Christine M. McDermott, Evan Murphy, Patrick Grimes & John Muffler, *Perceptions and Experiences with Judicial Security Threats: A Survey of U.S. State Court Judges*, Court Review, Vol. 60, Issue 3 (2024), *available at* https://www.amjudges.org/resources/court-review/court-review-archive.

[11]  Facilities and Security – Annual Report 2022, United States Courts, *available at* https://www.uscourts.gov/data-news/reports/annual-reports/directors-annual-report/annual-report-2022/facilities-and-security-annual-report-2022.

Judiciary operations or caused heightened facility or personal security concerns."[12]  These reports and figures indicate that the threats to federal, state, and local judges is increasing year after year, after year.

These threats have also turned deadly, exactly as Roske intended to commit here.  In 2005, the husband and mother of a Chicago U.S. District Court judge were shot and killed in the judge's home by a perpetrator whose lawsuit the judge had dismissed.[13]  The perpetrator was targeting the judge.  The same judge was the intended victim of a separate plot to kill her over a case that she presided, with the perpetrator being sentenced to 40 years in prison.[14]  In 2020, a New Jersey U.S. District Court judge's son and husband were shot, with her son dying from the attack.[15]  The attack similarly occurred at their family home, and targeted the judge.  Tragically, there have also been fatal attacks against other judges in Maryland.  In 2023, a Washington County Circuit Court judge was shot and killed in the driveway of his home by a perpetrator who he ruled against in a custody case.[16]

---

[12]    Facilities and Security – Annual Report 2024, United States Courts, *available at* https://www.uscourts.gov/data-news/reports/annual-reports/directors-annual-report/annual-report-2024/facilities-and-security-annual-report-2024#id-judicial-security.

[13]  Tahman Bradley, *Chicago judge whose husband, mother were slain at home speaks out after similar attack in New Jersey*, WGN9 (Jul. 20, 2020), available at https://wgntv.com/news/chicago-news/chicago-judge-whose-husband-mother-were-slain-at-home-speaks-out-after-similar-attack-in-new-jersey/.

[14]  P.J. Huffstutter, *40 Years for Plot to Murder Judge*, L.A. Times (Apr. 7, 2005), available at https://www.latimes.com/archives/la-xpm-2005-apr-07-na-hale7-story.html.

[15]  Amir Vera, Brynn Gingras and David Shortell, *Son of New Jersey federal judge was an 'avid sportsman' who aspired to be an attorney like his parents, family and friends say*, CNN (July 20, 2020), available at https://www.cnn.com/2020/07/20/us/federal-judge-esther-salas-family-profile/index.html.

[16]  Marlene Lenthang, Erik Ortiz and Victoria Ebner, *Maryland judge killed in his driveway, authorities search for suspect who 'targeted' him over divorce case ruling*, NBC News (Oct. 20,

The sentence in this case must send a strong and unequivocal message that condemn Roske's actions, and deter Roske and others from using threats and violence based on disagreement with judicial rulings.  The sentence must also reflect the need to incapacitate and deter the defendant from committing other similar acts, based on the defendant's own assessment of who "deserve[s]" to be hurt or killed, towards those who the defendant feel have wronged the defendant, or for ideological and terroristic purposes of affecting the legitimate workings of the government by intimidation and violence.  The crime here was not impulsive, a snap decision, or a bad judgment in a moment of weakness.  The defendant's crime was considered, planned, targeted, and callously indifferent to others' lives and the impact on their families ("***people have killed judges before***").  It involved a series of steps, decision after decision, day after day, and that ultimately was thwarted only by a visible law enforcement presence and a fortuitously timed phone call from the defendant's sister.  These decisions included:

- Searching for the addresses of the Associate Justice and Justice 2, Justice 3, and Justice 4;

- Mapping out and saving the justices' addresses;

- Researching the "most effective way to silently kill someone," including stabbing someone in the neck;

- Considering how to be "conscious of leaving evidence," like "gloves, masks, . . . and duct-taping shoes";

- Thinking thoroughly about the repercussions on the government, such as "what do you think would happen if [last name of Associate Justice] died"? and being able to "get at least one, which would change the votes for decades to come. and I am shooting for 3";

- Purchasing a pistol and ammunition;

---

2023), *available at* https://www.nbcnews.com/news/us-news/maryland-circuit-court-judge-killed-driveway-home-police-say-rcna121366.

- Practicing shooting the pistol;

- Purchasing tactical gloves, lock picks, cable ties, duct tape, a pry bar, and other tools;

- Researching and preparing for a defense to the conduct, such as "insanity defense" and "if you are hospitalized after a crime what happens";

- Booking a cross-country flight from Los Angeles airport to Washington Dulles, and re-booking it when the defendant did not successfully board the first flight;

- Wiping a computer hard drive; and

- Deleting an online social media account.

At any point in time, Roske could have changed course. Roske did not. These actions and behavior displayed a determination of purpose that gives the Government grave concerns, particularly when coupled with the defendant's stated view on the legitimacy of harming others based on nothing more than the defendant's own assessment. This mandates the need to incapacitate the defendant for a significant and extended period of time, and to impose such a high cost that the defendant and others will be deterred from committing violence as a response to disagreements with judicial rulings.

3. <u>To Protect the Public from Further Crimes of the Defendant, 18 U.S.C. § 3553(a)(2)(C)</u>

The defendant's determination of purpose, coupled with a view that the defendant can solely decide and hurt someone who the defendant "feel[s] are bad" and "deserve[s] it," and considered with the defendant's voluminous (and disturbing) Google search history into mass shootings, serial killers, neck stab wounds, and a sniper-style killing, makes incapacitation of the defendant an important purpose of sentencing in this case. Prior to this, the defendant had no criminal history, and had been on mental health medication, and escalated drastically to plotting knowingly and flying cross-country to complete an assassination mission. Upon his arrest, the defendant did not disclose the ultimate goal, which was to murder the Associate Justice, attempt

to murder up to three justices in total, and try to evade prosecution by leaving no evidence, claiming an insanity defense, or fleeing to a non-extraditing country.  The defendant's targets are those that the defendant decides, for any reason at all, that they "are bad" — in other words, the defendant anointed himself judge, jury, and executioner, even for an individual the defendant does not know or has never interacted with.  According to the defendant's medical records, the defendant has also expressed homicidal ideation towards people the defendant feels wronged by.  PSR ¶ 61.  The defendant, again, controls and singularly decides who meets that criterion.  This is extremely dangerous, and the defendant has already shown that the defendant has the skill and resources to perpetrate violence across the country in the United States, adding to the danger.  Protection of society through incarceration is another significant reason for the sentence in this case.

### 4. To Provide the Defendant with Needed Educational Training, Medical Care, or Other Correctional Treatment in the Most Effective Manner, 18 U.S.C. § 3553(a)(2)(D)

This purpose of sentencing is not as relevant to the needs of this case as the others addressed above.  The defendant does not need educational training, as the defendant has a Bachelor's degree in Philosophy.  The defendant is receiving the same medical care as the defendant was at the time of this crime, and the Bureau of Prisons has significant resources to address the defendant's documented mental health history.  There is no "other correctional treatment in the most effective manner" at issue here.

## D.  Supervised Release Conditions

A district court has "broad latitude" to impose conditions of supervised release.  *United States v. Dotson*, 324 F.3d 256, 259-260 (4th Cir. 2003).  In addition to complying with pertinent Sentencing Guidelines policies, Title 18, United States Code, Section 3583(d) requires that any condition of supervised release be "reasonably related" to the nature and circumstances of the

offense, and the history and characteristics of the defendant, and "involve[] no greater deprivation of liberty than is reasonably necessary" to meet those same factors.  18 U.S.C. §§ 3583(d)(1)-(3).

The Government concurs in the Mandatory and Standard Conditions of Supervision, along with the Additional Conditions of Supervision proposed by the U.S. Probation Office, with one proposed modification. The Government proposes that Additional Condition of Supervision #2 be revised to state (revisions in italics): "You must not communicate, or otherwise interact, with the victim, *the victim's immediate family, and all other individual Justices of the Supreme Court and their immediate families*, either directly or through someone else, without first obtaining the permission of the probation officer. *This condition does not apply for filing pleadings with any appeal taken from any judgment entered in this matter*." Given that the defendant targeted four Justices of the Supreme Court, including their homes where their immediate families live, this proposed modification is reasonably related to the offense, and does not deprive the defendant of any liberty as the defendant may still engage in such communications with the permission of the probation officer, and does not prohibit the defendant from filing, through official pleadings, any appeal in this case.

## VI. CONCLUSION

The defendant made a concerted and focused attempt to undermine and subvert the United States government by assassinating — in the defendant's own words, "at least one" sitting justice of the United States Supreme Court.  The defendant self-proclaimed to be "shooting for 3" justices. While planning these assassinations, the defendant was researching ways to, in the defendant's own words, "try to get away with it," by "avoid[ing] leaving evidence," by fleeing to a country with no extradition treaty with the United States, or through employing an insanity defense.  While the defendant has mental health issues, those issues do not detract from the gravity of the

defendant's crime: the defendant researched and targeted multiple members of the judiciary, and intended to alter the composition of the Supreme Court for ideological reasons.

The defendant's crime is one in a long line of an escalation of threats against the judiciary. Threats of violence and attempts to assassinate members of the judiciary have two goals: (1) to seek to replace through violence those judges who disagree with the criminal's position; and (2) to seek to cow judges in their decision-making, for fear of harm and death, retaliation, or retribution. The defendant's conduct falls within the quintessential definition of terrorism: the use of violence or threats of violence to achieve a political goal.  The defendant, by committing this crime, sought to achieve some level of significance by striking at the heart of our democracy — to alter the trajectory of the judicial branch for decades to come.  The defendant did so knowingly, and with full awareness of the consequences of the intended actions.  Had the defendant accomplished the stated terroristic mission to assassinate "at least one," but "shooting for 3" sitting judges, the impact on our government — and our society — could scarcely be calculated.

This Court's sentence must send the unequivocal, clear, and strong message that attempted violence and threats of violence against members of the judiciary — as well as other public and federal officials — cannot and will not be tolerated, and will be justly and severely condemned. The Court's sentence must also be significant to reflect the harm sought to be inflicted on the judiciary, and to send the message that the consequences for these acts — no fewer than 30 years to life in prison — are not worth the perceived ideological ends.

The Government submits that a Guideline sentence of no fewer than 30 years to life imprisonment, followed by a lifetime term of supervised release, with the conditions of release set forth in the PSR and as discussed above, is the necessary and just sentence in this case.

Respectfully submitted,

KELLY O. HAYES
United States Attorney


By:    /s/ Thomas M. Sullivan
       Thomas M. Sullivan
       Coreen Mao
       Assistant United States Attorneys

cc: Ashley Contreras, United States Probation Officer