**PARTLY UNDER SEAL**

**IN THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| **UNITED STATES** | : | |
| | : | |
| | : | |
| v. | : | **Case No.  DLB-22-0209** |
| | : | |
| **NICHOLAS ROSKE** | : | |
| | : | |
| **Defendant** | : | |

**MEMORANDUM IN ADVANCE OF SENTENCING**

**TABLE OF CONTENTS**

Table of Exhibits ...................................................................................................................3

Introduction ...........................................................................................................................4

Procedural History and the Presentence Report ......................................................6

Argument .................................................................................................................................7

    I.    The federal sentencing framework invites the Court to look past the sentencing guidelines. ..................................................................................................................7

    II.   Sophie's offense conduct stands in stark contrast to the rest of her personal history.....................................................................................................................8

        1.    In moments of crisis, Sophie has reached out for help............................................8

        2.    Sophie grew up in a family that loved her but was ill-equipped to address her mental health struggles and gender identity..........................................................9

        3.    The seriousness of Ms. Roske's conduct is balanced by voluntary abandonment of her plan and her cooperation with authorities before, during, and after her arrest.......................................................................................................................24

    III.  A full weighing of the 18 U.S.C. § 3553(a) factors demonstrates that a 96-month sentence is reasonable. ....................................................................................... 33

        1.    Long-term public safety begins with effective community-based treatment .. 33

2.  A 96-month sentence would provide substantial punishment for Ms. Roske not just because of the length of the sentence, but the conditions under which it has and will be served. ................................................................................................ 46

3.  Imposing a sentence over 96 months' incarceration would be unreasonable because the terrorism guideline applies a one-size-fits all approach to what § 3553(a) mandates be a individualized sentencing process, would not promote respect for the law, and would create unwarranted disparities with like defendants. ................................................................................................................. 52

4.  A wide range of authority supports a substantially downwardly variant sentence ................................................................................................................. 60

Recommendations to the Bureau of Prisons ............................................................ 64

Conclusion ............................................................................................................ 64

**TABLE OF EXHIBITS**

**Exhibit 1** – Sophie Roske Letter
**Exhibit 2** – Dr. Stejskal Report (Under Seal)
**Exhibit 3** – Character Letters

- Olivia Roske, sister – pp. 1-4 (Partly Sealed)
- Colleen Roske, mother – pp. 5-8 (Partly Sealed)
- Vernon Roske, father – pp. 9-11 (Partly Sealed)
- Daniel Shannon, Sr., grandfather – p. 12
- Darrin Shannon, uncle – pp. 13-14
- Daniel Shannon III, cousin – p. 15
- Pamela Shannon, grandmother – p. 16
- Daniel Timothy Shannon, Jr., uncle – p. 17
- Tjjohn Shannon, aunt – pp. 18-19
- Jennifer Binkley, aunt – pp. 20-21
- Alejandra (Alex) Rosiles, friend – pp. 22-24
- John Giarratana, friend – p. 25
- Mindy Kephart, friend – pp. 26-27

**Exhibit 4** – BetterHelp Transcript (Under Seal)
**Exhibit 5** – Taxi Receipt
**Exhibit 6** – Residential Camera video 1  (Under Seal)
**Exhibit 6A** – Residential Camera video 1 clip  (Under Seal)
**Exhibit 7** – Residential Camera video 2  (Under Seal)
**Exhibit 7A** – Residential Camera video 2 clip  (Under Seal)
**Exhibit 8** – Redacted Transcript, Recorded Interviews
**Exhibit 9** – Unredacted 911 Recording  (Under Seal)
**Exhibit 10** – Redacted 911 Transcript
**Exhibit 11** – Transcript Officer LC BWC Redacted 1
**Exhibit 12** – Transcript Officer LC BWC Redacted 2
**Exhibit 13** – Sophie Roske Resource Document  (Under Seal)
**Exhibit 14** – August 8, 2025, Chronic Care Note  (Under Seal)
**Exhibit 15** – Dr. Scott Bender Report  (Under Seal)
**Exhibit 16** – Dr. Grant 2024 Report (Under Seal)
**Exhibit 17** – Dr. Grant 2025 Report  (Under Seal)
**Exhibit 18** – Jack Donson Declaration (Under Seal)
**Exhibit 19** – BOP OGC Memorandum

I would like to begin by apologizing to [The Justice]and his family. I put them through a harrowing experience and for that I am truly sorry. I am very glad I did not continue. I am also sorry for contributing to a trend of political violence in American politics. I can see now how destructive and misguided such acts are, and am ashamed to have not recognized these things sooner.

Exhibit 1, Letter from Sophie Roske

## INTRODUCTION

Sophie Roske, the Defendant, by and through Andrew R. Szekely and Ellie Marranzini, Assistant Federal Public Defenders, hereby files her memorandum in advance of her October 3, 2025, sentencing.[1] On that day, the Court should impose a sentence of 96 months' incarceration followed by a 25-year supervised release term. A sentence of this length advances 18 U.S.C. § 3553(a)'s goals and is in keeping with two overarching principles of sentencing – the parsimony principle, requiring a sentence no greater than necessary, and the crafting of an individualized sentence.

Ms. Roske's offense is serious. She readily admitted to her conduct, starting with her call to 911 and continuing through her guilty plea. The seriousness of Ms. Roske's offense conduct, however, is just one of many factors the Court considers. When the Court weighs all the § 3553(a) factors, Ms. Roske's offense conduct is mitigated by several factors, including but not limited to:

- Her voluntary abandonment of her plan;

- Her voluntary disclosure of the offense, peaceful surrender, and post-arrest cooperation with law enforcement;

- Ms. Roske's history of mental illness and the COVID-era isolation that kept her from effective treatment;

---

[1] The case is captioned as *United States v. Nicholas John Roske.* That name remains Ms. Roske's legal name, and she has not asked to recaption the case. Out of respect for Ms. Roske, the balance of this pleading and counsel's in-court argument will refer to her as Sophie and use female pronouns.

- The likelihood that Ms. Roske's prescription ████████ exacerbated her existing mental illness and contributed to her engaging in offense conduct that was out of character;

- The degree of support Ms. Roske has from her family, immediate and extended, to ensure Ms. Roske is never so isolated or ineffectively treated again;

- Her positive response to treatment, amenability to continued treatment, and identification of community-based resources to assist in all aspects of Ms. Roske's well-being;

- Public safety measures such as supervised release conditions requiring monitoring of electronic devices and travel restrictions that can provide ongoing protection to the community;

- Significant collateral consequences that serve to both punish Ms. Roske's conduct and protect the public, such as her inability to ever again lawfully possess a firearm;

- The harshness of the conditions of confinement Ms. Roske will face due to current Bureau of Prisons polices regarding transgender inmates and the lack of adequate mental health resources in the Bureau of Prisons; and

- Ms. Roske's shame and remorse.

This memorandum also addresses why the advisory sentencing guidelines range of 360 months' incarceration to life imprisonment is at odds with Congress' mandate that sentencing be a highly individualized proceeding and why a sentence in that range would frustrate several of the sentencing factors outlined in § 3553(a), including general deterrence. Finally, the memorandum details recommendations for supervised release and Bureau of Prisons that Ms. Roske asks to have included in the Judgment and Commitment Order.

## PROCEDURAL HISTORY AND THE PRESENTENCE REPORT

Montgomery County police arrested Ms. Roske on June 8, 2022, following her call to 911 stating her thoughts of harming others and herself. After separate statements to state and federal authorities, Ms. Roske appeared in the United States District Court for the District of Maryland on a complaint charging her with an Attempt to Murder a United States Judge, in violation of 18 U.S.C. § 115(a)(1)(A). Criminal Complaint, ECF No 1. One week later, the government obtained an indictment charging Ms. Roske with Attempt to Assassinate a Justice of the United States, in violation of 18 U.S.C. § 351(c). Indictment, ECF No 10.

On April 8, 2025, Ms. Roske appeared before the Court and entered a guilty plea, without an agreement with the government, to the sole count pending against her. In advance of the hearing, both parties filed letters outlining the facts in support of the guilty plea and other matters required by Federal Rule of Criminal Procedure 11. *See* Plea Correspondence, ECF Nos. 80, 80-1, and 81. After accepting Ms. Roske's plea, the Court directed the United States Probation Office to produce a Presentence Report (PSR).

The PSR applied a base offense level of 33 as Ms. Roske's offense conduct was an attempted first-degree murder. PSR at ¶ 29, U.S.S.G. § 2A2.1(a)(1). The PSR further found that the offense was intended to promote a federal crime of terrorism, and increased the offense level by 12, for a total of 45. PSR at ¶¶ 31 and 34. Due to Ms. Roske's timely acceptance of responsibility, the PSR deducted of 3 levels from Ms. Roske's offense level. PSR at ¶¶ 35 and 36. The Total Offense Level is therefore 42. PSR at ¶ 38.

The Criminal History Section of the Presentence Report reflects that Ms. Roske has no juvenile adjudications, no adult criminal convictions, and no arrests other than this case. PSR at Part B. Normally, the absence of any criminal history would result in a criminal history category

of I. PSR at ¶ 41. But because Ms. Roske's offense is subject to § 3A1.4(b), the PSR applied a criminal history category of VI. PSR at ¶ 32.

An offense level 42 and a criminal history category of VI yields an advisory sentencing guidelines range of 360 months' incarceration to life. But, for the reasons detailed below a sentence within or near that range would be substantively unreasonable.

## ARGUMENT

### I.    The federal sentencing framework invites the Court to look past the sentencing guidelines.

Even before the sea change *United States v. Booker*, 543 U.S. 220 (2005), brought to federal sentencing practice, the Supreme Court recognized that sentencing is an individualized process and that "every case [is] a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and punishment to ensue." *Koon v. United States*, 518 U.S. 81, 113 (1996). Over the past two decades, a line of Supreme Court cases has steadily eroded the importance of the guidelines by first declaring the guidelines to no longer be mandatory; then stripping the guidelines of the presumption that they yield a reasonable sentence; and finally by emphasizing 18 U.S.C. § 3553(a)'s overarching directive that a sentence be "sufficient, but not greater than necessary" to accomplish the statutory aims of sentencing. *See Booker*, *supra*; *Gall v. United States*, 552 U.S. 38, 49-50 (2007); *Kimbrough v. United States*, 552 U.S. 85 (2007).

In other words, the Court is free to vary from the once non-negotiable parameters of the United States Sentencing Guidelines (hereinafter the "Guidelines"), including the terrorism adjustment. *See Gall*, 552 U.S. at 49. Of course, judges must consider the advisory guideline range in crafting a sentence. However, "[the Judge] may not presume that the Guidelines range is reasonable. . . [and] must make an individualized assessment based on the facts presented." *Id.* at the 49-50 (*citing Rita v. United States*, 551 U.S. 338, 351 (2007)); *see also United States v. Raby*, 575 F.3d 376, 380 (4th Cir. 2009) ("The Sentencing Guidelines are advisory, and sentencing

courts have discretion to sentence defendants within the statutory range, regardless of whether the sentence falls within the Guidelines range or without.").

Thus, after giving both parties an opportunity to argue for whatever sentence they deem appropriate, the district judge should then consider all the sentencing factors outlined in 18 U.S.C. § 3553(a) to determine whether they support the sentence requested by each party. In the end, a sentencing court must never disregard the legislative mandate that "⌈18 U.S.C. § 3553⌉ . . . contains an overarching provision instructing district courts to 'impose a sentence sufficient, but not greater than necessary' to accomplish the goals of sentencing." *Kimbrough*, 552 U.S. at 85.

Section 3A1.4 of the Guidelines specifies the criteria for determining whether a defendant is subject to its draconian enhancement, and the sentencing implications when a defendant meets the criteria. This adjustment is neither mandatory nor binding, therefore the Court has the discretion to reject it by imposing a lower sentence. Indeed, district courts "may vary from the Guideline ranges based solely on policy considerations, including disagreements with the Guidelines." *Kimbrough*, 552 U.S. at 101; *see also United States v. Spears*, 555 U.S. 261, 264–66 (2009) (stating that district courts can vary from the advisory guidelines ". . . based on policy disagreements with them, and not simply based on an individualized determination that they yield an excessive sentence in a particular case"). In Ms. Roske's case, the Court should, as detailed below, vary from the advisory sentencing guidelines range for both policy reasons and because a sentence in that range is too harsh.

## II.   Sophie's offense conduct stands in stark contrast to the rest of her personal history.

### 1.   In moments of crisis, Sophie has reached out for help.

In 2015, when Sophie was 19 years old, she made plans to take her own life by driving off a cliff near her church in Chatsworth, California. She thought about the plan for months before

she got into her car and drove to the location she had chosen, overlooking a canyon.[2] But when she got there, rather than accelerate into the canyon below, she stopped, parked, and called a member of her youth group, ███, who had been open with the group about mental health struggles. When Garrett got the call, he was with their youth group leader, ███. Sophie told ███ of her plans. ███ kept Sophie talking, put the phone on mute, and told ███ to call 911. As ███ directed emergency responders to Sophie's location, he and ███ headed there. When they arrived, Sophie was handcuffed in the back of a police car. Sophie was taken to a local emergency room and hospitalized for five days.[3]

Sophie has battled ████████████████████████ for years. The 2015 hospitalization was the first of several over the ensuing years, and the beginning of a period of irregular psychiatric care. It was also the beginning of a pattern -- no matter how isolated, lonely, and depressed Sophie has been, in her deepest moments of crisis she has reached out for connection and help.

### 2. Sophie grew up in a family that loved her but was ill-equipped to address her mental health struggles and gender identity.

#### 1. *Sophie was an intelligent, happy child who grew up among family and church.*

Sophie is the oldest of her parents' two children and her maternal grandparents' seven grandchildren. As her uncle Darrin writes, she was "the pride and joy of our family," which was very close-knit.[4] She was a bright, happy child who enjoyed reading, building Legos, and playing outside with her sister.[5]

---

[2] Exhibit 2, Dr. Stejskal report at 4.
[3] *Id.* at 5; PSR at ¶ 59.
[4] Exhibit 3 at 13, Darrin Shannon Letter.
[5] *Id.* at 5, Colleen Roske Letter.





*Sophie receives an award in 2nd Grade.*

*Sophie reading at home.*

*Sophie and her sister Olivia.*

Sophie's family spent a lot of time hiking and camping. She became active in Boy Scouts, eventually attaining the rank of Eagle Scout, the highest in scouting. One requirement for reaching Eagle Scout was to design and execute a service project. Her father recalls that Sophie had great, big ideas but struggled to develop a step-by-step plan to implement them, so he helped her complete the project. When her younger cousin, Danny, earned his Eagle Scout, Sophie mentored him and ultimately spoke at his award ceremony.

Sophie and her sister Olivia grew up in a large, evangelical Christian church. As active



*Sophie (bottom right), Olivia (left) and her cousins.*

members of the church community, Sophie's parents raised their children "to focus on spiritual and moral values as opposed to wealth and fame," and taught them "that everyone was equal, everyone should be allowed forgiveness, and to love others as [they] love [themselves]."[6] As a young teen,

---

[6] Exhibit 1 at 1, Sophie Roske letter.

Sophie volunteered as a counselor for the church's vacation Bible School and with the children's music program.

From a young age, Sophie demonstrated a love of learning. She excelled in school academically, but struggled socially. She was evaluated for Autism



*Sophie and Vernon after an Eagle Scout event in 2014.*



*Sophie (age 23) at cousin Danny's Eagle Scout ceremony.*

Spectrum Disorder when she was in second grade but did not meet criteria for the diagnosis.[7]

When they were in elementary school, because of Sophie's social struggles, Colleen decided to home school both children for several years. During that time, Sophie was relatively sheltered; she socialized with other children in a small homeschool cohort, at church, and through Boy Scouts.



*Sophie (second from right) at her homeschool 6th grade graduation in 2008.*

Sophie begged to return to public school for high school and her parents relented; she hoped to expand her social circle and community. The first year was extremely difficult for her. She had no friends, so spent most of her

---

[7] Exhibit 2, Dr. Stejskal Report at 3.



*Sophie and Olivia at a church event in 2016*

school hours alone in the library. [8] Eventually, she developed a small, close group of mostly female friends through her Advanced Placement classes. She spent a lot of time reading, writing, watching movies (her favorites are musicals), and playing video games. During her senior year, she began to experience persistent depression but, as she had little awareness of anything to do with mental health, she kept her struggles to herself.

After graduating from high school in 2014, Sophie attended college, first at Moorpark College, a community college in Ventura County, and then at California State University, Northridge, graduating in 2018 with a Bachelor's in philosophy. During college, she worked for years as a sales associate at Kohl's. After graduating, she got a job with a pest control company. She aspired to continue her education and considered a career in teaching.



conGRADulations fav brother!

CLASS OF 2018

---

[8] Exhibit 2, Dr. Stejskal Report at 3.

### 2. Sophie developed major depression and did not receive adequate treatment.

After high school, Sophie's depression worsened significantly. It was at this point she called her friend from the edge of the cliff seeking help. Police took Sophie safely to the hospital,

████████████████████████████████████████████████████████████████████

████████████████████████████████████ █

Sophie's parents were shocked and confused by her suicide attempt. They hadn't suspected that she was depressed, let alone that she was actively suicidal. For her part, Olivia, then 17, had noticed that Sophie had been more withdrawn, disinterested in things that used to interest her, and not herself.[10] After visiting Sophie in the hospital, her parents reached out to their church for guidance. A prayer group, concluding that Sophie's attempt had been driven by satanic forces, organized a house call during which they removed items they deemed suspicious (like foreign souvenirs) from Sophie's room and prayed together for her salvation. Still trying to help her, Sophie's parents then met with her youth counselor before receiving a referral to ██

████████████████████████████████████████████████████████████████████

████ ██ ███████████████████████████████████████████████████████████

██████████████████████████████████████████

These years were destabilizing for Sophie during a vulnerable period of her adolescence. Sophie became disillusioned with her church after its reaction to her mental health crisis, and she distanced herself from religion and the community she had grown up in. As Sophie's friend and fellow church member, John Giarratana, writes,

---

[9] Exhibit 2, Dr. Stejskal Report at 5.
[10] Exhibit 3 at 1-2, Olivia Roske letter.

██ ████████████████████████████████████████████████████████████
████████████████████████████████████████████

[W]e both have had to look at this fundamental aspect of ourselves, our faith, and let it go. This relinquishing is a traumatic one. It is radioactive. It is as if it molecularly disassembles truth. It makes you question everything: what you know about your parents, your friends, your world, and yourself.[12]

Meanwhile, Sophie was able to resume her college classes while living at home with her parents, and made two strong friendships with fellow philosophy majors at her college—Alex and Mindy—and the three engaged in intense conversations about philosophy. Mindy recalls that their professors held Sophie "in high regard. They valued her thoughtful questions, her genuine engagement with their lessons, and her consistent, timely work."[13]

Alex writes,

At her happiest, Sophie is someone who will break out in song and dance in reference to a musical number. Her spirit is joyous and silly. She is observant and quick-witted, requiring complex ethical conversations or comparative analysis of books and movies. So, it was evident when her mental health deteriorated throughout the years as she retreated into herself and her negative thoughts.[14]

Mindy adds,

Sophie is one of the most thoughtful conversationalists I have ever known. Even when we disagreed, she listened attentively, showing a genuine desire for mutual understanding. One of the most distinct things that I miss about her, that I can perfectly picture in my head even now, is the puzzled look/furrowed brow she gets when really taking in what another person is saying. I could always see from her expression that she was actively engaged, respectful, and open to confronting her own beliefs when presented with new perspectives. That expression captured her openness and her willingness to question her own beliefs in pursuit of truth.[15]

During this time, she also became more politically conscious, and "gained a bigger appreciation for how difficult life was for many people and a desire to help."[16]

---

[12] Exhibit 3 at 25, John Giarratana letter.
[13] Exhibit 3 at 27, Mindy Kephart letter.
[14] Exhibit 3 at 22, Alejandra (Alex) Rosiles letter.
[15] Exhibit 3 at 26, Mindy Kephart letter.
[16] Exhibit 1, Sophie Roske letter at 2.

In 2017, while working as a cashier at Kohl's, ███████████████████████

████████████████████████████████████████████████████████████

███████████████ She relied on her parents or Mindy to drive her to school, work,

therapy, and social activities.[18] ██████████████████████████████████

██████████████████████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████

Sophie stopped seeing her therapist, ████████ in March of 2020, when the Covid-19

pandemic made in-person visits impossible. As Sophie later explained to a police officer after her

arrest,

████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████[20]

Of this time, Olivia recalls,

████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████

---

[17] ██████████████████████████████████████████████████████
██████████████████████████████████████████████████████████
2.

[18] Exhibit 3 at 6, Colleen Roske letter.

[19] *Id..*

[20] Exhibit 12, Transcript Officer L.C. BWC 2 at 5-6.

████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████:

████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████.

**3.    *Despite her health challenges, Sophie kept up with school and work and supported her sister through a difficult time.***

Though she was juggling serious mental and physical health issues that disrupted her day-to-day life, Sophie managed to finish college, work, and support her sister through a difficult time. ██████████████████████████████████████████████████

---

[21] Exhibit 3 at 2, Olivia Roske letter.



During that time, Colleen describes Sophie as Olivia's "rock." Similarly, Olivia writes,





Olivia is now thriving. She is engaged to be married to a woman who her parents love and consider part of the family; a few months ago, they gave Olivia's fiancée their blessing before she proposed. She is working as an elementary school *birthday.*

teacher. And she is the rock for Sophie now that Sophie has been for her.

4.    *Sophie attempted to move out on her own and live as a trans woman; it ended in failure.*

In 2020, Sophie came out to herself as a trans woman and sought medical care.





*Sophie on her 24th birthday (February 2020)*

████████████████████████████

████████████████████████████

██████████████  ████████████████

████████████████████. She came out to her sister and closest friends as trans between late 2020 and early 2021. At the time, Sophie was certain that her parents would not have accepted her gender identity. So, while living at home, she began transitioning in secret — "purchasing women's clothes, selecting a name, and socially transitioning on the internet."[23]

In early 2020, Sophie was accepted to a master's program in Philosophy at Stony Brook University in New York, where she planned to enroll that fall. But the Covid-19 pandemic derailed those plans—classes would be held virtually, and Sophie did not want to spend so much money on a program that wasn't in-person. So, she stayed home, and closeted, with her parents with no plans for work or education.

By the end of 2020, seeking a fresh start and the freedom to live as her true self, Sophie embarked on two failed attempts to move out on her own: first, she moved for two months to a communal house in Los Angeles, then, a couple of weeks after



*Sophie (far right) with her sister (far left), cousins, and grandfather on Father's Day 2020*

---

[23] Exhibit 3 at 2, Olivia Roske letter.

returning home to her parents, to a studio apartment in Seattle, Washington. The moves were desperate and impulsive. She hoped to get a job, find friends, develop a hobby, find a partner. But she knew no one in Seattle, had no means to support herself, and lacked skills for living on her own. When Sophie lived at home, ████████████████████████████████████ ████████████████████ Sophie had never cooked for herself before, eating what her parents made or frozen dinners. Her parents were worried about the move, but because Sophie was an adult, and as she increasingly shut them out, they felt powerless to stop her.

From the start, Sophie was miserable in Seattle. Things were still closed down due to Covid, so socializing was impossible. She couldn't find work, and her plans to earn money as an online poker player were a bust. ████████████████████████████████ ████████████████████████████████████████████On three separate occasions over the course of just three months, she took herself to the emergency room and was admitted for inpatient psychiatric treatment. After each discharge, she would return to her solitary studio apartment ████████████████████████████████████████████████ ████████████ Her depression worsened, and the cycled repeated itself.

After her third hospitalization, in May of 2021, she called her mother and told her she wanted to come home, that it would be better for her to be around people. But her car battery was dead and the windshield was covered in parking tickets; she could not problem-solve the situation. Colleen and Vernon walked her through step-by-step: call AAA, get the car fixed, begin the drive home. She attempted to do the entire drive on little to no sleep before her parents insisted that she stop at a hotel (which they booked for her) to rest along the way.

---

[24] Exhibit 2, Dr. Stejskal report at 7.
[25] Exhibit 2, Dr. Stejskal report at 8.

5.    *Sophie moved back home, where she descended deeper into depression.*

Colleen recalls that Sophie ███████████████████████████████████████
██████████████████████████████████████████████████████████ ■ At home,
she went back into the closet, figuratively, living as a male, and hiding her female clothing in her



closet, literally.   A few months later, Olivia—her closest confidante—moved to San Francisco. Sophie was unusually withdrawn from her parents. Colleen reflected, "[L]ooking back, I think she did not feel safe to be open about the transgender issue, and she was trying to sort all that out by herself, but she was too depressed to manage anything."[27] For her part, Sophie was too down to ask her parents for help or support; she hoped, passively, that they would discover she went by Sophie or find the women's clothing in her closet, approach her, and be accepting about her gender identity. She needed and wanted her

*Sophie and Olivia on a family trip in 2021, shortly after Sophie's return home and before Olivia moved to San Francisco.*

parents' help but was unable to tell them.

███████████████████████████████████████, Colleen insisted that Sophie find work. She did—she got a job as a part-time substitute teacher. Her friend Alex recalls that this "was the most fulfilling employment she had ever had."[28] She did better once she started teaching; she ate better, woke up at a decent hour, went on hikes with friends. She found meaning

---

[26] Exhibit 2, Dr. Stejskal report at 11.
[27] *Id.*.
[28] Exhibit 3, Alejandra Rosiles letter at 2.

in the work and benefitted from the structure of a routine. She reminded her parents of high-school-age Sophie: on top of her schoolwork, self-motivated, organized. But she was only working two or three days a week, and after a while, started to decline. ████████████████████████

████████████████████████████████████

████████████████████████

██████████████████████████████

████████████████████████████████

████████████████████████████████████████

███████████████████


*Sophie and Olivia in late 2021 during a visit from Olivia.*

In the midst of this isolation, though, Sophie managed to reconnect with her college friends Mindy and Alex. Alex remembers that Sophie seemed quieter after her return from


*Picture of Sophie taken by Alex in April 2022*

Seattle. Mindy recalls that Sophie—normally so responsive to others' feedback—was much more isolated from her friends during this time. She writes,

> Very often while at social gatherings, one would be able to see how much her mental health affects her. Sometimes you would see this physically by her balling up her body into self-soothing positions. . . . I believe that the combination of social isolation, the rift in our friendship, and her search for purpose created vulnerabilities that led her to this point.[31]

---

[29] Exhibit 2, Dr. Stejskal report at 11.
[30] Exhibit 2, Dr. Stejskal report at 12.
[31] Exhibit 3 at 27, Mindy Kephart letter.

Sophie spent a lot of time online and playing video games (primarily world-building games like Planet Coaster or the Civilization series), and less time with her loved ones. This was a marked deviation because, as Mindy observed, "[h]er deep love for her family has also been constant and her devotion to her family has also been unwavering. Many times when I asked to make plans, she would tell me she was already spending the evening with her family—watching plays, going to movies, or sharing  a television series with her father."[32]

### 6.     *Sophie decided to end her life.*

It was in this context that in April of 2022, knowing that her parents would go on vacation in June, Sophie decided to end her life.[33] Then, on May 2, 2022, Politico published a leaked draft of the Supreme Court's opinion in *Dobbs v. Jackson Women's Health Organization*, which would overturn *Roe v. Wade* and *Planned Parenthood v. Casey*, and with them, constitutional protections of abortion rights. The leaked draft sparked online outrage and protests from pro-choice groups. On May 9, 2022, a demonstration outside [the Justice's] home was covered by the media.[34] This started Sophie, then acutely suicidal, ruminating about the Supreme Court and the impact its decisions can have on the country.

███████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████

---

[32] Exhibit 3 at 26-27, Mindy Kephart letter.
[33] Exhibit 2, Dr. Stejskal report at 13.
[34] Rafael Sanchez-Cruz, *Pro-choice protests outside Maryland homes of Justices* ████████████,
WUSA9, (May 8, 2022), *available at* https://tinyurl.com/pkcfmta2. .



In late May, the Roskes celebrated Olivia's graduation from Moorpark, the last time they were together as a family of four. Olivia returned home to San Francisco, and the Roske parents left for a vacation.





*The Roskes celebrating Olivia's college graduation in late May 2022 – just a couple of weeks before Sophie traveled to Maryland.*

---

[35] Exhibit 4, BetterHelp Transcript at 1.
[36] *Id.* at 8.

3. **The seriousness of Ms. Roske's conduct is balanced by voluntary abandonment of her plan and her cooperation with authorities before, during, and after her arrest.**

1. *Acutely suicidal, Sophie researched a plan to kill a justice that she was not capable of going through with.*

When her parents were away on vacation, on June 7, 2022, Sophie flew across the county with a plan to end her life and that of a Supreme Court Justice. The plan to kill the Justice, which included her purchasing burglary tools and firearm, was secondary to her months-long desire to kill herself. Deeply depressed and acutely suicidal, she reasoned that she could give her life some meaning if she were able to stop the Supreme Court from overturning *Roe v. Wade*, a decision she felt certain would result in pain and suffering to others. She brought with her a couple of days' worth of medication, an unloaded, secured, and lawfully obtained firearm, and burglary tools.

At 12:53 a.m., in the taxi to the Justice's house, she messaged her sister "I love you." As her taxi pulled into the Justice's neighborhood— a quiet, tree-lined residential street, where people lived with their families—a little after 1:00 a.m. on June 8th, all of her intellectualized plans collided with reality. This reality pulled her from the depression-induced fog she had inhabited. Of this moment, she writes, "I had become so focused on the effects policy has on people that I forgot the judges and politicians making policy are real people too. That became immediately clear to me and I wanted to leave."[37] As she told Dr. Stejskal, ███████████ ████████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████

---

[37] Exhibit 1, Sophie Roske letter at 4–5.
[38] Exhibit 2, Dr. Stejskal report at 13–24.

The taxi stopped in front of the Justice's address at approximately 1:06 a.m.[39] She noticed two cars parked outside, and assumed they were security. She got out of the taxi, grabbed her backpack and suitcase, and walked past the house. Security camera footage from the front of the house shows Sophie walking from the street to the sidewalk, and walking up the sidewalk past the house, and past a white SUV (in which a Deputy U.S. Marshal was seated), pulling a rolling bag behind her.[40]



Her sister, concerned to receive Sophie's message, called and Sophie answered. Olivia determined that her sister was in crisis and far from home; she told Sophie that she wanted to have her as a sibling for the rest of her life,[42] and encouraged her to call 911. Immediately upon hanging up

---

[39] Exhibit 5, Taxi receipt.
[40] Exhibits 6A and 7A, clips from security camera videos (full videos included as Exhibits 6 and 7).
[41] Still from Exhibit 7A, security camera video clip. A Deputy U.S. Marshal was inside the white SUV.
[42] Exhibit 8, Transcript Recorded Interviews Redacted at 11.

with her sister, Sophie did what she has done every time she has planned to hurt herself: she

████████████████████████████ She called for help.

### 2. Sophie contacted emergency services and voluntarily disclosed her offense.

At 1:39 a.m., Sophie called 911 and told the dispatcher that she was "having suicidal and homicidal thoughts," she had been "having them for a long time," and that she came from California "to act on them."[44] (At this point, more than 30 minutes had passed since she had gotten out of the taxi; no law enforcement was pursing her.) She informed the dispatcher: "I brought a firearm with me, but it's unloaded and locked in a case,"[45] that the suitcase was zip-tied shut, and that she had a backpack with her, but it had no weapons in it.[46] When asked if she needed medical attention, she responded: "I need psychiatric help."[47] After Sophie offered to move the suitcase further away from her, and the dispatcher told her to do that,[48] she can be heard walking and stated that she was now about 20 yards away from the suitcase. She added that there were additional weapons in the suitcase, but none in her possession.[49] She told the dispatcher: "I want to be fully compliant, so whatever they want me to do, I'll do."[50] While Sophie waited for police to arrive, she answered additional questions of the dispatcher, including explaining how she identified the Justice's address and that she had been suicidal for a long time with multiple

---

[43] Exhibit 2, Dr. Stejskal report at 4.

[44] Exhibit 9, Unredacted 911 Recording at 00:20–00:49; *see also* Exhibit 10, Redacted 911 Transcript at 2.

[45] Exhibit 9, Unredacted 911 Recording at 01:25–01:32; *see also* Exhibit 10, Redacted 911 Transcript at 2.

[46] Exhibit 9, Unredacted 911 Recording at 02:30–02:46; *see also* Exhibit 10, Redacted 911 Transcript at 3.

[47] Exhibit 9, Unredacted 911 Recording at 03:06–03:12; *see also* Exhibit 10, Redacted 911 Transcript at 3.

[48] Exhibit 10, Redacted 911 Transcript at 4.

[49] *Id.* at 5.

[50] *Id.* at 6.

hospitalizations.[51] Sophie remained on the line with the dispatcher until police arrived. She ended the call by telling the dispatcher: "They're here. I'm going to hang up."[52]

### 3. Sophie was fully compliant with officers and provided multiple detailed confessions.

Several Montgomery County police officers were dispatched to the area.[53] As one officer approached Sophie, he instructed her to put down her phone, stand up, and turn around. She complied. The officer then ordered Sophie to lay down on the ground with her arms and legs far apart. She complied. After officers handcuffed her, Sophie continued to cooperate with officers' questions and instructions, telling them where her suitcase was (down the street). Officers located and began searching her luggage, which was zip-tied shut. After cutting the zip-tie with an officer's knife (Sophie's knife was inside the zip-tied suitcase), officers found a locked gun case inside the suitcase. Officers used a key taken from Sophie's backpack to open the gun case and seize the firearm. The suitcase and backpack contained personal effects, burglars tools, a knife, and a gun. It did not contain, nor did any of Ms. Roske's electronic devices, any sort of manifesto or other statement of purpose intended for a larger audience.

While officers searched her bags, an officer took Sophie to a police car and interviewed her. When asked, "What's going on here?" she explained that she had been mentally ill throughout her adulthood, and that she was "thinking about killing [the associate justice]and then myself."[54] She added: "And then I texted my sister that I loved her. And then she called me

_____

[51] *Id.* at 8, 9.
[52] *Id.* at 12.
[53] The facts in this paragraph were laid out in the defense Motion to Suppress at ECF 67 and accompanying exhibits.
[54] Exhibit 11, Transcript Officer L.C. BWC Redacted at 8.

and she told me not to do it. And then I called 9-1-1."[55] Sophie also explained, in detail, everything she had in her suitcase.[56]

Officers then took Sophie to a police precinct where she participated in two lengthy interviews, first with a Montgomery County police detective (between 4:00 and 6:30 a.m.), and then with FBI agents (between 9:50 and 11:35 a.m.). During both interviews, she gave detailed accounts of her mental health history and her offense conduct.[57] Most urgently, law enforcement wanted to learn whether Ms. Roske acted alone.[58] She readily disclosed all details of her planning, including discussions she had online about the Justice, but she acted alone, received no encouragement from others, and had not told anyone of her travel plans.[59]

She shared, for example, that she enjoyed the process of researching the plan, but that she didn't know if she "would have been capable of actually doing it."[60] The detective asked her, "When you saw those guys, the security guys and you walked away, what was running through your mind? Were you going to sneak around back or were you going to – or had you not thought that far ahead?"[61] Sophie responded: "I hadn't thought that far ahead. I knew – honestly, it just hit me that like this isn't something in my head, this is real."[62]

####        4.        *Planning violence was totally out of character for Sophie; the self-restraint and honesty she demonstrated was not.*

Sophie's loved ones were shocked when they heard that Sophie had been arrested and what she had done. Those who know her best know that she wishes to make the world a better

---

[55] *Id.* at 9.
[56] *Id.* at 10–11.
[57] Exhibit 8(Transcript Recorded Interviews Redacted)
[58] *Id.* at 6–7.
[59] *Id.* at 6–7, 52–58.
[60] *Id.* at 16.
[61] *Id.* at 34.
[62] *Id.*

place, acts with integrity, desires to help others, and is deeply empathetic. She has never been violent or aggressive. As her grandfather writes: "What she did is totally out of character."[63]

Sophie has a core desire to help others. Her father, Vernon, describes a young child who once spent hours picking up packing peanuts littering a neighbor's yard, a teenager who volunteered as a camp counselor and who walked around the neighborhood taking down flyers that disparaged a neighbor.[64] Multiple family members wrote of Sophie's achieving Eagle Scout, which required time and commitment to community,[65] as well as her mentorship of her younger cousin as he pursued the same milestone.[66] Her friend John describes Sophie's instincts in letter-based role playing games as focused on helping a character in trouble.[67]

Sophie's friend Alex writes, "Sophie is not the type of person to intimidate anyone with her presence. It was out of character and surreal to imagine she would come to such a wrong conclusion about her actions. A Sophie with a healthy mind would sooner intervene in her own mental crisis."[68]

That Sophie planned to kill someone, that she acquired supplies and took steps in pursuit of that plan, is entirely out of character for her. But the self-restraint that she exercised in a moment of crisis is *in character*. When Mindy learned what Sophie had done, she was surprised by the incident, but not at all surprised that she called the police on herself, remarking to a defense investigator, "that is her MO when she is suicidal." Sophie's exercise of self-restraint is consistent with her holding essential connections—lifelines—to loved ones, even during times of darkness

---

[63] Exhibit 3 at 12, Daniel Shannon, Sr. letter.
[64] Exhibit 3 at 9, Vernon Roske letter.
[65] Exhibit 3 at 15, Daniel Shannon III letter; *id.* at 18, Tjjohn Shannon letter.
[66] Exhibit 3 at 13, Darrin Shannon letter; *id.* at 17, Daniel Shannon Jr. letter.
[67] Exhibit 3 at 25, John Giarratana letter.
[68] Exhibit 3 at 23, Alejandra Rosiles letter.

and isolation. It is consistent with her empathy and will to live. And it is consistent with the values her parents raised her to hold that she still holds. As her friend John writes,

> [W]hat I think counts is what she did *not* do. This action of self restraint is indicative of someone who is picking up the pieces of their morality in the absolute moment of truth. This is someone who has confronted that we live in a world wrought with evil and violence, yet chose not to perpetuate it herself.[69]

As Sophie puts it, in that moment of not going forward, "I connected to my true self, the person my parents raised. I realized how far I had let myself slip."[70] And as Olivia later observed, if she had really intended to go through with any of it, she wouldn't have taken Olivia's call.

Sophie is deeply remorseful and deeply ashamed. She is sorry to the Justice and his family for the fear she caused them. She is sorry to be part of a terrible trend of political violence in our country; she does not believe in violence as a solution to societal problems. She is ashamed that this is what she will be known for, because it is not who she is. And she is ashamed she did not realize these things sooner.[71]

She is also deeply sorry for putting her family through such a difficult experience. During a jail visit from Colleen and Olivia last year, Sophie asked Olivia if she was mad at her (she had a dream that Olivia was angry with her). After Olivia assured Sophie that she was not, Sophie said, "I am sorry for everything."[72] Collen writes that in that moment they "could feel the remorse, the regret and the concern for our well-being. Sophie is committed to doing what is necessary to learn, grow and become a better woman tomorrow than she was yesterday."[73]

---

[69] Exhibit 3 at 25, John Giarratana letter.
[70] Exhibit 1, Sophie Roske letter at 4.
[71] Exhibit 1, Sophie Roske letter at 1.
[72] Exhibit 3 at 7, Colleen Roske letter.
[73] *Id.*

While Sophie recognizes that her mental illness played a significant part in her offense conduct, she does not "believe mental illness excuses what [she] did."[74] Nothing does. But, she writes, "had I not been actively suicidal, the idea of committing an act of violence would never have occurred to me."[75] She has learned that her need to care for her mental health is paramount and will be for the rest of her life.[76]

Those who know Sophie best believe that she is capable of living a peaceful, productive life, and that she has a lot of good to offer her family and community.

### 5. Things have changed significantly for Sophie and her family.

Since Sophie's arrest more than three years ago, significant changes have taken place for her and her family.

**First**, Sophie is out to her entire family, and her family loves and accepts her for who she is. Being able to be open with her family about this has lifted a tremendous weight from Sophie's shoulders. It has been a journey for the entire family. Colleen describes discovering that Sophie was trans while cleaning out her room after Sophie's arrest, and reflects on what she and Vernon could have done differently to signal that they were a safe space for her earlier.[77] Olivia describes the "incredible amount of growth in terms of acceptance of the LGBT+ community" her parents have demonstrated over the past three years.[78]

**Second**, Sophie and her family have fostered a relationship of "transparency, healing and growth."[79] Sophie is now comfortable being open, honest, and vulnerable with her family. She knows that she can count on them. While the distance has made in-person visitation nearly

---

[74] Exhibit 1, Sophie Roske letter at 2.
[75] *Id.* at 2-3.
[76] *Id.* at 4.
[77] Exhibit 3 at 7, Colleen Roske letter.
[78] Exhibit 3 at 4, Olivia Roske letter.
[79] Exhibit 3 at 7, Colleen Roske letter at 3; *id.* at 10, Vernon Roske letter.

impossible, they maintain frequent communication and never miss a video visit. They have demonstrated a commitment to understanding how best to support her by educating themselves and attending family support meetings with NAMI (National Alliance Mental Illness) and PFLAG (Parents, Families, and Friends of Lesbians and Gays).[80]

*Third*, Sophie has been in treatment in Central Booking's mental health unit for three years. She engages in regular counseling, is compliant with her psychotropic medications, and recently resumed receiving gender affirming care. She is stable. And she feels hopeful about her future. As discussed in more depth below, effective treatment, and Sophie's compliance with treatment, is essential to her well-being.

*Fourth*, Sophie has a great deal of support now, in the most difficult chapter of her life to date. Having grown up in a tight and loving family and then drifted away, she is grateful to have her family firmly in her corner now. Olivia, who now lives close to home, researched and put together a "Sophie Roske Resource Document" that includes local re-entry resources for Sophie spanning from psychiatric care to hiking groups.[81]  The Roskes have been actively engaged with defense counsel throughout the case; they have recognized how essential structure is for Sophie to do well and are committed to helping her create and maintain it.. Other relatives correspond with Sophie via mail. Olivia writes: "Sophie needs a balanced life and appropriate support from loving people, not incarceration and we need her home in order to fully provide that to her."[82] Her closest friends also remain supportive. Mindy writes of her "steadfast support for my friend," John shares that Sophie "is a net positive member of our society," and Alex believes that "Sophie has a good soul and has the potential the change the world in positive ways."[83]

---

[80] Exhibit 3 at 3, Olivia Roske letter; *id.* at 7, Colleen Roske letter.
[81] Exhibit 13,  Sophie Roske Resource Document.
[82] Exhibit 3 at 4, Olivia Roske letter.
[83] Exhibit 3 at 23-26.

Luckily, she has many loved ones eager to show her support. Her grandfather writes: "Please send her home. She has a large family to help and support her where she will get all the love and support she needs to continue to be an example to others."[84] Since Sophie's arrest, her



*A stack of cards from Sophie's grandfather on the Roskes' kitchen table.*



grandfather has sent to her house a card for every holiday and birthday. The Roskes have saved every card, intending to give them all to Sophie when she returns home.

### III.    A full weighing of the 18 U.S.C. § 3553(a) factors demonstrates that a 96-month sentence is reasonable.

1.    **Long-term public safety begins with effective community-based treatment**

As detailed above, Ms. Roske's offense occurred at her darkest moment; one which came despite past yet ineffective treatment of her mental illness. Public safety, therefore, is inextricably linked with the effective treatment of Ms. Roske's mental illness. Embedded within that broad term are several factors for the Court to consider: whether Ms. Roske's mental illness is treatable;

---

[84] Exhibit 3 at 12, Daniel Shannon, Sr. letter.

what sort of treatment she requires; whether she is amenable to treatment; and whether the Bureau of Prisons is equipped to provide that treatment.

1.    *Ms. Roske's treatment needs include proper medication and therapy*

To address these issues and provide Ms. Roske with a treatment plan, counsel engaged Dr. William Stejskal to conduct a forensic mental health evaluation of Ms. Roske. *See* Exhibit 2, Dr. Stejskal Report. Dr. Stejskal met with Ms. Roske for nearly ten hours; reviewed community and custodial medical records and discovery materials; spoke with two members of Ms. Roske's family; and reviewed reports drafted by other mental health experts, including the results of a comprehensive neuropsychological evaluation. *Id.* at 1-2.



In her letter to the Court, Ms. Roske writes that when she "arrived in his neighborhood, my whole perspective shifted. I had become so focused on the effects policy has on people that I forgot the judges and politicians making policy are real people too. That became immediately clear to me and I wanted to leave." Ms. Roske, in that moment "reconnected to [her] true self, the person [her] parents raised" and realized "how far" she had "let [herself] slip." Exhibit 1 at 3–4.

Ms. Roske expanded on this idea when she spoke with Dr. Stejskal:

Ms. Roske's disclosure and surrender to authorities, discussed at length above, is consistent with Ms. Roske's explanation of what happened when she exited the taxi. The epiphany that she could not harm someone is consistent with several safety factors, or factors that suggest Ms. Roske is unlikely to commit violence in the future. These factors include her complete lack of past criminal behavior; a similar absence of interpersonal violence or aggression, and her 

Ms. Roske has reflected on both her conduct and her rationale throughout the pendency of her case. She explains, "First, I would like to make it clear that I don't believe mental illness

excuses what I did. Nothing excuses the actions I took." Exhibit 1 at 2-3. But had she "not been actively suicidal the idea of committing an act of violence would never have occurred to me." *Id.* at 2-3. Treating Ms. Roske's depression, while also managing her epilepsy, is crucial to Ms. Roske not entering that dangerous thought cycle again.

During Ms. Roske's three years of pretrial confinement, she has participated in the mental health treatment opportunities afforded to her at the IMHU. ██████████████████

██████████████████

██████████████████████████████████████
██████████████████████████████████████
██████████████████████████████████████

██████████████████

Ms. Roske's compliance with mental health treatment demonstrates her amenability to treatment. ████████████████████████████████████
██████████████████████████████████████████
██████████████████████████████████████████
██████████████████████████████████████████
██████████████████████████████████████████
██████████████████████████████████████████
█████████████████
████████████████████████████████████████
██████████████████████████████████████████
██████████████████████████████████████████
████████████████████████████████████████"

[REDACTED]

Counsel retained Dr. Arthur Grant, director of the Comprehensive Epilepsy Center at Downstate Health Sciences University in Brooklyn, NY, to review Ms. Roske's record to see if she was being effectively treated and to see what, if any, interplay existed between [REDACTED] her overall mental health, and her offense. Dr. Grant consulted on the case twice, first in 2024 and again in 2025 to provide an update to his 2024 consultation.

[REDACTED]

---

[85] Dr. Bender interviewed Ms. Roske in early 2024, before she had come out to her family. As such, his report refers to her as Nicholas and uses male pronouns.

[REDACTED]

███████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████

Dr. Grant continues:



Exhibit 16, Dr. Grant 2024 Report (emphasis added).

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████.

███████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████

─────────────────────────

████████████████████████████████████████████████



Ms. Roske is, in other words, treatable and eager to receive treatment. Ms. Roske, unlike some individuals, has never resisted treatment. Rather, she withdrew from treatment that was either difficult to manage or was unable to meet her needs. Since her arrest, Ms. Roske has taken her medication regularly and has started to learn more about herself and her thoughts. And it shows.

Ms. Roske writes, "I now recognize my need to attend therapy and plan to do so for the rest of my life. While there are many things in the world I am still upset about, I now recognize that violence (political or otherwise) is not the solution. The thought that my actions may have inspired anyone else to act violently disgusts me and makes me feel extremely ashamed." Exhibit 1 at 4. Ms. Roske, who three years ago saw no future for herself, now hopes to "use this experience to help others and even prevent someone from following in my footsteps." *Id.*

[87] Available at: https://tinyurl.com/4fdaz2da.

**2.** *The Bureau of Prisons' mental health services are understaffed, underfunded, and in crisis.*

In a Department of Justice Office of the Inspector General report regarding the use of restrictive housing within the Bureau of Prisons ("OIG report"), the Inspector General made several stark observations regarding the overall provision of mental health services to inmates in federal prisons. *See* Review of the Federal Bureau of Prisons' Use of Restrictive Housing for Inmates with Mental Illness, U.S. Department of Justice, Office of the Inspector General (July 2017).[88]

*First*, the report found that the BOP does not even always know which inmates need mental health services. The report authors wrote, "BOP data showed that, as of 2015, only 3 percent of the BOP's sentenced inmate population was being treated regularly for mental illness. Yet, the BOP's FY 2016 Performance Budget Congressional Submission cited an internal BOP study, which suggested that approximately 19 percent of federal inmates had a history of mental illness. Moreover, a 2006 Bureau of Justice Statistics report concluded that 45 percent of federal inmates had symptoms or a recent history of mental illness." *Id.* at ii, *see also id.* at 34–36.

*Second*, the report noted that since the BOP "adopted a new mental health policy in 2014, increasing the standards of care for inmates with mental illness . . . the total number of inmates who receive regular mental health treatment decreased by approximately 30 percent. . .." *Id.* at iii. In other words, though the BOP recognized a decade ago it was not properly providing mental health care to inmates, its performance in this area has worsened as of 2017.

*Third* and finally, the BOP has a significant staffing shortage in mental health jobs. The report found that, "Based on our review, it appears that mental health staff may have reduced the number of inmates . . . who must receive regular mental health treatment because they did not

---

[88] Available at: https://tinyurl.com/BOPIG2017

have the necessary staffing resources to meet the policy's increased treatment standards. Indeed, we found that, as of October 2015, the BOP had filled only 57 percent of its authorized full-time Psychiatrist positions nationwide and that it had significant staffing issues with regard to Psychologist positions as well." *Id.*, at iii, *see also id.* at 41–46.

Though the inspector general's report is from 2017, recent news about BOP shows the concerns expressed in the report remain valid. In March 2022, the Office of the Inspector General (OIG) published an audit of the health care contracts at three BOP prisons, including two medical facilities and one standard-care facility; the audit found the BOP's contractor did not provide the specialty care required by their own contract, nor did the BOP have an adequate method of tracking off-site medical providers. Department of Justice, Office of the Inspector General, *Audit of Federal Bureau of Prisons Comprehensive Medical Services Contracts Awarded to the University of Massachusetts Medical School* (Mar. 17, 2022).[89]

In 2023, an extensive investigation into BOP healthcare by NPR "found stories of inmates at prisons all over the country going without needed medical care. We found more than a dozen who waited months or even years for treatment, including people with symptoms that were obviously concerning – unexplained pain, bleeding, lesions, a lump that wasn't there before." Transcript, *1 in 4 inmate deaths happens in the same federal prison. Why?* NPR (Sep. 23, 2023).[90]

Given the well-documented, post-pandemic staffing shortages in BOP, the Court should have little confidence that a federal prison system that is hemorrhaging staff will have adequately staffed mental health departments. *See* Glenn Thrush, *Short on Staff, Prisons Enlist Teachers and Case Managers as Guards*, N.Y. Times (May 1, 2023); Michael R. Sisak, *Cash-strapped Bureau of Prisons freezes some hiring to 'avoid more extreme measures,' director says*, Associated Press (May 9,

---

[89] Available at: https://tinyurl.com/2022BOPIGMEDICAL
[90] Available at: https://tinyurl.com/NPRBOPTranscript

2025) (reporting that there are 4,000 job vacancies in BOP). "Staffing shortages, with corrections officers and medical personnel, are among the biggest obstacles facing the federal prison system," according to the Justice Department's Inspector General. Jaclyn Diaz, *Lack of staffing led to 'deeply concerning' conditions at federal prison in Oregon, NPR*, All Things Considered (May 22, 2024).[91]

Though the PSR's documenting of Ms. Roske's mental health history will hopefully address the first of these issues, it will do little to help with the latter two. Ms. Roske will not receive long-term individual therapy in the BOP, indeed she may not receive any treatment beyond her medication. In short, in order "to provide [Ms. Roske] with needed . . . medical care . . . in the most effective manner," the Court should consider the treatment in the community as an imperative to a lengthier sentence. *See* 18 U.S.C. § 3553(a)(2)(D).

### 3.    Ms. Roske's release plan will ensure the safety of the community.

Ms. Roske's days of hiding her condition from her family are over. Ms. Roske knows how self-destructive and harmful that behavior was to others. She is committed to following up on all of Dr. Stejskal's recommendations for treatment, starting with medication compliance in the BOP and continuing through to treatment, mental health and gender affirming, in the community. Contemporaneously with this memorandum, counsel is filing a motion seeking to unseal Dr. Grant, Bender, and Stejskal's reports as to Ms. Roske's parents and sister to permit them to assist Ms. Roske in coordinating her care.

Further, Ms. Roske's sister has compiled a six-page list of resources to form the basis of release planning for Ms. Roske Exhibit 13, Sophie Roske Resource Document. The guide is comprehensive. It covers housing options with family; a plan to enroll Ms. Roske in Medi-Cal

---

[91] Available at https://tinyurl.com/NPRBOPSheridan

(California's ACCA Medicaid plan) and assist her attending appointments; local employers who hire formerly incarcerated individuals; social activities like book clubs and hiking groups; and, most importantly, mental health providers.

The guide identifies local providers in both Ventura County, and gender affirming practices in Los Angeles County, about 30 miles from Ms. Roske's planned home. The list also includes information for crisis hotlines and in-patient providers. The hope is Ms. Roske will never need the latter two options, but her family is committed to making sure Ms. Roske is as prepared as possible for her life in the community as possible.

Additionally, counsel reached out to the United States Probation Office in the Central District of California to determine what contract outpatient mental health providers might be used during Ms. Roske's term of supervised release. Counsel learned that Probation frequently contracts with ███████████████████████ (with multiple locations in Los Angeles County)[92] or ███████████████████████████.[93] If those providers do not meet the client's needs, and the client is eligible for MediCal, they can be referred to a provider through Ventura County's behavioral health system, which operates a number of clinics in the county and can provide more intensive care, including referrals to crisis stabilization programs, if needed. ██████████████████████████████████████████████████ ████████████████████████████████████████.[94] A 96-month sentence will deter individuals similarly situated to Ms. Roske

Among the factors the Court considers at sentencing is deterrence – specific and general. *See* 18 U.S.C. 3553(a)(2)(B). Specific deterrence for Ms. Roske is straightforward. She has never

---

[92] ████████████████████████████.
[93] ████████████████████████████.
[94] ████████████████████████████.

been arrested before, has already spent 3 years in custody, and is requesting a sentence that will continue to incarcerate her. An 8-year sentence is lengthy by any measure. For a young person with no prior criminal history it is all the lengthier. This experience has been completely life-altering for her. It has provoked serious introspection, insight, and concrete change. Ms. Roske does not need a longer sentence to be herself deterred from reoffending and facing further incarceration.

General deterrence, however, is less straightforward. First, it is well-recognized, "in virtually every deterrence study to date, [that] the perceived certainty of punishment [is] more important than the perceived severity." Ray Paternoster, *How Much Do We Really Know About Criminal Deterrence?*, 100 J. Crim. L. & Criminology 765, 817 (2010); *Five Things About Deterrence*, Nat'l Institute of Justice (Jun. 5, 2016). Indeed, severity increases are "seldom if ever crime preventatives." Michael Tonry, *Purposes and Functions of Sentencing*, 34 Crime & Just. 1, 29 (2006). Even if the Court were to accept that longer sentences result in a greater deterrent effect, that is only the start of the inquiry.

Any general deterrence argument begins with two threshold questions: Who is the Court trying to deter with its sentence and what from what. For many cases on this Court's docket the answer is obvious.

When sentencing a corporate officer who embezzled funds, the Court wants to deter other businesspeople from committing fraud. In cases involving the possession of a firearm by a prohibited person, the Court's message is intended to deter people from unlawfully obtaining and possessing firearms. In a Hobbs Act robbery case, the Court's message is directed at other would-be robbers so they think twice before committing a robbery.

Here, however, the question is more nuanced. The message to be sent here is not directed at all individuals thinking of committing political violence. Nor does it pertain to those who

attempt political violence but are thwarted by circumstances outside their control. Rather, the message here should be directed at the smaller subset of individuals who have made plans but might abandon them. If there is a message to be sent by Ms. Roske's sentence it should be one that encourages similarly situated people to stop, think, and call for help.

No sentence this Court crafts can ever prevent individuals from having violent thoughts. No sentence of this Court can put an end to violent political rhetoric. But the Court can send a clear and meaningful message that people who start and then abandon a plan to harm others will receive help and lesser punishment than those who follow through on their plans or attempt to cover up their actions.

At the critical moment on June 8, 2022, Ms. Roske was deterred. Not by the prospect of a long prison sentence, or even by law-enforcement intervention, but by her own humanity as she faced the cold, hard fact that her plan involved harming real people. At the root of political violence is dehumanization of one's opponents; Ms. Roske's abandonment of her plan came from her recognition she was about to harm *people*, not *ideas*. Ms. Roske engaged in a process of rehumanization before it was too late and then called for help.

The Court's deterrent message should recognize that people who plan but cannot carry through with violence are a fundamentally different population than those who are set on their plans at all costs.

## 2. A 96-month sentence would provide substantial punishment for Ms. Roske not just because of the length of the sentence, but the conditions under which it has and will be served.

Ms. Roske has been held at Central Booking since her arrest more than three years ago. For the first two weeks, she was held in the jail's Inpatient Mental Health Unit (IMHU), a unit reserved for suicidal and other detainees who require a high level of care. Since, she has been held in the Special Needs Unit (SNU), which is a step-down unit for detainees who have significant

mental health needs, but whose conditions are managed.  While she has benefitted from mental health and medical treatment during her pre-trial detention, she has lived under extremely restrictive conditions, making the time she has already served that much more punitive.

The photograph below was taken during a February 2023 tour of Central Booking's IMHU by an attorney for the ACLU's National Prison Project in connection with ongoing litigation with the jail. *See* ACLU, *Court Holds Maryland Accountable for Dire Conditions in Baltimore Jails*, (Oct. 21, 2024); [95] *see also Duvall v. Moore, et al.*, 24–cv–2541–MJM. The jail cell that Ms. Roske lives in today resembles the cell pictured here in all but three respects: (1) Ms. Roske's is a two-person cell with two beds, parallel to one another; (2) the beds have metal headboards attached to the wall; and (3) the beds have mattresses. But the size of the cell, the size of the window, the location of the toilet



An incarcerated person at the Baltimore Central Booking and Intake Center's Inpatient Mental Health Unit lies on the floor of their cell, as observed during a February 2023 tour by an attorney for the ACLU's National Prison Project. (ACLU National Prison Project)

---

[95] Available at https://tinyurl.com/48k99m2m.

(shared by two cellmates), and the complete lack of other furniture depicted in the photograph are true of Ms. Roske's cell.

Ms. Roske and her unit mates are confined to their cells for at least 18 hours per day. On most days, they are allowed out of their cell and into the day room of the unit between 10:00 a.m. and 1:00 p.m., and again from 5:00 p.m. to 8:00 p.m. Once a week, on commissary days, there is only one three-hour break from the cell. And any time there is a security or health-related lockdown, open hours are suspended, sometimes for days or weeks at a time.

Once per week, the inmates are allowed "gym time," which may include time outside. The outside recreation area is concrete with a metal grate for a ceiling, so there is not a clear view of the sky. Ms. Roske normally opts to skip gym time because it occurs early in the morning and under crowded conditions. Additionally, if the weather is cold, there are no jackets to wear outside. The last time Ms. Roske felt fresh air on her skin was several months ago when she was taken to an outside medical appointment. Even when she is transported to Court she is moved through an underground garage and does not go outside.

These restrictive conditions of confinement would be difficult for anyone to endure. They have been particularly so for Ms. Roske, a lover of nature and the outdoors. It is a testament to her resilience and the efficacy of her current treatment that she has managed to maintain stability and optimism under these conditions. She has availed herself of the limited human connection available to her—tablet messaging and video visits with her family, frequent conversations with the counselors in her unit, correspondence with friends—and managed to strengthen essential relationships with her loved ones.

Ms. Roske's difficulties will only increase once she enters the Bureau of Prisons. To assist counsel in making appropriate, targeted recommendations to the Bureau of Prisons for designation and programming, counsel retained Jack Donson. Mr. Donson retired from the

Bureau of Prisons after 23 years spent in a variety of positions including security classification and program placement/evaluation.  Mr. Donson reviewed case materials, including medical reports and the Presentence Report, and met with Ms. Roske and counsel. After his review and the meeting, Mr. Donson made several findings relevant to sentencing.

██████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████

Compounding Ms. Roske's dilemma regarding BOP vetting is her status as a transgender woman. ████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████



Following this order the BOP sent an internal guidance memo directing

> all Bureau of Prisons facilities will provide hormone therapy and
> social accommodations to inmates with gender dysphoria under the
> policy that existed prior to the issuance of EO 14168. Specifically,
> inmates with a diagnosis of gender dysphoria should be referred to
> by their preferred pronouns, allowed to purchase items from a
> standardized list of commissary items, and allowed other
> accommodations under the policy that existed prior to January 20,
> 2025. Also, the provision of clothing and undergarments will
> similarly revert to the policy that existed prior to January 20, 2025,
> to the extent it applies to inmates with diagnosed gender
> dysphoria. Finally, inmates with diagnosed gender dysphoria will
> be offered pat searches in accordance with the Program Statement
> *Searches of Housing Units, Inmates, and Inmate Work Areas* prior to
> the EO 14168 changes.

Exhibit 19, BOP OGC Memorandum.

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████

The Court cannot change the vetting culture of the BOP or reinstate BOP's former transgender inmate policy, but its sentencing decision directly impacts Ms. Roske's exposure to the risks discussed above. ████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████████████. Thus, were the Court to impose a 96-month sentence, Ms. Roske would likely be able to serve her sentence in a safer environment.

Finally, imposing a sentence consistent with a low security designation will permit Ms. Roske access to a higher level of medical care at a facility close to her family. ███████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████

**3. Imposing a sentence over 96 months' incarceration would be unreasonable because the terrorism guideline applies a one-size-fits all approach to what § 3553(a) mandates be a individualized sentencing process, would not promote respect for the law, and would create unwarranted disparities with like defendants.**

*1.    The terrorism enhancement under § 3A1.4 is fundamentally at odds with the requirement that a defendant be sentenced according to their individual characteristics.*

The terrorism enhancement of the Sentencing Guidelines, U.S.S.G. § 3A1.4, is a blunt instrument and a draconian one: if "the offense is a felony that involved, or was intended to promote, a federal crime of terrorism,"[96] the enhancement automatically increases a defendant's offense level by 12 levels (with a minimum of 32) and automatically places a defendant in Criminal History Category VI. U.S.S.G. § 3A1.4 (a), (b).[97] Unsurprisingly, this can have an immense influence on a defendant's Guidelines range and ultimate sentence.

While the defense acknowledges that, strictly as a legal matter, this "unequivocally severe" regime, *United States v. Benkahla*, 501 F. Supp. 2d 748, 751 (E.D. Va. 2007), applies in this case, it operates entirely "contrary to the theory behind the guidelines: that the offense level will reflect the seriousness of the offense, increasing incrementally based on specific aggravating facts, and the criminal history category will reflect the risk to the public, based on the defendant's prior record." *United States v. Dais*, 482 F. Supp. 3d 800, 803 (E.D. Wis. 2020). Indeed, the enhancement contravenes one of the fundamental tenets of our criminal justice system—that sentences should be "individualized and proportionate," distinguishing "between the worst offenders and those

---

[96] The term "federal crime of terrorism," consists of two elements: (1) the commission of one of a list of specified felonies, and (2) a specific intent requirement, namely, that the underlying felony was "calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct." 18 U.S.C. § 2332b(g)(5); *United States v. Chandia*, 514 F.3d 365, 376 (4th Cir. 2008).

[97] Thus, at the very least, this results in a starting advisory sentencing guidelines range of 210-262 months.

who are less dangerous." *Id.* Ms. Roske's sentence should be crafted accordingly to avoid a "'dramatically unreasonable'" result. *United States v. Stewart*, 590 F.3d 93, 147 (2d Cir. 2009) (quoting sentencing judge on the illogical severity of the enhancement).

The enhancement is fundamentally flawed in two respects.

***First***, the shift to the highest criminal history level is predicated on an insidious fiction of a recidivist, repeat offender, one who has failed to rehabilitate after being previously caught and punished:

> [The enhancement] can, as it does in this case, import a fiction into the calculus. It would impute to a defendant who has had no criminal history a fictional history of the highest level of seriousness. It's one thing to adjust the offense level upward to signify the seriousness of the offense. *It is entirely another to say that a defendant has a history of criminal activity that [s]he does not, in fact, have.*

*United States v. Mehanna*, No. 09-10017-AO (D. Mass. 2012), ECF No. 439 at 69-70 (emphasis added).

In effect, § 3A1.4 transforms the defendant into a career offender, even if they have never gotten so much as a parking ticket. *See id.* (contrasting the terrorism enhancement with the career offender guideline, which makes a similar adjustment, but does so "precisely because [a defendant] has a certain criminal history."); *Stewart*, 590 F.3d at 147 (defendant "'has no criminal history and yet is placed in the highest criminal history category equal to that of repeat felony offenders for the most serious offenses including murder and drug trafficking.'") (quoting sentencing judge).

Courts that have signed off on the enhancement's treatment of criminal history have done so by concluding, in effect, that the threat from 'terrorism' is so grave, and 'terrorists' are so resistant to rehabilitation, that "terrorists and their supporters should be incapacitated for a longer period of time." *United States v. Meskini*, 319 F.3d 88, 92 (2nd Cir 2003); *see also United States v. Jayyousi*, 657 F.3d 1085, 1117–19 (11th Cir. 2011); *United States v. Ressam*, 679 F.3d 1069, 1091 (9th Cir. 2012) (quoting *Jayyousi*, which quoted *Meskini*). But as one court has convincingly

shown, such a belief is just that—a belief—one undergirded by no data, one shown to be false. *United States v. Alhaggagi*, 372 F. Supp. 3d 1005, 10130-15 (N.D. Cal. 2019), *vacated and remanded on other grounds*, 978 F.3d 693 (9th Cir. 2020) ("There is no published statistical data demonstrating that defendants convicted of . . . anti-terrorism statutes . . . are any more likely to be recidivists than any other first offenders. Nothing in the history of U.S.S.G. section 3A1.4 would indicate that any reliable data was used to determine if a person convicted of a material support offense is more likely to be a recidivist.") citations omitted); *United States v. Muhtorov*, 329 F. Supp. 3d 1289, 1302 (D. Colo. 2018) ("In the terrorism context, the basic problem with the Guidelines is the utter vacuity of empirical evidence or facts employed by the Sentencing Commission in forming them. In this respect, the Guidelines are the epitome of *ipse dixit*—'because the Commission says so.'").

The basis on which  the Guidelines purport to rest—the reason § 3553(a) states they are entitled some careful consideration—is that they are supposed to be based on empirical evidence that the Commission considers in the exercise of its characteristic institutional role. So when that's not the case, as with the terrorism enhancement, the rationale for deferring to the Guidelines disappears. *See Kimbrough*, 552 U.S. at 109 (authorizing district courts to disagree with, and vary from, Guidelines on policy grounds when a particular guideline "do[es] not exemplify the Commission's exercise of its characteristic institutional role," i.e., the Commission did not take account of "empirical data and national experience" when formulating the guideline).

In reality, § 3A1.4 appears to be "simply a way of 'cooking the books' to get to a score and a desired sentencing range." *Mehanna*, ECF No. 439 at 69-70. That's especially true for Ms. Roske, given she has no criminal history and nothing to indicate she will recidivate. In fact, as Dr. Stejskal noted, Ms. Roske has several factors that suggest the opposite – that she is a *low* risk to offend. Exhibit 2, Dr. Stejskal Report at 14–15.

Of course, a "judge determining that § 3A1.4(b) over-represents 'the seriousness of the defendant's past criminal conduct or the likelihood that the defendant will commit other crimes' *always has the discretion under § 4A1.3 to depart downward in sentencing.*" *Meskini*, 319 F.3d at 92 (emphasis added); *see also Benkahla*, 501 F. Supp. 2d at 759 ("Without any prohibition or limitation, it is clear that the Commission did not intend to restrict a court's discretion with respect to criminal history downward departure under § 3A1.4.").[98] And there is a growing chorus of courts decrying the intransigent severity of the enhancement—especially in cases, like this one, where the defendant is summarily whisked from category I to VI. These include cases with serious and dangerous conduct.

Take, for example, Judge Hazel of this Court in *United States v. Hasson*, No. 8:19-cr-00096 (D. Md.). Mr. Hasson pleaded guilty to violating 18 U.S.C. § 922(g)(3) by possessing firearms as someone "who is an unlawful user of or addicted to any controlled substance," in addition to two firearm-possession counts and one misdemeanor count of simple drug possession. But that case was about much more than a simple firearms conviction: the government alleged that Mr. Hasson, a distinguished Coast Guard officer, had been stockpiling weapons and planning domestic terror attacks, including targeting specific members of Congress, all in service of a white supremacist ideology. *See id.* ECF 104.

At sentencing, the Court found § 3A1.4 applied. *Id.*, ECF 134 at 230-37. While agreeing that the enhancement properly increased Mr. Hasson's offense level, the Court balked at the concomitant increase in criminal history from category I to category VI. It departed downward, moving him back to Category I "for the fairly simple reason that that's his criminal history, *that*

---

[98] This, of course, includes the discretion to vary downward as well under 18 U.S.C. § 3553(a). And recent amendments passed by the Sentencing Commission and set to go into effect on November 1, 2025, essentially replace departures in favor of variances. U.S.S.C. 2024–2025 Amendment Cycle Simplification Amendment.

*the defendant has no criminal history.*" *Id.* at 237 (emphasis added). "It simply doesn't make sense," the Court concluded, "that [the enhancement] should impact his criminal history category." *Id.*

The judge in the high-profile case of *United States v. Fox*, No. 1:20-cr-00183 (W.D. Mich.), in which the defendant was convicted of participating in a militia plot to kidnap the Governor of Michigan, ruled similarly, calling the enhancement a "very rough instrument." *Id.* ECF 851, Sentencing Tr. at 28. The court disregarded § 3A1.4's criminal history enhancement because the court's task at sentencing is to determine "the overall seriousness of the wrongdoing and the overall seriousness of the offender's history, *because in the case of the terrorism enhancement the guidelines don't do the job.*" *Id.* at 30 (emphasis added). In the end, the court found unwarranted a move up to category VI since the defendant's actual history "would, apart from the terrorism enhancement, be category I, the lowest criminal history because he doesn't have any." *Id.* at 28-29.[99]

In *United States v. Alhaggagi*, 372 F. Supp. 3d 1005 (N.D. Cal. 2019), a Yemeni-American man was convicted of attempted material support for ISIS for engaging in boisterous talk on ISIS chatrooms, bragging to an undercover source, and being provided with fake explosives before backing off any further action. The district court applied the terrorism enhancement, but with serious reservations, noting that it "takes a wrecking ball to th[e] carefully constructed edifice [of the Sentencing Guidelines.]" *Id.* at 1013 (citing George D. Brown, *Punishing Terrorists: Congress, the Sentencing Commission, the Guidelines, and the Courts*, 23 Cornell J.L. & Pub. Pol'y 517, 520 (2014)). The enhancement's 12-level increase, the court noted, is no doubt based on the notion that "'terrorism'" is a serious crime. But a "defendant's *criminal history category* reflects something different." *Id.* (emphasis in original). "Automatically increasing a defendant's criminal

_____

[99] The defense did not object to the applicability of the enhancement, but rather sought a variance. *Id.* at 6.

history to reflect the seriousness of the charged offense is inappropriate, as it does not reflect—unlike every other offense—the seriousness of the defendant's previous criminal convictions." *Id.* The court therefore departed back to criminal history category I. *Id.*

It would be "illogical and unjust," *Alhaggagi*, 372 F. Supp. 3d at 1016 to place Ms. Roske's criminal history in category VI rather than category I. Indeed, as the Fourth Circuit reminds us, a "departure pursuant to § 4A1.3 is *encouraged*, provided that the criminal history category does not account adequately for the defendant's past criminal conduct or the likelihood that [s]he will commit other crimes." *United States v. Dixon*, 318 F.3d 585, 588 (4th Cir. 2003) (emphasis added). That is the case here: Ms. Roske is the "quintessential candidate for a downward departure" or a variance of the same degree  since for "an individual with no criminal record and no evidence of ever having committed an illegal act in h[er] life outside of the conduct for which [s]he is convicted, [category VI] clearly over-represents the seriousness of h[er] criminal history." *Benkahla*, 501 F. Supp. 2d at 759.[100]

**Second,** the same force of logic applies to the problems with the enhancement's increase of offense level just as much as with criminal history. Section 3A1.4 prescribes a one-size-fits-all approach, mandating a twelve-level increase in all terrorism cases, regardless of how blameworthy a particular defendant is. Few provisions in the Guidelines call for such an enormous enhancement; increasing a defendant's offense level so dramatically is fundamentally inconsistent with the theory underlying the Guidelines, which generally gradate punishment incrementally to reflect marginal increases in culpability. *See*, *e.g.*, U.S.S.G. § 2D1.1(c) (providing

---

[100] By contrast, the court in *United States v. Mason*, No. 1:08-cr-00047 (W.D. Mich.), determined that "absent the terrorism enhancement guideline, [defendant] would be placed in Criminal History Category I." But the court nevertheless concluded the defendant was "aptly placed in Criminal History Category VI, given her admission to the conduct which [wa]s contained in the presentence report which contain[ed] multiple felony offenses, both at the state and national level." ECF 201, Sentencing Tr. at 96.

escalating base offense levels—from 6 to 38—that increase gradually as the quantity of drugs involved in an offense increases) and U.S.S.G. § 2B1.1(b)(1) (providing a series of escalating offense levels in financial crimes based on the monetary loss by victims).

But courts have also pushed back against this undifferentiation in crafting sentences unique to the defendants in front of them.  As the *Fox* court reminded, "We have to calibrate as judges the overall seriousness of the wrongdoing [...] because in the case of the terrorism enhancement the guidelines don't do the job." *Fox*, ECF 851, Sentencing Tr. at 30. That court fully acknowledged the "incredibly serious" nature of the defendant's crime—conspiring to kidnap a government official—one that has an "impact on our overall governmental system." *Id.* at 29. Even then, after considering the specific offense conduct (including what was intended and what in fact happened) and the defendant's characteristics, the court varied downward from a Guidelines range of life and sentenced the defendant to 192 months. *Id.* at 40.

The same is true in the case of a domestic eco-terrorist who set off a bomb and burned down a research facility at Michigan State University. *United States v. Mason*, No. 1:08-cr-00047 (W.D. Mich.). That case, the judge noted, was "not about a prosecution for holding political viewpoints. [...] [The] case is about an abandonment of the marketplace of ideas in favor of reckless criminal activity where intimidation and fear replace persuasion and dialogue." *Id.* ECF 201, Sentencing Tr. at 102. Again, even so, the court found the full 12-level increase to offense level inappropriate because "the enhancement is without gradation." *Id.* at 103. The court therefore limited the increase to eight offense levels. *Id.*

Similarly, the sentencing court in *United States v. Garey*, 383 F. Supp. 2d 1374 (M.D. Ga. 2005), *aff'd*, 546 F.3d 1359 (11th Cir. 2008), varied downward from the Guidelines range of life in a case in which the defendant was convicted of threatening to bomb various buildings in and around Macon, Georgia. The court acknowledged "the wisdom in the policy underlying the

Sentencing Guidelines provision that increases a defendant's sentence when the defendant's offense is intended to affect the conduct of government by intimidation or coercion." *Id.* at 1380. But it nevertheless determined "that a twelve level increase, which represents approximately twenty-five percent of the total offense level, to be excessive." *Id.* at 1380. This was, in part, because it found troubling that "another defendant who carried out a threat to bomb public facilities, injuring and maiming (but not killing) thousands of people, would face the same sentence as this Defendant who did not cause physical injury to a single person" and would not "accomplish the purposes set forth in 18 U.S.C. § 3553." *Id.* at 1379.[101] Instead, the court decided that a more reasonable adjustment to the offense level would be a six-level increase—comparable to the greatest adjustment permitted when the victim of an offense is an "official victim" under U.S.S.G. § 3A1.2. *Id.*

> Simply put, the terrorism enhancement
>
> flies in the face of fair, individualized sentencing, and is inappropriate as to this Defendant. The presumption under U.S.S.G. section 3A1.4 is incompatible with 18 U.S.C. § 3553, which requires that a defendant be evaluated individually to justify his or her sentence.

*Alhaggagi*, 372 F. Supp. at 1015 (internal quotations omitted).[102]

---

[101] Indeed, someone who pleads guilty to first degree murder (without the terrorism enhancement) would have an OL of 40 and CHC I for an advisory sentencing guidelines range of 292-365, lower than Ms. Roske's current Guidelines range. *See* U.S.S.G. § 2A1.1.

[102] *See also United States v. Giampietro*, No. 2:19-cr-00013 (M.D. Tenn.), Sentencing Tr., ECF 440 at 42 (a § 4A1.3 case where the court stated: "Notwithstanding what the guideline range is, I need to recognize the reality. And that is that Ms. Giampietro is a first-time, first-ever any type of criminal behavior, serious criminal behavior that it is, but it's still the first time. I have to recognize there was no actual violence as a result of her actions. Although, I've already spoken that it's extraordinarily serious conduct. And I still have to nuance the 3553(a) factors, which I'm trying to do to the best of my ability. And that requires the Court to impose a sentence that's unique, and recognize that most sentencing judges and courts recognize there is no one-size fits all for any crime, including the one before the Court.").

### *2.    A guideline sentence would not promote respect for the law.*

The terrorism guideline's flaws, as explained above, do not just frustrate individualized sentencing, they also impact other parts of the § 3553(a) analysis. Overpunishing Ms. Roske by imposing a guideline sentence would not advance respect for the law. Rather, a guideline sentence would suggest the law is focused primarily on the category of the offense to the exclusion of the facts of the offense or the characteristics of the defendant. This approach would also suggest that the law is not concerned with the actual lived lives of defendants, but with more abstract concepts that bear little connection to people's understanding, from their own lives, that every individual is complex blend of strengths and flaws. In other words, respect for the law is advanced when the Court disregards the one-size-fits-all approach of § 3A1.4 and instead focuses on § 3553(a)'s list of Congressionally-mandated sentencing factors.

### 4.    <u>A wide range of authority supports a substantially downwardly variant sentence</u>

In addition to the § 3553(a) and policy considerations above, several other factors support the Court's imposing a 96-month sentence.

***First***, supervised release provides an important level of long-term assurance of public safety. Ms. Roske agrees with the PSR's recommended 25-year term of supervised release. She further has reviewed and consents to all the recommended statutory, mandatory, and recommended additional conditions of supervision.[103] Ms. Roske also consents to the government's requested additional condition of supervised release that bars her travel to the Washington, DC metropolitan area without prior approval of her supervising United States Probation Officer.

---

[103] Ms. Roske objected to the wording of Additional Condition 8, but subject to a revision of the condition consents to it.

These conditions, taken together, are significant. All of Ms. Roske's electronic communications will be monitored, she will be required to verify her participation in mental heath treatment, she will be required to verify her compliance her medication regimen, and she will be prohibited from possessing weapons. Due to her felony conviction, she faces a broad range of collateral consequences. Most relevant to public safety, 18 U.S.C. § 922(g) bars from Roske from ever possessing a firearm – even an inoperable one.[104] ████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████ Ms. Roske's parents are similarly confident that their daughter will do well with rules and structure.

**Second**, beyond its one-size-fits-all nature, the advisory sentencing guidelines range fails to account for offense characteristics that distinguish Ms. Roske's case. While she will qualify for a 3-level adjustment for her acceptance of responsibility, those 3 levels fail to capture to extent of her acceptance of responsibility. Nearly every defendant who pleads guilty prior to the government beginning trial preparation receives a 3-level adjustment for their acceptance of responsibility.

Few, if any, of those defendants abandoned their offenses, turned themselves in peacefully immediately after, and provided multiple, detailed confessions. Ms. Roske did. Ms. Roske's acceptance of responsibility should result in a variance beyond the 3-levels built in the guidelines.

---

[104] Ms. Roske, as a California resident, faces over 1,600 different collateral consequences due to her status as a felon. *See Collateral Consequences Inventory*, National Inventory of Collateral Consequences of Conviction. Available at:
https://niccc.nationalreentryresourcecenter.org/consequences

*See e.g.*, *United States v. Gardellini*, 545 F.3d 1089 (D.C. Cir. 2008) (where defendant convicted of filing false income tax return,  and guidelines 10-16 months, district court properly imposed sentence of probation in part because defendant "cooperated with authorities and accepted responsibility…to an extraordinary degree.");   *United States v. Milne*,  384 F.Supp.2d 1309 (E.D.Wis.2005) (in bank fraud case, advisory guidelines range of 18-24 months did not fully account for defendant's voluntary reporting of his misconduct to bank and his significant early efforts to repay bank); *United States v. Smith*, 311 F.Supp.2d 801 (E.D. Wis. 2004) (in crack-sale case, two-level downward departure from heartland of sentencing guidelines granted, even though defendant also received offense level reduction for acceptance of responsibility, where defendant demonstrated self- improvement, fundamental change in attitude, and complete withdrawal from criminal drug distribution lifestyle in three years before he was arrested and before he knew he was under investigation, and those post-offense, pre-arrest rehabilitative efforts had not been taken into account in formulating guideline range.).

Further, though Ms. Roske frames her sentencing request as a variance, her offense characteristics would have qualified for a departure even under the former mandatory guideline scheme. Section 5K2.16 permits a departure where

> [T]he defendant voluntarily discloses to authorities the existence of, and accepts responsibility for, the offense prior to the discovery of such offense, and if such offense was unlikely to have been discovered otherwise, a downward departure may be warranted. For example, a downward departure under this section might be considered where a defendant, motivated by remorse, discloses an offense that otherwise would have remained undiscovered. This provision does not apply where the motivating factor is the defendant's knowledge that discovery of the offense is likely or imminent, or where the defendant's disclosure occurs in connection with the investigation or prosecution of the defendant for related conduct.

Ms. Roske's actions on June 8 into June 9, 2022, are on all fours with § 5K2.16. She told the Court and Dr. Stejskal that she abandoned her attempt when she exited the taxi and saw the neighborhood. Exhibits 6A and 7A show Ms. Roske walking past her previous target without so

much as a glance. To the extent the government argues otherwise, the record does not support their assertions. Police responded to Ms. Roske's call, not a call from U.S. Marshals protecting the Justice's home. The Marshals did not approach Ms. Roske, who appears to be nothing more than a person walking through a quiet neighborhood after taking a taxi from the airport. In short, no law enforcement was pursuing her at the time she called 911.

Ms. Roske could have called a taxi to return to the airport. Ms. Roske could have disposed of her suitcase and checked herself into a hospital with a false story. She did neither. Instead, she called 911, disclosed her offense, and cooperated at every stage from her arrest through her two confessions.

*Finally*, the guidelines fail to account for Ms. Roske's status as a first offender and as a young defendant. As to the former, research consistently demonstrates that first-time offenders with Ms. Roske's characteristics – educational attainment, family and community support, the embrace of prosocial coping strategies – have low recidivism rates. *See, e.g.*, U.S. Sentencing Comm'n, Recidivism Among Federal Offenders: A Comprehensive Overview 18 (2016) (explaining that "consistent with its previous recidivism studies, the Commission's present study found that recidivism rates are most closely correlated with total criminal history points" and finding the lowest levels of recidivism for offenders with zero total criminal history points like Ms. Roske).

For the latter, Ms. Roske is young. She was just 26 the night of her arrest. ███████ "████████████████████████████████████████ The Sentencing Commission promulgated a revised guideline on age last year. *See* U.S.S.G. § 5H1.1. In it, the Commission acknowledged that "[t]he age-crime curve, one of the most consistent findings in criminology, demonstrates that criminal behavior tends to decease with age." In line with that finding is the guideline's policy statement that "Youthful individuals also are more amenable to

63

rehabilitation." *Id.* Ms. Roske's demonstrated amenability to mental health treatment accords with this find. And supports a variance.

## RECOMMENDATIONS TO THE BUREAU OF PRISONS

Ms. Roske asks the Court to include the following recommendations in the Judgment and Commitment Order:

1. The Court strongly recommends placement at FCI Terminal Island because elderly immediate family members including one with a Parkinson 's condition prevents them from traveling far distances. In addition, the court recommends a Department of Labor VT program for Baking and Federal Prison Industries (UNICOR). If the BOP cannot place Ms. Roske at Terminal island, the Court requests a detailed written response as to the reason for non-compliance.

2. That the reports of Dr. Bender, Dr. Grant, and Dr. Stejskal be included in the eDesignate package sent to the Bureau of Prisons. The Court recommends the Bureau of Prisons consult those reports, including Dr. Grant's medication recommendations, when coordinating Ms. Roske's care. The Court recommends participation in all appropriate mental health programs, including DBT.

## CONCLUSION

Ms. Roske engaged in very serious offense conduct. Crucially, she stopped short of causing harm to another person. Her actions resulted in large part from isolation and inadequately treated mental illness. But in her deepest moment of crisis she showed her humanity.

She is ashamed and remorseful. She is receiving adequate treatment now and has a plan for continued effective treatment once she rejoins her community. She has family and friends who have done serious work to understand what led Ms. Roske to commit this crime and how they can best support her.

A sentence of 96 months' imprisonment, followed by 25 years of supervised release is a significant life-altering sentence. Under this sentence, Ms. Roske will be under court supervision into her 50s. This sentence is sufficient but not greater than necessary to promote the purposes of sentencing.

Respectfully submitted,

James Wyda
Federal Public Defender
 for the District of Maryland

Andrew R. Szekely
Ellie Marranzini
Assistant Federal Public Defenders
100 South Charles Street
Tower II, 9th Floor
Baltimore, Maryland 21201
Phone: (410) 962-3962
Fax: (410) 962-3976
Email:  andrew_szekely@fd.org
         ellie_marranzini@fd.org